IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., and CONSUMER SERVICE ALLIANCE OF TEXAS, <br><br>                  Plaintiffs, <br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU and JOHN MICHAEL MULVANEY, in his official capacity as Acting Director, Consumer Financial Protection Bureau, <br><br>                  Defendants. | Civil Action No. 1:18-cv-295 |

## COMPLAINT

Plaintiffs Community Financial Services Association of America, Ltd., and Consumer Service Alliance of Texas allege, by and through their attorneys, on knowledge as to Plaintiffs and on information and belief as to all other matters, as follows:

1.      Small-dollar, short-term loans known as payday loans or payday advances provide a financial lifeline for millions of consumers who need access to funds and choose these products over other available forms of credit.  Currently, approximately twelve million Americans per year rely on payday loans to help with their financial needs.  Without payday loans, these consumers would be forced into vastly inferior and more costly alternatives, such as defaults on other debts, bounced checks, overdraft fees, and the use of unregulated and illegal underground sources of credit.  Consumers understand this, which is why they consistently and overwhelmingly praise the product and value the flexibility it provides.

2.      Yet rather than strengthen and protect access to this critical form of consumer credit, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") decided to virtually

eliminate it, and an entire industry, through its draconian final rule on payday, vehicle title, and certain high-cost installment loans (the "Final Rule").  The centerpiece of the Final Rule is an ability-to-repay requirement restricting payday loans to borrowers who have sufficient net income to satisfy all other financial obligations and repay the loan within its initial term—a limitation fundamentally inconsistent with the fact that consumers, many of whose income and expenses vary from one month to the next, use payday loans precisely *because* their net income in a particular month may be insufficient to satisfy their financial obligations.

3.      The Final Rule rests on unfounded presumptions of harm and misperceptions about consumer behavior, and was motivated by a deeply paternalistic view that consumers cannot be trusted with the freedom to make their own financial decisions.  In fact, the Bureau ignored and attempted to discount the available research showing that short-term, small-dollar loans result in *improved* financial conditions, not harm, because in many cases they are better than the alternative options available to consumers.  By effectively eliminating a critical form of credit for millions of borrowers who are in dire need of it, the Final Rule severely injures the very consumers the Bureau is charged with protecting.

4.      This fundamentally flawed rule is the product of a fundamentally flawed agency—one whose substantial power over the U.S. economy is unconstitutionally concentrated in a single, unaccountable and unchecked Director insulated from both the President and the Congress and hence from the people.  The Bureau's policies—including the Final Rule—are therefore those of the Director alone, without any mechanism of political accountability.

5.      Despite its vast authority and the far-reaching consequences of its actions, neither the Bureau nor its Director is supervised or directed by the President, who lacks the power to

remove and replace the Director (except for exceedingly narrow instances of misconduct), and thus lacks the ability to ensure that the Bureau's policies accord with his own.

6.     The Bureau is also free of control or influence by any other official elected by the people—thus further eliminating any accountability to the citizens it regulates and who possess the ultimate sovereignty in our constitutional republic.  This is because it takes federal government money without congressional appropriation:  The Director has exclusive authority to set the Bureau's budget at up to 12% of the Federal Reserve System's operating expenses (over half a billion dollars), a perpetual budget that is exempt even from mere review by the House and Senate Appropriations Committees.  As the Bureau itself puts it, this unfettered access to hundreds of millions of dollars in "funding outside the congressional appropriations process" ensures its "full independence" from Congress.

7.     The Bureau also wields unconstitutionally delegated legislative authority when it exercises—as it did in promulgating the Final Rule—its power to define unfair, deceptive, and abusive acts and practices ("UDAAP").  Congress lacks the constitutional authority to delegate to an agency the power to create generally applicable rules of private conduct, as it purported to do here.  Additionally, when Congress does confer decision-making authority upon an agency, it must lay down intelligible principles to which the agency is directed to conform.  Congress's delegation of UDAAP authority here, even with the Act's attempt at further definition, affords the Bureau discretion that is far too subjective and imprecise.  As former Director Cordray himself told Congress, the delegation of authority over "abusive" practices is "a little bit of a puzzle because it is a new term," which is "[p]robably not useful to try to define … in the abstract."

8.      Separately and in combination, the Bureau's freedom from presidential oversight and control, exclusion from the appropriations process, and exercise of delegated, standardless legislative power contravene established principles of the Constitution's separation of powers. Accordingly, the Bureau and all power and authority exercised by it—including the Final Rule— violate the Constitution.

9.      Even apart from these constitutional infirmities, the Final Rule and the rulemaking process that produced it suffer from several other critical flaws. For one, the Final Rule is fundamentally at odds with Congress's careful delineation of the Bureau's statutory authority. Congress set a clear boundary on the Bureau's powers by unequivocally declaring that the Bureau lacks the authority to establish a usury limit. The Final Rule flagrantly runs afoul of this statutory restriction by improperly targeting payday and other covered loans because of their alleged "high cost" and "unaffordability"—*i.e.*, because of their high interest rates. Likewise, Congress's express delegation of authority to impose an ability-to-repay requirement for other types of loans demonstrates that Congress intended to deprive the Bureau of the authority to impose such a requirement for short-term, small-dollar loans.

10.     The Final Rule is also unlawful because the Bureau misconstrues the statutory terms "unfair" and "abusive" and because, in any event, the Bureau lacks substantial evidence for its conclusions that payday and other covered loans are unfair and abusive. In equating reborrowing with substantial injury, the Bureau arbitrarily and capriciously assumes without evidence that the extended use of payday loans is harmful to consumers. In fact, the Bureau's assumption defies common sense and basic economic analysis. There is no evidence to support it and ample evidence to contradict it. The evidence that the Bureau had before it shows that payday loans and loan sequences provide net benefits, allowing cash-strapped and credit-starved

4

consumers to satisfy necessary expenses without resorting to more costly and less affordable alternatives.

11.     The Bureau also arbitrarily and capriciously presumes that consumers do not know or appreciate what they are doing when taking out payday and other covered loans.  This contention, too, defies reality and lacks evidentiary support.  Indeed, ample evidence demonstrates that consumers fully understand the costs and risks of these products, and choose to use them because their benefits outweigh their costs.

12.     The Bureau is required by statute to engage in a cost-benefit analysis before adopting a rule.  But the Bureau has done so here only on the most superficial level.  Among other problems, it has ignored numerous costs and benefits, failed to quantify others, and engaged in inconsistent reasoning.

13.     Over a million individualized comments opposing the rule and the Bureau's efforts to stamp out payday lending were submitted during the comment period by the very consumers the Bureau is charged with protecting, yet the Bureau brushed aside these objections in its zeal to finalize the rule.  Similarly, throughout the rulemaking process, the Bureau tellingly ignored its own evidence of consumer satisfaction with payday loans and failed to consult with any actual borrowers, at one point even telling an industry representative that the Bureau did not need to speak to borrowers.  But the Bureau may not enact a purported consumer-protection rule without properly taking the views of consumers into account.

14.     If permitted to go into effect, the Final Rule will effectively eliminate payday lending.  It prohibits the vast majority of payday loans currently made, and makes payday lending so unprofitable that few if any companies will be able to remain in the business, even to offer loans that the Bureau concedes are beneficial to consumers.

15. The Bureau's heavy-handed proposal is all the more arbitrary because numerous States employ alternative, less burdensome regulatory approaches, improperly ignored by the Bureau, that would adequately address the Bureau's concerns while preserving access to payday credit.

16. The Bureau's arbitrary and capricious disdain for small-dollar lenders is further demonstrated by its failure to impose the same restrictions on other financial products, offered by banks and credit unions, that are used by consumers in similar ways with similar consequences, such as overdraft protection, credit cards, and deposit advance products.

17. For these and other reasons set forth herein, the Final Rule is outside the Bureau's constitutional and statutory authority, as well as unnecessary, arbitrary, capricious, overreaching, procedurally improper, and substantially harmful to lenders and borrowers alike. Accordingly, Plaintiffs ask this Court to set aside the Final Rule under the Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ("APA").

## PARTIES

18. Plaintiff Community Financial Services Association of America, Ltd. ("CFSA") is a non-profit organization created in and existing under the laws of Maryland. CFSA is the national trade association for companies offering small-dollar, short-term payday loans and similar consumer financial products. CFSA was established in 1999 to promote laws and regulations that protect consumers while preserving their access to credit options, and to support and encourage responsible industry practices. In bringing this action, CFSA seeks to vindicate the interests of its members, who are engaged in the business of offering payday loans and similar consumer financial products, several of whom have extensive operations in Texas. CFSA's members are directly regulated and injured by the Final Rule. This lawsuit is germane

to the purpose of CFSA, which exists to preserve consumers' access to short-term credit options. CFSA's individual members are not indispensable to the proper resolution of the case.

19.     Plaintiff Consumer Service Alliance of Texas ("CSAT") is a non-profit organization created in and existing under the laws of Texas. It is headquartered and maintains its principal place of business in Austin, Texas.  CSAT is a trade association whose members are regulated, licensed Texas credit access businesses ("CABs") that obtain for consumers or assist consumers in obtaining extensions of consumer credit in the form of small-dollar, short-term deferred presentment transactions (*i.e.*, payday loans) and motor vehicle title loans.  CSAT advocates for the protection of financial choice based on personal responsibility and seeks to help ensure that Texans have access to short-term loans and other financial-services products in compliance with the law and responsible industry practices.  In bringing this action, CSAT seeks to vindicate the interests of its members, who are engaged in the business of obtaining for consumers or assisting consumers in obtaining payday and title loans, and who are thus directly regulated and injured by the Final Rule. This lawsuit is germane to the purpose of CSAT, which exists to preserve consumers' access to short-term credit options.  CSAT's individual members are not indispensable to the proper resolution of this case.

20.     Defendant Consumer Financial Protection Bureau ("CFPB" or the "Bureau") is an executive agency of the United States within the meaning of 5 U.S.C. § 105 and an agency within the meaning of the APA.

21.     Defendant John Michael Mulvaney is the Acting Director of the Consumer Financial Protection Bureau.  He is sued in his official capacity.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (waiver of sovereign immunity).

7

23.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1), because Defendants are an agency and an officer of the United States and plaintiff CSAT resides in this judicial district.

## STATEMENT OF FACTS

### A.     The Consumer Financial Protection Bureau

24.     In 2010, in response to the 2008 financial crisis, Congress enacted and President Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act.  Pub. L. No. 111-203 ("Dodd-Frank Act").  Title X of the Dodd-Frank Act is the Consumer Financial Protection Act of 2010 ("CFPA" or "Act").

25.     The Act's centerpiece was the establishment, "in the Federal Reserve System," of a new "independent" regulatory agency known as the Bureau of Consumer Financial Protection ("CFPB" or "Bureau").  The Bureau is charged with regulating individuals and entities that engage in offering or providing consumer financial products or services, including loans provided primarily for personal, family, or household purposes.

26.     As originally proposed by then-Professor Elizabeth Warren, the Bureau was to operate as a traditional multi-member independent agency. In the final legislation, however, Congress strayed from this well-established structure and instead provided, in Section 1011(b) of the Act, for a single "Director," appointed by the President with the advice and consent of the Senate, to "serve as the head of the Bureau."

27.     Section 1011(c) of the Act provides that the Director shall serve for a term of five years; an individual may serve as Director after the expiration of his term until a successor has been appointed and qualified; and the President may remove the Director only for cause, that is, "for inefficiency, neglect of duty, or malfeasance in office."  As a result, the President lacks the power to supervise or direct the Director in the exercise of his statutory authorities.

8

28.     Section 1017(a) of the Act requires the Board of Governors of the Federal Reserve System to periodically transfer "the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau," subject to a cap of 12% of the Federal Reserve System's operating expenses (over half a billion dollars).  The Act provides further that this perpetual budget is exempt even from mere "review by the Committees on Appropriations of the House of Representatives and the Senate."

29.     The Act delegates to the Bureau broad authority to create and enforce U.S. consumer protection laws.  The Bureau possesses the power to "prescribe rules or issue orders or guidelines pursuant to" nineteen distinct consumer protection laws whose implementation was transferred to the Bureau from seven different government agencies.  *See* CFPA § 1061(a), 12 U.S.C. § 5581(a).  The Bureau may pursue actions to enforce these consumer financial laws and its own regulations in federal court, as well as in administrative actions before administrative law judges, and may issue subpoenas requesting documents or testimony in connection with those enforcement actions.  CFPA §§ 1052–1054, 12 U.S.C. §§ 5562–5564.  The Bureau has the power to impose a wide range of legal and equitable relief, including restitution, disgorgement, money damages, injunctions, and civil monetary penalties.  *Id.*  The Bureau also has supervisory power over nondepository lenders, including those who offer or provide payday loans.  *Id.* § 1024, 12 U.S.C. § 5514.

30.     Section 1021(a) of the Act requires the Bureau to implement and enforce consumer financial law "consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products," and instructs the Bureau to ensure that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions."

31.     Section 1022(a) of the Act provides that, in exercising its rulemaking authority, the Bureau must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons … and the impact on consumers in rural areas."

32.     Section 1031(b) of the Act provides that the Bureau's rulemaking authority includes the power to "prescribe rules … identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service."  Section 1031(h) further provides that "[r]ules under this section may include requirements for the purpose of preventing such acts or practices."  This power to regulate unfair, deceptive, and abusive acts and practices is often referred to as the Bureau's "UDAAP" authority.

33.     Pursuant to section 1031(c) of the Act, "[t]he Bureau shall have no authority … to declare an act or practice … to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition."  Moreover, while "the Bureau may consider established public policies as evidence to be considered with all other evidence" in determining whether an act or practice is unfair, "[s]uch public policy considerations may not serve as a primary basis for such determination."

34.     Pursuant to section 1031(d) of the Act, "[t]he Bureau shall have no authority … to declare an act or practice abusive … unless the act or practice—(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or

service; or (2) takes unreasonable advantage of—(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."

35.     Section 1027(o) of the Act provides that the Bureau lacks the authority to impose any usury limits on the extension of credit.  It states:  "No provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit applicable to an extension of credit offered or made by a covered person to a consumer, unless explicitly authorized by law."

**B.     The Market for Payday Loans**

36.     A payday loan is small-dollar, short-term, unsecured loan based on a consumer's employment or other income.  While the concept of an individual getting a loan based on future income has been around for centuries, payday lending emerged in the 1990s as check-cashing businesses began offering the service of cashing post-dated checks or agreeing to defer presentment of cashed checks.  Today, thirty-five States permit—and regulate—payday lending.

37.     The modern payday-lending transaction is straightforward.  A borrower presents a lender evidence of a bank account and employment or other income.  The borrower writes a check for a set amount or authorizes an equivalent electronic withdrawal from his bank account, and receives a cash loan of some value less than the face value of the check or electronic-withdrawal authorization.  The payday lender promises not to cash the check or make the withdrawal for a short period of time, typically two weeks or a month.  After that time, the borrower may pay off the loan in cash or the lender may cash the check or make the withdrawal. The difference between the face value of the check or authorized withdrawal and the cash

received by the consumer represents the fee.  The typical payday transaction involves a loan of a few hundred dollars with a fee of $15 per $100 borrowed.  This charge reflects the cost and risks of extending this form of credit.

38.     At the end of the loan's term, a borrower may also have the option (depending on state law) of renewing, reborrowing, or rolling over the loan for another term for an additional charge.  The borrower typically pays the original fee at this time.  The Bureau refers to two or more payday loans taken in this manner as constituting a payday-loan "sequence."

39.     Payday lenders offering these transactions provide a valued service to underserved consumers.  Due to low profitability, mainstream financial institutions have largely vacated the small-dollar, short-term credit market, except for credit cards.  Yet credit cards are unavailable to a significant subset of the population, and those who do have credit cards may have no remaining unused credit line.  Left without access to commercial-bank credit, consumers with small, short-term credit needs must search for alternatives.  Those alternatives include, for example, tapping into savings (if any), borrowing from social networks, pawn loans, and incurring fees associated with existing accounts, such as bounced-check fees or late-payment fees.  Each of these types of credit has obvious drawbacks and consumers often do not have access to some types.  Many consumers, for example, lack savings to tap or do not enjoy social networks populated by people with liquid assets to lend.  Payday lending, by contrast, offers access to credit for consumers whose only resource is employment or other income, and it offers it on clear terms at nearby locations during convenient hours and on a quick timetable.  Indeed, payday lending is not only an available and attractive option for underserved consumers, it is often the most cost-effective option.

40.     By providing a source of credit to consumers with low credit scores and no viable alternatives, payday loans expand financial choices and allow individuals and households to better manage their cash flow in the face of volatile income and expenses.  This in turn enables these consumers to avoid more costly alternatives, such as pawnbrokers, bank overdraft services, credit-card cash advances, over-the-limit credit-card fees, late-payment fees, utility-reconnection fees, and the like.  Thus, restricting payday lending as an option for financially stressed consumers will make them worse off and force them to use inferior and less-preferred types of credit, such as pawnshops, or to go without credit.

41.     Numerous studies demonstrate that consumers will substitute inferior and more costly alternative forms of credit when they lack access to payday loans.  In States that have banned payday loans, the reduction in payday borrowing leads to increases in pawn loans.  Consumers subject to payday-loan bans also bounce more checks and pay more bank overdraft fees.  When Georgia and North Carolina banned payday lending, for example, the number of bounced checks skyrocketed.  According to a Federal Reserve Board study, the number of consumer bankruptcies also increased.

42.     These alternative forms of credit are both more expensive and have equivalent or higher annual percentage rates ("APRs") than payday loans.  Pawn loans in many states, for example, have an average fee of $20 for each $100 borrowed, which translates to an APR of about 250 percent.  And pawn shops are especially unappealing to many consumers because, even if their cost is comparable to payday loans, they require the borrower to part with valuable personal property that is forfeited upon default.

43.     Similarly, overdraft fees are often more expensive than payday credit.  A single overdraft charge is typically $50 (generally comprising $25 to the merchant and $25 to the bank),

which is substantially more than $15 for a $100 payday loan.  One study estimated that a subset of households saves about $43 million per year in returned-check fees when States permit payday lending.  Not only are overdraft fees more expensive than payday credit, but so is the overdraft "protection" offered by most banks.  The Bureau itself has observed that one common overdraft scenario, involving a $34 finance charge on an overdraft of $24 borrowed for three days, carries an APR of 17,000%.  The ability to charge these enormous fees has discouraged credit unions and banks from offering payday loans, and consumers have thus turned to payday lenders for their less expensive product.

44.    The same is true of revolving credit and credit-card cash advances:  consumers forced to engage in greater use of revolving credit likely end up paying even higher costs for credit and run into greater financial difficulty.  For revolving credit, financially stressed consumers frequently find themselves pushed toward credit-line maximization and difficulty in meeting payments, thereby triggering repeated over-the-limit fees, late fees, and other behavior-based fees.  And for credit-card cash advances, consumers fare even worse, showing a much higher rate of missed payments on mainstream credit loans than those who use payday loans.

45.    Restricting access to payday loans hurts consumers in other ways as well.  Without access to such loans, consumers are forced to miss required payments or to default on their other debts, giving rise to various collateral consequences, including late fees on utility bills or termination of crucial utility services, loss of bank accounts, and loss of a vehicle due to missed car payments or inability to pay for repairs.  Further, unlike payday-loan defaults, which typically are not reported to the national credit bureaus, missed payments on other loans and invoices can damage the consumer's formal credit standing, making it even more difficult for the consumer to obtain credit and substantially harming his or her long-term financial health.

14

46.     Finally, consumers lacking access to payday loans may turn to underground sources of credit, including illegal, unregulated lenders and criminal loan sharking, with its associated threats of violence.  Research in the United States confirms that where payday credit has been restricted, consumers turn to online and unlicensed lenders.  Similarly, research on foreign countries has shown that when access to consumer credit is restricted, many consumers will turn to illegal lending markets.  Not surprisingly, borrowing from illegal lenders comes at a much higher cost than a payday loan, and collections by illegal lenders rest on threats, intimidation, violence, and forms of exploitation, including demands for sexual favors.

47.     It is unsurprising, therefore, that payday borrowers praise the product and the companies who offer it in overwhelming numbers.  The Bureau's own "Tell Your Story" and consumer-complaint portals demonstrate the overwhelmingly positive reaction of borrowers.  Nearly all of the stories submitted to the "Tell Your Story" portal on payday lending and similar products are positive.  The Bureau receives a minuscule number of complaints related to regulated, storefront payday lenders, far fewer than complaints about other products and services monitored by the Bureau.  Social-science studies showing widespread borrower satisfaction confirm that an overwhelming number of borrowers are satisfied with the product.

48.     A substantial amount of evidence confirms that access to payday loans does not harm consumers, but rather improves consumer financial health.  These studies demonstrate that restricting access to payday loans injures consumers in various ways, including by increasing the number of bounced checks, or causing troubles with debt-collection agencies, delinquency on other accounts, mortgage foreclosures, bankruptcies, late payment of bills, and unemployment.  They likewise show that consumer access to payday loans has no negative effect on various measures of consumer financial health.

49.     Empirical research also shows that payday borrowers understand the nature of the product, including that their payday-loan indebtedness may last longer than the two-week or thirty-day initial term of the loan, and accurately predict how long it will take to repay their loans.  Consumers thus fully understand and act in their own interests.

50.     Under Texas law, consumers obtain payday, title, and similar small-dollar, short-term loans via regulated, licensed credit access businesses ("CABs") that obtain or assist consumers in obtaining loans made by independent third-party lenders.  The CABs, rather than the lenders, maintain storefront locations, assist in qualifying borrowers, typically service and collect the loans for the lenders, and may also guaranty the loans.  *See* 82 Fed. Reg. 54,472, 54,486, n.140 (Nov. 17, 2017).  Consumers pay a fee to the CAB and interest on the loan capped at 10% per annum.  According to the Bureau, the loans produced by such arrangements are functionally the same as those issued by a single entity.  *Id.* at 54,534–35.

## C.      The Rulemaking Process

51.     Despite the popularity and benefits of payday loans, the Bureau upon its formation promptly targeted them for elimination because of their high interest rates.

52.     In developing and promulgating the Final Rule, the Bureau acted with an unalterably closed mind toward the preordained result of shutting down the payday-lending industry.

53.     In targeting payday loans, the Bureau took its marching orders from special-interest groups opposed to payday lending, including Pew Charitable Trusts ("Pew") and the Center for Responsible Lending ("CRL").  *See, e.g.*, Anna Palmer, *Emails reveal consumer protection agency's cozy ties*, Politico, Nov. 19, 2015, *available at* goo.gl/DRCiTV.  Among other things, the Bureau's proposed rule followed a literal outline given to it by CRL, and the Bureau later acceded when CRL directed it to speed up issuance of a final rule by abandoning

16

certain provisions addressing longer-term installment lending.  At the same time, the Bureau cast aside independent studies submitted by payday lenders and neutral third parties—a strong indication, in itself, that the agency's preferred conclusions are not supported by evidence.

54.     On June 2, 2016, the Bureau published a notice of proposed rulemaking that proposed to impose underwriting and other requirements on the extension of payday loans, vehicle-title loans (*i.e.*, loans secured by an interest in a vehicle), and installment loans with high interest rates.  *See* 81 Fed. Reg. 47,863 (July 22, 2016).  Although the Bureau accepted comments on the proposed rule during a four-month window ending in October 2016, the result of the rulemaking was a foregone conclusion:  the elimination of longstanding payday (and vehicle-title) lending practices relied on by millions of customers, based on the Bureau's ideological and highly paternalistic view that these products are too expensive and that customers cannot be trusted with the freedom to make their own financial decisions.

55.     Despite receiving substantial criticisms of the proposed rule from various constituents, as well as more than 1.4 million comments overall, the Bureau rushed the proposed rule to completion less than one year after the close of the 2016 comment period.  The Final Rule was published in the Federal Register on November 17, 2017.  *See* 82 Fed. Reg. 54,472 (Nov. 17, 2017).

**D.     The Final Rule**

56.     The principal element of the Final Rule is the imposition of an ability-to-pay requirement applicable to consumer loans, including payday and vehicle-title loans, with a contractual duration of forty-five days or less.  *See* 12 C.F.R. § 1041.4 ("It is an unfair and abusive practice for a lender to make covered short-term loans … without reasonably determining that the consumers will have the ability to repay the loans according to their terms.").  Pursuant to this requirement, a lender may not extend a covered short-term loan unless

17

it makes a "reasonable determination" that the consumer can make payments for major financial obligations (housing expense, debt obligations, including those under other covered loans, child-support obligations, and alimony), make all payments under the loan (*i.e.*, principal, interest, and fees), and meet basic living expenses (*e.g.*, food, utilities, transportation to work, daycare for dependent children), during the term of the loan and for thirty days thereafter. *Id.* § 1041.5(b).

57.     Moreover, because the Bureau, guided by Pew and CRL, asserts that reborrowing is an indication that the consumer lacks the ability to repay the loan, the Final Rule prohibits lenders from making a covered short-term loan if it would be the fourth loan in a sequence. *Id.* § 1041.5(d)(2).  (The Final Rule deems a covered loan part of a sequence if it is made during the term of, or within thirty days after, a prior covered loan. *Id.* § 1041.2(a)(14).)  Loans are thus capped at three in a row followed by a mandatory thirty-day cooling off period, during which time no additional loans may be made. *Id.* § 1041.5(d)(2).  In addition, the Bureau will "view extensive re-borrowing, as observed through the lender's performance metrics, as an indicator that the lender's ability-to-repay determinations may not be reasonable."  82 Fed. Reg. at 54,631.

58.     The Final Rule permits lenders of payday (but not title) loans to comply with alternative requirements in lieu of the ability-to-pay requirements.  Under this so-called "conditional exemption" to the ability-to-repay requirements, lenders are required, through the use of a registered information system, to verify the consumer's borrowing history and confirm that the consumer does not have, and over the preceding thirty days has not had, any outstanding covered loans, and that the loan will not result in the consumer having more than six covered loans or being in debt for more than ninety days during a twelve-month period.  12 C.F.R. § 1041.6.  If a consumer meets these requirements, a lender is permitted to make (or roll over) up to three loans in a sequence without an ability-to-pay determination if the principal amount of the

first loan does not exceed $500; the principal amount of the second loan does not exceed two-thirds of that of the first loan; and the principal amount of the third loan does not exceed one-third of that of the first loan.  *Id.* § 1041.6(b).  Lenders must make specified written disclosures in connection with these loans, including, at time of first loan, notice of the restriction on principal amount and the restrictions on the number and principal amounts of future loans, and, at the time of the third loan, notice of the restriction on principal amount and the thirty-day cooling off period.  *Id.* § 1041.6(e).  A lender may not rely on this conditional exemption if a borrowing-history report is unavailable because, for example, no entity has been registered as an information system.  82 Fed. Reg. at 54,779.

59.     Similar ability-to-repay requirements apply to longer-term balloon-payment loans. 12 C.F.R. § 1041.5.  However, the Final Rule exempts from its ability-to-repay requirements "accommodation loans"—which the Bureau describes as "occasional small loans on an accommodation basis" made by "[s]ome depository institutions, particularly community banks and credit unions" "to their customers."  82 Fed. Reg. at 54,494.  To qualify for the exemption, the lender and its affiliates collectively must have made no more than 2,500 covered loans in each of the current and preceding calendar years, and derived no more than 10% of their receipts from covered loans during the most recent completed tax year.  12 C.F.R. § 1041.3(f).  Through this provision, the Final Rule permits banks and other depository institutions to offer loans, similar to payday loans, known as deposit advance products.

60.     The Final Rule also prohibits, as an unfair and abusive practice, lenders of certain loans (including payday loans, vehicle-title loans, and longer-term installment loans with an APR greater than 36%) from attempting to withdraw payment from a consumer's account after the

lender's second consecutive attempt to do so has failed due to a lack of sufficient funds, without obtaining a new, specific authorization from the consumer.  12 C.F.R. §§ 1041.7–.8

61.     The Final Rule also requires disclosures to consumers of payment-transfer attempts, *id.* § 1041.9; mandates the use of new credit reporting systems, *id.* §§ 1041.10–.11; imposes new compliance and record-keeping requirements, *id.* § 1041.12; and prohibits actions taken with the intent to evade any requirements of the rule, *id.* § 1041.13.

62.     The Final Rule greatly increases the costs to payday lenders of doing business by imposing a slew of very costly operational requirements on lenders, including costs related to hiring new employees and investing in systems to comply with the Bureau's ability-to-repay requirements; furnishing and obtaining information from registered information services; and complying with the Final Rule's onerous record-retention obligations.

63.     More significantly, the Final Rule will reduce dramatically the supply of credit by prohibiting the vast majority of payday loans that are currently made.  This in turn would make payday lending so unprofitable that it would virtually eliminate the entire payday-loan industry, killing off hundreds of small businesses, eliminating thousands of jobs, and denying access to this form of credit to millions of consumers who rely on it, including those who the Bureau concedes benefit from payday loans.

64.     The Bureau itself has conceded that the Rule's draconian requirements will prohibit the vast majority of payday loans that are currently made.  The Bureau's own simulations project that the reborrowing restrictions imposed by the ability-to-repay requirements—requirements that by design are virtually impossible to meet—alone will cause storefront payday-loan volumes to decrease dramatically, by between 60% and 81%.  81 Fed. Reg. at 48,122.  This is *in addition to* the significant reductions in loan volumes that will be

caused by the application of the ability-to-repay requirement to the first loan in a sequence.  *Id.*
The Bureau's own estimates are that only one-third or fewer of payday borrowers will be able to
satisfy those ability-to-repay requirements.  *Id.* at 48,125.  Indeed, the Bureau concedes that the
ability-to-repay requirements are so draconian that storefront payday lenders will be forced to
eschew the ability-to-repay approach altogether and make loans "primarily" using the alternative
requirements of the conditional exemption.  *Id.* at 48,121.  But the Bureau estimates that under
the alternative requirements, loan volumes will decrease by between 55% and 62%.  *Id.* at
48,122.  And if a registered information service is unavailable, so is this alternative approach.  82
Fed. Reg. at 54,779.

      65.    The Bureau's simulations underestimate the full effect on loan volumes that
would follow implementation of the Final Rule.  Among other things, they improperly assume
that consumers will not alter their behavior in response to the Final Rule, including that
consumers will continue to borrow in the maximum amounts and durations permitted by the
Final Rule (and, in particular, by the alternative requirements of the conditional exemption), even
though those loans will no longer be adequate to meet the consumers' demanded amount or term,
and that consumers will not immediately seek to substitute into other products, including illegal
forms of credit, that completely fulfill their requirements.

      66.    Other studies confirm that the Bureau's already dramatic assessment of the Final
Rule's devastating impact is too low.  One study conducted after the Bureau proposed its rule
found that the rule's ability-to-repay requirement would lead to a 90.5% to 92.7% decline in loan
volumes, while the alternative requirements of the Final Rule's conditional exemption would
reduce loan volumes by 81.7%.  A second study concluded that the rule would result in a
reduction in the supply of credit of 82.5%.

67.     Of course, the most significant consequence of this vast elimination of credit from the marketplace is that the consumers who rely on it will no longer have access to it.  Moreover, lenders who are no longer permitted to offer this credit will suffer severe revenue losses, making it impossible for them to stay in business and thereby eliminating even those payday loans that the Final Rule by its terms does not prohibit.

### COUNT ONE

### THE BUREAU VIOLATES THE SEPARATION OF POWERS AND THE RULE THEREFORE IS UNCONSTITUTIONAL AGENCY ACTION

68.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

69.     Actions taken by an officer or agency that violate the Constitution's separation-of-powers protections are invalid.  *Ryder v. United States*, 515 U.S. 177, 182–83 (1995).  Private plaintiffs have the right to equitable relief to restrain government action that violates separation-of-powers principles.  *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

70.     In addition, the APA forbids agency action "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

71.     The Constitution provides that "[t]he executive Power shall be vested in a President," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 2.  These provisions vest all executive power, including the power to enforce the law, in the President of the United States.  It is unconstitutional for Congress to vest executive power in officers who are not removable by, and hence not accountable to, the President.  *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 119 (1926).  The sole exception to this rule applies only in the case of certain independent commissions headed by

bipartisan, multimember bodies (such as the Federal Trade Commission).  *See Humphrey's Executor v. United States*, 295 U.S. 602, 632 (1935).

72.    As set forth above, the Bureau exercises wide-ranging executive power that is insulated from Presidential supervision or control.  The Bureau exercises its powers through a single presidentially appointed Director—not a bipartisan multimember commission—who may only be removed by the President "for cause," that is "for inefficiency, neglect of duty, or malfeasance in office."

73.    This for-cause removal restriction enables the Bureau to exercise wide-ranging, core executive power immune from Presidential oversight, and impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives.  As a result, the Board, as well as its implementation of its delegated responsibilities under the Act through rulemaking and otherwise, violates the separation of powers.

74.    The Constitution further provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const., art. I, § 9, cl. 7.

75.    The Bureau takes federal government money without an appropriations act:  The director has exclusive authority to set the Bureau's budget at up to 12% of the Federal Reserve System's operating expenses (over half a billion dollars), *see* CFPA § 1017(a)(2)(A), 12 U.S.C. § 5497(a)(2)(A), a perpetual budget that is exempt even from mere "review by the Committees on Appropriations of the House of Representatives and the Senate," *id*. § 1017(a)(1)–(2), 12 U.S.C. § 5497(a)(1)–(2).  Both separately and in combination with the provisions shielding the Bureau from executive supervision, this improper insulation from congressional supervision renders invalid any assertion of the Bureau's regulatory authority.

76.     For these reasons, the Bureau is unconstitutionally regulating plaintiffs, so the Final Rule must therefore be invalidated and enjoined.  In addition, the Final Rule is contrary to constitutional right, power, privilege, or immunity, and must therefore be set aside.

## COUNT TWO:

## THE RULE VIOLATES THE NONDELEGATION DOCTRINE

77.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

78.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const., art. I, § 1.  This provision vests all legislative power in the Congress of the United States.

79.     By virtue of its grant of legislative authority to the Bureau under the Act's provisions for prescribing rules identifying as unlawful unfair, deceptive, or abusive acts or practices, and its lack of an intelligible principle to which the Bureau is directed to conform in the exercise of that authority, the CFPA unconstitutionally delegates legislative power to an administrative agency.

80.     For this reason, the Final Rule unconstitutionally regulates plaintiffs and must therefore be invalidated and enjoined.  In addition, the Final Rule is contrary to constitutional right, power, privilege, or immunity, and must therefore be set aside.

## COUNT THREE

## AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY

81.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

82.     The APA forbids agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

83.     The Final Rule exceeds the Bureau's statutory authority in numerous respects.

84.     *First*, the Final Rule's identification of unfair and abusive lending practices conflicts with the express limitations on the Bureau's authority to declare an act or practice unfair or abusive as set forth in section 1031 of the CFPA, 12 U.S.C. § 5531.

a.      In order to be classified as "unfair," a practice must be "likely to cause substantial injury" that is "not reasonably avoidable by consumers."  CFPA § 1031(c)(1)(A), 12 U.S.C. §  5531(c)(1)(A).  Offering consumers a voluntary choice to obtain a payday or title loan (and to permit the withdrawal of loan payments from a consumer's bank account) based on fully disclosed terms cannot be considered likely to inflict "substantial injury" on consumers since it does nothing but increase the financial options available to them.  To the contrary, a consumer's free and informed choice to obtain such a loan under fully disclosed terms is highly likely to confer a substantial *benefit* on the consumer, because it strongly indicates that the loan is a better option than any of the available alternatives.  But in any event, any "injury" caused by payday or title loans is plainly "reasonably avoidable" because consumers are entirely free to simply refuse to take out such loans at their own discretion.  As long as consumers have a free and informed choice, the amount of effort required to "avoid" the supposed "injury" cannot be considered "unreasonable," because it does not require any effort whatsoever for a consumer to avoid taking out a loan.

b.      In order to be classified as "abusive," a practice must meet one of two conditions:  It must either (1) interfere with a consumer's "ability . . . to understand a term or condition," or (2) take unreasonable advantage of the consumer's (A) "lack of understanding . . . of the material risks, costs, or conditions," or (B)  his "inability . . . to protect [his] interests," or his (C) "reasonable reliance" on the lender to "act in the

interests of the consumer."  CFPA § 1031(d), 12 U.S.C. § 5531(d).  These statutory criteria ensure that payday and title loan terms are fully disclosed and reasonably understood in order to facilitate a fair arms-length transaction between lenders and the consumers.  By contrast, the Final Rule prohibits lending practices as "abusive" *regardless* of whether the consumer fully understands all of the terms, risks, conditions, and costs; *regardless* of whether the consumer is fully able to protect his interests by evaluating the relative costs and benefits; and *regardless* of whether the consumer has reasonably relied on the lender to act in his best interest.  Instead, the agency has apparently construed the notion of consumer "understanding" to require a sophisticated knowledge of complex economic studies and industry-wide market dynamics, which would effectively allow the Bureau to prohibit *any* financial product on the ground that consumers are not sophisticated enough to "understand" their financial options.

85.     *Second*, Congress set a clear boundary on the Bureau's authority by unequivocally prohibiting the Bureau from "establish[ing] a usury limit."  CFPA § 1027(o), 12 U.S.C. § 5517(o).  The Final Rule violates this command because it improperly targets what the Bureau deems to be "high-interest" loans; results from the Bureau's improper consideration of the cost of credit; determines the legal status of certain covered loans based solely on their interest rate; and, at bottom, rests on the Bureau's view that covered loans are harmful to consumers because of their high interest rates.

86.     *Third*, the Bureau lacks statutory authority to impose an ability-to-repay requirement.  An agency may not disrupt an established regulatory framework absent a clear congressional command.  American law has long eschewed any legal requirement that lenders assess consumers' ability to repay extensions of consumer credit or otherwise evaluate the

appropriateness of credit for a consumer.  In those few instances where Congress has authorized imposition of an ability-to-repay requirement, such as for certain mortgages and credit-card payments, it has done so clearly.  In stark contrast, there is nothing in the Dodd-Frank Act authorizing the Bureau to impose an ability-to-repay requirement in the field of consumer credit. Without such an authorization, the Bureau simply is not delegated the power to impose an ability-to-repay requirement.

87.     *Fourth*, the Final Rule violates Congress's statutory command that public policy considerations may not serve as a primary basis for an unfairness determination and may not be considered at all in determining whether an act or practice is abusive.  *See* CFPA § 1031(c)–(d), 12 U.S.C. § 5531(c)–(d).  In violation of these statutory commands, the Final Rule's UDAAP analysis is infused with, and ultimately turns on, public-policy considerations about the undesirability of expensive small-dollar loans.

88.     *Fifth*, the Bureau's effort to stamp out a lawful, highly regulated product exceeds the Bureau's statutory UDAAP mandate.  An agency may not prohibit a particular product when the premise of congressional lawmaking is that the product will be sold in the marketplace.  By expressly authorizing the supervision of entities that offer or provide "payday loan[s]," CFPA § 1024(a)(1)(E), 12 U.S.C. § 5514(a)(1)(E); by requiring the Bureau to act with the purpose of ensuring that all consumers have access to credit and can make their own responsible decisions about financial transactions; and by empowering the Bureau to prevent practices, not products, Congress's plain premise is that payday and title loans will continue to be available to consumers who need them.  Yet the Final Rule has the purpose and effect of fundamentally altering the payday- and title-loan products and eliminating them from the marketplace.

89.     *Sixth*, the Final Rule is not a valid exercise of the Bureau's general rulemaking authority because the Final Rule is not "necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof."  CFPA § 1022(b)(1), 12 U.S.C. § 5512(b)(1).

90.     For these reasons, the Final Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and the Final Rule must therefore be set aside.  5 U.S.C. § 706(2)(A).

## COUNT FOUR:

## ARBITRARY AND CAPRICIOUS RULEMAKING IN VIOLATION OF THE APA

91.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

92.     The APA forbids agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

93.     Under this provision of the APA, a court must set aside a rule if the agency's decision is unsupported by substantial evidence or if the agency has made a clear error in judgment.  *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).

94.     The Bureau's unfairness and abusiveness determinations are unsupported by substantial evidence and reflect a clear error in judgment.

95.     The Bureau's unfairness determination rests on its assertion that covered short-term loans, as currently marketed without an ability-to-repay determination, cause or are likely to cause four types of substantial injuries to consumers:  "default, delinquency, re-borrowing, and the collateral consequences caused by making unaffordable payments."  82 Fed. Reg. at 54,591. None of these asserted harms is supported by substantial evidence.  To the contrary, the Bureau's conclusions rest on various suppositions and erroneous presumptions about consumer harm.

96.     *First*, in equating reborrowing with substantial injury, the Bureau arbitrarily and capriciously assumes without evidence that the extended use of covered short-term loans is harmful to consumers.  Indeed, the Bureau failed to conduct any research on whether reborrowing causes consumer harm—a telling omission given that reborrowing is the central purported harm addressed by the Final Rule.  The Bureau also wrongly refused to assess as part of its injury analysis whether the risks and costs of the loan are likely to be outweighed by the corresponding *benefits* to the consumer in the typical loan transaction.  The Bureau's failure to establish substantial injury is alone sufficient cause for setting aside the Final Rule.  In fact, the available evidence, ignored by the Bureau, shows that payday loans generally, as well as loan sequences that result from reborrowing, provide net benefits, allowing cash-strapped and credit-starved consumers to satisfy necessary expenses without resorting to more costly and less affordable alternatives.

97.     *Second*, the Bureau mischaracterizes the allegedly harmful consequences of payday-loan defaults and delinquencies.  Moreover, these alleged harms (*e.g.*, injuries related to debt collection and bank fees for failed ACH payments) are caused by third parties involved in repayment and collection efforts, and it is arbitrary, capricious, and unreasonable for the Bureau to restrict the *availability* of small-dollar loans because of perceived abuses by non-lenders.

98.     *Third*, the Bureau lacks any evidence that the "collateral consequences" it identifies are caused—rather than mitigated—by payday loans.

99.     The Bureau's unfairness determination further rests on the claim that the asserted substantial injuries are not reasonably avoidable by consumers.  But the Bureau's assertion that there are obstacles to the free exercise of consumer decision-making is speculative, unreasonable, and contradicted by the available evidence.  Here, too, the Bureau failed to

29

conduct any research to support its claim that consumers are forced to reborrow on their existing loans, and the only actual research on this point establishes the opposite.

100.     The Bureau's unfairness determination further rests on the claim that the asserted substantial injuries are not outweighed by countervailing benefits to consumers or to competition.  The Bureau's analysis here makes three basic errors: (1) the Bureau arbitrarily assigns excessive weight to the asserted injuries, (2) it ignores the benefits to consumers of payday and title lending, and (3) it ignores the benefits to competition from current lending practices.

101.     The Bureau also lacks substantial evidence for its claim that making a payday or title loan without satisfying the Final Rule's ability-to-repay requirements is abusive because (1) consumers do not understand the material risks and costs of such loans, (2) borrowers are unable to protect their own interests because they are financially vulnerable, and (3) lenders take unreasonable advantage of these consumers through a business model that profits from reborrowing activity. On all three of these points, the evidence relied on by the Bureau strongly points to the precise opposite of what the Bureau concluded.

102.     The Final Rule is also arbitrary and capricious because the Bureau's actions are internally inconsistent.  Under the Bureau's rationale, consumers are "harmed" to an even greater degree by higher-cost alternative short-term credit solutions like overdraft protection and credit-card late fees and by longer-duration loan products.  However, not only has the Bureau failed to take any action to restrict those products, but the Final Rule will cause consumers to use them instead of payday loans.  Additionally, the Final Rule's exemption for "accommodation loans" (*i.e.*, deposit advance products) arbitrarily and capriciously exempts banks and credit unions from the restrictions imposed on non-bank lenders.

103.    An agency action is also arbitrary and capricious if the agency either fails to provide a reasoned explanation for its action or has "entirely failed to consider an important aspect of the problem" being regulated. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

104.    The agency has failed to engage in any reasoned explanation in support of the draconian inability-to-repay requirements imposed by the Final Rule.  It points to no empirical studies showing that payday borrowing or reborrowing results in worse consumer outcomes compared to outcomes for consumers in the same financial circumstances who choose not to use or do not have access to payday loans.  It uses no reliable studies of consumers of payday loans.  Nor does it make any real attempt to compare consumer-welfare outcomes between states that allow payday lending and those that prohibit or restrict it.  And it fails to assess how many payday borrowers are injured, and in what magnitude, compared to the alternative scenario in which payday lending were not available to them.  These failures make it impossible for the Bureau to have reached any reasoned conclusion about the overall consequences of the Final Rule.

105.    The Bureau has also entirely failed to consider multiple important aspects of the purported "problem" of payday lending.

106.    First, the Bureau has ignored abundant evidence showing that consumers rely on payday loans and loan sequences for their own substantial benefit and would shift to far worse alternatives if these products were unavailable. As discussed above, consumers use payday loans because they need access to credit, and rationally choose payday loans and payday loan sequences because they are superior to other available alternatives.  If payday loans are banned or severely restricted, then consumers will turn to other inferior and more costly alternatives,

such as pawnbrokers, illegal loan sharks, and unregulated and unlicensed lenders, or suffer the negative consequences of an inability to pay expenses, such as overdraft fees for bounced checks, late fees for missed payment of bills, and reactivation fees to restore services terminated as a result of non-payment or late payment.  The Bureau has utterly failed to consider this aspect of the purported problem, pretending instead that payday lending practices are somehow the *cause* of consumers' financial woes instead of an effective part of a market-based *solution* that is far superior to the available alternatives.

107.    Second, despite claiming to be acting in the interests of consumers, the Bureau failed to give any consideration to the views and desires of actual borrowers who rely on the services that will be eliminated by the Bureau's new regulations.  Instead, in its paternalistic rush to judgment, the Bureau has relied on abstract, preconceived, ivory-tower theories about consumer behavior, without consulting any actual consumers who will be dramatically harmed— and whose freedom will be dramatically curtailed—by the Bureau's rulemaking.  And in disregarding the views of over one million consumers who submitted comments opposing the Final Rule, the Bureau blithely asserts that its rulemaking is "not designed" to be governed by "majority sentiment."  82 Fed. Reg. at 54,518.

108.    Third, in its haste to eliminate a critical source of credit for millions of consumers, the Bureau has failed to consider whether the problems it identifies can be addressed through alternative measures that mitigate or ameliorate unnecessary, harmful burdens.  In particular, the Bureau has failed to consider whether any lack of consumer understanding that may exist regarding the costs and risks of payday and title loans could be addressed through an enhanced disclosure regime.  Disclosure is the backbone of federal consumer credit law, from the Truth in Lending Act to the CFPA, and yet the Bureau has made no attempt to explain why disclosure

requirements that are sufficient in a host of other financial-services contexts are somehow insufficient in this context.  At the same time, the Bureau has failed to consider the various approaches to short-term lending currently followed by at least thirty-five states, which are far less draconian than the Final Rule but nevertheless succeed in addressing the Bureau's purported concerns.  The Bureau has also failed to consider addressing consumers' underlying need for credit by making educational efforts and encouraging saving among vulnerable populations instead of regulating their best financial options out of existence.  And finally, the Bureau has failed to consider whether it could obtain better results by targeting unregulated lenders that operate offshore and online, out of the reach of existing federal and state consumer-protection measures.

109.    The Bureau has failed to explain how the authorizing statute empowers it to preempt state law by regulation, especially given the strong presumption that state law should not be displaced absent a statement of clear congressional intent.  At the same time, the Bureau has also failed to explain why such broad preemption is justified when more than half of the States have chosen to allow payday lending, and all of those already have consumer protections in place.  Before completely eradicating all of these established state-law regulatory regimes in one fell swoop, the Bureau is at least required to engage in some examination of how each regulatory regime is functioning and whether these state-law solutions are working effectively without federal intervention.

110.    The Bureau has also failed to consider whether it should allow an exemption for States that already effectively regulate the perceived risks of payday and title lending through their own consumer-protection laws.  Instead of respecting federalism by analyzing whether the Bureau's perceived problems may have already been successfully addressed in some States, the

Bureau has taken a heavy-handed, one-size-fits-all approach that treats every state lending market as if it were exactly the same.

111.     The Final Rule's provisions regarding payment-transfer attempts are likewise outside the scope of the Bureau's statutory UDAAP authority and otherwise arbitrary, capricious, and unsupported by substantial evidence.  These provisions purport to be justified by the Bureau's professed concern about the fees that consumers' banks might impose on them for failed payment-withdrawal attempts.  But, among other things, the Bureau has improperly relied on evidence about online lenders to justify provisions applicable to storefront lenders; has improperly confused the cost of a loan with injury; has made an entirely arbitrary determination that fees associated with a third (rather than, say, a fifth) attempted withdrawal constitute "substantial injury"; ignores ways that consumers can avoid fees; and improperly treats covered lenders, rather than the banks that impose and collect the fees, as the cause of the consumers' alleged injuries.

## COUNT FIVE

## DEFECTIVE COST-BENEFIT ANALYSIS

112.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

113.     The Dodd-Frank Act requires the Bureau to consider "the potential benefits and costs to consumers and covered persons [*i.e.*, lenders], including the potential reduction of access by consumers to consumer financial products" and "the impact on consumers in rural areas." CFPA § 1022(b)(2), 12 U.S.C. § 5512(b)(2).  Such cost-benefit analyses are inadequate if, *inter alia,* the agency:  relies on estimates that "ha[ve] no basis beyond mere speculation"; fails to estimate costs that are quantifiable; completely discounts available studies in favor of relatively unpersuasive studies; fails to adopt a reasonable baseline so as to account for the marginal costs of the rule; "duck[s] serious evaluation of" certain costs; engages in internally inconsistent

reasoning; and fails to address requested exceptions for entities that are situated differently for purposes of costs and benefits. *Business Roundtable v. SEC*, 647 F.3d 1144, 1150–55 (D.C. Cir. 2011).

114.    The Bureau's cost-benefit analysis fails to satisfy these standards for several reasons, including:  (1) the purported benefits of the Final Rule are speculative because the Bureau simply presumes the existence of harms caused by covered short-term loans (as currently marketed without the Bureau's ability-to-repay determination) and fails to account for the benefits of those loans, (2) the costs of the Final Rule are understated because the Bureau has not seriously considered the impact on consumers of the loss of a crucial source of credit, (3) the Bureau has failed to consider the cost of depriving consumers of their free choice to make a financial decision, (4) the Bureau has failed to consider the Final Rule's impact on consumer privacy, and (5) the Bureau has failed to fully evaluate the Final Rule's impact on consumers in rural areas.

## COUNT SIX:

## FAILURE TO OBSERVE PROCEDURE REQUIRED BY LAW

115.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

116.    The APA forbids agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

117.    Here, the Bureau has violated at least four procedural requirements.

118.    First, for a notice-and-comment rulemaking process to be meaningful under the APA, the agency must actually evaluate the information presented during the process, rather than dismiss it to reach a pre-ordained result.  Here, however, the history of the rulemaking demonstrates that the Bureau will not consider or evaluate empirical studies or evidence that diverges from the Bureau's pre-determined decision that payday lending and title lending are

harmful and must be burdened by draconian regulations.  Ever since the Bureau began to

consider regulating payday lending, it has repeatedly made statements and issued publications

riddled with errors and misperceptions.  CFSA and others have repeatedly attempted to correct

these errors and misperceptions, but to no avail.  Instead, the Bureau has doubled-down on its

earlier errors through first the proposed rule and then the Final Rule, which suffers from the

same methodological and evidentiary defects.  Because the Bureau refuses to rationally consider

the evidence and instead dismisses every cited study's conclusion as incorrect, it has

demonstrated that its mind was unalterably closed to any result aside from promulgation of the

Final Rule.  Such behavior is an abuse of discretion and shows the capriciousness of the

Bureau's actions.

119.    Second, based on information obtained under the Freedom of Information Act

(FOIA), as well as other information and belief, the Bureau has largely allowed outside groups

opposed to payday lending to drive this rulemaking, and has not adequately disclosed its reliance

on these groups.  Because the Bureau has so allowed these special-interest groups to dictate the

scope and text of the Final Rule while ignoring the concerns of lenders and borrowers, the

agency has reduced the elaborate rulemaking process to little more than a sham.  As a result, the

outcome of the process was preordained from the beginning of the process, and the resulting

Final Rule is procedurally invalid.

120.    Third, the Bureau has failed to comply with the Regulatory Flexibility Act (RFA)

by failing to adequately assess the Final Rule's impact on small businesses and by improperly

going through the motions of a small-business-review panel process under the Small Business

Regulatory Enforcement Fairness Act (SBREFA) without any meaningful thought or analysis

towards a foregone conclusion.  Under the SBREFA, an agency must, at the time of issuance of a

36

notice of proposed rulemaking, publish an initial regulatory flexibility analysis which "shall describe the impact of the proposed rule on small entities."  5 U.S.C. § 603(a).  That initial analysis must also describe "any significant alternatives to the proposed rule which accomplish the stated objectives" of the applicable statute while minimizing significant economic impact on small entities. *Id.* § 603(c).  And the final analysis published with the final rule must explain how the agency has minimized the impact of the rule on small entities and why it has rejected alternatives.  *Id*. § 604(a)(6).  Here, the Bureau failed to adequately take into account the impacts on small businesses, as demonstrated by the blistering comment submitted in opposition to the rule by the Chief Counsel for Advocacy of the Small Business Administration.  The Bureau's failures in this regard are particularly egregious because the Final Rule will have a devastating impact on thousands of small businesses and the untold number of consumers that those business serve.

121.    Fourth, the APA requires that the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and that the agency give "consideration" to "the relevant matter presented."  5 U.S.C. § 553(c).  During the period for such submissions, the Bureau received more than 1.4 million written comments from interested persons, including over one million comments from consumers who opposed the proposed rule.  Showing disdain for the views of those who will be most affected by the Final Rule, however, the Bureau failed to adequately take these highly relevant comments into account or give them the individualized consideration required by the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for an order and judgment in their favor and against defendants comprising the following relief:

1.      an order and judgment holding unlawful, enjoining, and setting aside the Final Rule;

2.      costs and attorneys' fees pursuant to any applicable statute or authority;

3.      any other relief that the Court deems just and appropriate.

Dated: April 9, 2018                                    Respectfully submitted,


*/s/ Laura Jane Durfee*

MICHAEL A. CARVIN*
  D.C. Bar No. 366784
  macarvin@jonesday.com
CHRISTIAN G. VERGONIS*
  D.C. Bar No. 483293
  cvergonis@jonesday.com
**JONES DAY**
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
**JONES DAY**
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

*Applications for admission *pro hac vice* pending