**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., *et al*., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:18-cv-295 |
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al*., | |
| *Defendants*. | |

### RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION

Plaintiffs Community Financial Services Association of American, Ltd., and Consumer Service Alliance of Texas, two trade associations representing companies that offer or facilitate payday loans, vehicle-title loans, or similar consumer financial products, brought this suit against the Bureau of Consumer Financial Protection ("Bureau") and its Acting Director, Mick Mulvaney, to challenge the Bureau's "Payday, Vehicle Title, and Certain High-Cost Installment Loans" rule ("Payday Rule" or "Rule"). The Bureau, however, has announced that it will undertake a rulemaking process to reconsider that Rule—a process that could moot or otherwise resolve this litigation but that the Bureau reasonably expects will not be possible to complete before the Rule's current compliance date and that will not formally commence until after Plaintiffs' members will have had to incur considerable costs to prepare to comply with a rule that may be fundamentally altered through rulemaking. Accordingly, the Parties jointly moved, under § 705 of the Administrative Procedure Act (APA), for a stay of the Rule's August 19, 2019, compliance date to prevent irreparable injury pending conclusion of this litigation. Joint

Motion for Stay of Litigation and Stay of Agency Action Pending Review, ¶¶ 9-12 (ECF No. 16) ("Joint Motion"). The Parties also jointly moved to stay this litigation for the duration of the rulemaking process. *Id.* ¶¶ 6-7.

This Court granted that motion in part and denied it in part on June 12, 2018. (ECF No. 29). The Court's order granted the Parties' joint request to stay the litigation but denied the request to stay the Rule's compliance date. Plaintiffs moved for reconsideration of that order on June 21, 2018, arguing that staying the litigation without staying the compliance date cuts off Plaintiffs' right to judicial review and exposes them to irreparable harm, as the Bureau will not likely complete its intended reexamination of the current Rule before the Rule's compliance date. (ECF No. 30). The Bureau now files this response in support of Plaintiffs' request for reconsideration and in further support of a stay of the Rule's compliance date.

## BACKGROUND

### A.  The Rule

The Bureau published the Payday Rule in the Federal Register on November 17, 2017. 82 Fed. Reg. 54472. Although the Rule became effective on January 16, 2018, most of its provisions have a compliance date of August 19, 2019. 82 Fed. Reg. 54472.

The Rule imposes various requirements on the extension and collection of certain consumer loans, including payday loans, vehicle-title loans, and longer-term loans with balloon payments. The Rule's centerpiece requires lenders to assess consumers' ability to repay before making certain covered loans. In particular, the Rule deems it "unfair" and "abusive" within the meaning of the Consumer Financial Protection Act (CFPA), 12 U.S.C. § 5531, to make such loans without "reasonably determining" the borrower's ability to repay, and it prescribes the

specific steps lenders must follow to make that determination. *See* 82 Fed. Reg. 54874-76 (codified at 12 C.F.R. §§ 1041.4, 1041.5).

The Rule also carves out a conditional exemption under which lenders may make covered loans without meeting the specific ability-to-repay requirements if they instead make covered loans that enable the consumer to step down the amount of principal over time. 82 Fed. Reg. 54876-77 (codified at 12 C.F.R. § 1041.6). To make a loan under this exemption, lenders must meet various requirements, including that they review the consumer's borrowing history on a report from a registered information system, a new kind of entity that the Bureau expected to arise as a result of the Rule. 82 Fed. Reg. 54876 (codified at 12 C.F.R. § 1041.6(a)). To make this possible, the Rule also establishes a framework through which entities may become such "registered information systems." 82 Fed. Reg. 54882-84 (codified at 12 C.F.R. § 1041.11). The Rule further makes clear that if no registered information systems are available, the lender cannot take advantage of the exemption and instead must (absent some other exemption) satisfy the specific ability-to-repay requirements. 82 Fed. Reg. 54906-07 (codified at 12 C.F.R. pt. 1041, Supp. I, ¶ 6(a)-2). The only provisions of the Rule with a compliance date before August 19, 2019, are those governing the registration of these information systems. *See* 82 Fed. Reg. 54472; 12 C.F.R. § 1041.11.

**B.  The Bureau's Planned Rulemaking**

The Bureau is currently taking steps to reconsider the Payday Rule through notice-and-comment rulemaking. On January 16, 2018, the Bureau announced that it "intends to engage in a rulemaking process so that the Bureau may reconsider the Payday Rule." CFPB, *Statement on Payday Rule* (Jan. 16, 2018), *available at* https://go.usa.gov/xQ6SE. In a Spring 2018 rulemaking agenda submitted to the Office of Management and Budget, the Bureau reiterated its

intent to initiate a rulemaking to reconsider the Payday Rule and advised that it expected to issue

a notice of proposed rulemaking setting forth a proposed rule for this purpose by February 2019.

CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans (Spring 2018), *available*

*at* https://go.usa.gov/xQ6QN.

In light of its plans to revisit the Rule, the Bureau also announced that it would entertain

requests from any potential applicants to become a registered information system for waiver of

the April 16, 2018, deadline for applications for preliminary approval. Recognizing that efforts to

comply with the April 16, 2018, deadline could cause companies to engage in unnecessary or

premature work, the Bureau has granted a waiver from that deadline to all companies that have

requested one. *See* CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans

Registered Information Systems registration program, Waiver requests and Bureau

determinations, *available at* https://go.usa.gov/xQ6Q5. Those waivers do not have a fixed

expiration date or establish a new deadline. *See, e.g.*, Letter from Jamie Robenseifner, Consumer

Financial Protection Bureau, to Andrew Sheehan, Clarity Services, Inc. (Mar. 23, 2018),

*available at* https://go.usa.gov/xQ6SU. Given those waivers, no entity has yet applied for

preliminary approval to become a registered information system.

### C.  This Litigation

Plaintiffs filed this suit challenging the Payday Rule on April 9, 2018. Complaint (ECF

No. 1). The complaint asserts six claims. First, Plaintiffs claim that the Rule is invalid because it

was promulgated by an agency whose organic statute violates constitutional separation-of-

powers principles. *Id.* ¶¶ 68-76. Second, Plaintiffs claim that Congress's grant of authority to the

Bureau to prescribe rules addressing unfair, deceptive, and abusive acts or practices violates

Article I of the Constitution by improperly delegating legislative power to an agency without

4

setting forth an intelligible principle. *Id.* ¶¶ 77-80. Third, Plaintiffs claim that the Rule exceeds the Bureau's statutory authority for at least six reasons, including that the identified practices are not actually "unfair" or "abusive." *Id.* ¶¶ 81-89. Fourth, Plaintiffs claim that the Rule is arbitrary and capricious because, among other things, substantial evidence does not support the determination that it is unfair and abusive to make a covered loan without reasonably determining that the consumer has the ability to repay it, and because the Bureau did not consider less burdensome alternatives. *Id.* ¶¶ 91-111. Fifth, Plaintiffs contend that the Rule's cost-benefit analysis is defective. *Id.* ¶¶ 112-14. Finally, Plaintiffs contend that the Bureau violated procedural requirements in four different ways. *Id.* ¶¶ 115-121.

On May 31, 2018, Plaintiffs and Defendants jointly filed a motion requesting that the Court stay this litigation pending the Bureau's rulemaking to reconsider the Payday Rule and stay the Rule's compliance date until 445 days after final judgment in this litigation. Joint Motion ¶¶ 7, 12. In particular, the Joint Motion argued that the litigation should be stayed because the Bureau's rulemaking could moot or otherwise resolve this litigation or require amendments to Plaintiffs' complaint. *Id.* ¶ 6. Thus, staying these proceedings could conserve tremendous judicial and party resources and avoid the need for further litigation. *Id.* The Joint Motion also argued that a stay of the Rule's compliance date was warranted to prevent irreparable injury to Plaintiffs' members. *Id.* ¶¶ 9-10. As the Joint Motion stated, the Parties agree that the factors for granting a stay are met here. *Id.* ¶¶ 9-11. In addition, the Parties agreed that it would be appropriate for the stay of the compliance date to remain in effect for 445 days after final judgment in this litigation. *Id.* ¶ 12. This 445-day extension would give Plaintiffs' members the same amount of time for bringing their operations into compliance as they had from the date of the Joint Motion to the Rule's current compliance date of August 19, 2019. *Id.*

On June 2, 2018, four advocacy organizations—Public Citizen, Inc., Americans for Financial Reform Education Fund, Center for Responsible Lending, and National Consumer Law Center—filed a motion seeking leave to file an amicus brief opposing the Joint Motion. (ECF No. 18). The Court granted that motion and accepted the brief for filing on June 12, 2018. (ECF No. 27). That same day, the Court granted in part and denied in part the Parties' Joint Motion, granting the Parties' request to stay the litigation and denying the request to stay the Rule's compliance date. (ECF No. 29). Plaintiffs filed a motion seeking reconsideration of the Court's denial of a stay of the Rule's compliance date. (ECF No. 30).

## ARGUMENT

This Court can reconsider its decision on the Joint Motion under Federal Rule of Civil Procedure 54(b), which permits interlocutory orders to "be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see also Independence Receivables Corp. v. Precision Recovery Analytics, Inc.*, No. 1:11-cv-008, 2012 WL 13029375, at *1 (W.D. Tex. June 7, 2012). This Court "enjoys broad discretion to revise such an order 'for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'" *Independence Receivables*, 2012 WL 13029375, at *1 (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)).

Reconsideration is warranted here. Without a stay of the Rule's compliance date, Plaintiffs' members will suffer irreparable harm from having to comply with the Rule. Although the Bureau is undertaking a rulemaking process to revisit that Rule, it reasonably expects that it will not be possible to complete that process before the compliance date arrives. Nor would it

6

make any sense to proceed to litigation on the merits here, as the Bureau's rulemaking process could moot or otherwise resolve this litigation. For those reasons, staying the compliance date is appropriate to maintain the status quo. Contrary to amici's contention, this Court has authority to stay the Rule's compliance date under § 705 of the APA. And the requirements for granting such a stay are met because the case involves a serious question, Plaintiffs have presented a substantial case on the merits, and the balance of equities heavily favors a stay.

I.      **This Court Has Authority Under 5 U.S.C. § 705 To Stay the Rule's Compliance Date**

Section 705 of the APA, 5 U.S.C. § 705, states, as relevant here, that: "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or *to preserve status or rights pending conclusion of the review proceedings*." (Emphasis added). That is exactly the relief that the Joint Motion requested—to preserve the status quo (as of the date the Joint Motion was filed) so that Plaintiffs' members do not suffer irreparable injury before this Court has addressed the merits of Plaintiffs' challenge to the Rule. That request squarely fits within the four corners of the text of § 705.

Amici were thus incorrect to assert that this Court lacks authority under § 705 to grant the Parties' request to stay the Rule's compliance date pending judicial review if the litigation is also stayed. *See* Memorandum of Amici Curiae in Opposition to the Parties' Joint Motion for A Stay of Agency Action Pending Review (ECF No. 28) ("Amici Br."), at 3-4 ("Section 705 cannot properly be used as a basis for a stay where the parties are not litigating and have no intention to do so."). The text of § 705 contains no "active litigation" requirement. Rather, as long as "review proceedings" have not "conclud[ed]," this Court can stay a rule's compliance date. 5 U.S.C. § 705. Courts have thus recognized that § 705 "authorizes courts to stay agency rules pending judicial review without any time limit on the duration of the stay." *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 310

(D.D.C. 2016); *see also Covington v. Schwartz*, 230 F. Supp. 249, 253 (N.D. Cal. 1964) (invoking predecessor to § 705 to stay Army sergeant's "undesirable discharge" pending exhaustion of administrative proceedings and judicial review), *aff'd as modified*, 341 F.2d 537 (9th Cir. 1965). In this respect, this Court's authority to grant a § 705 stay of the Payday Rule is analogous to courts' practice of preliminarily enjoining an agency action and then staying further litigation while the agency reconsiders the challenged action. *See Franciscan Alliance, Inc. v. Price*, No. 7:16-cv-00108, 2017 WL 3616652, at *5 (N.D. Tex. July 10, 2017) (staying case until agency "completes reconsideration of the [challenged] Rule" while keeping in place preliminary injunction barring implementation of the rule); *League of Women Voters v. Newby*, 238 F. Supp. 3d 6, 16 (D.D.C. 2017) (explaining that "[t]he Court will stay this case" during remand to the agency, "but, as the case will still be pending, the preliminary injunction will remain in place"); *FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 73, 75-76 (D.D.C. 2015) (granting "stay of proceedings while [the agency] undertakes a new notice-and-comment process" to reconsider rule and explaining that rule "will continue to be enjoined until the Court reaches final judgment").

Amici also mistakenly contended that, under *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012), there must be a "rational connection between [the § 705] stay and the underlying litigation," and that the parties did not establish any such rational connection. Amici Br. at 3. This contention misses the mark for two reasons. First, that case involved an *agency*-issued notice staying a rule, not a court order. *See Sierra Club*, 833 F. Supp. 2d at 33-34 ("The agency cannot use Section 705 of the APA to stay the effectiveness of its rules … simply because litigation in the court of appeals happens to be pending."). An agency's authority to stay its own rules derives from a different part of § 705 and differs from courts' broader authority to issue stays "to the extent necessary to prevent irreparable injury." *See* 5 U.S.C. § 705. Second, and in any event, the parties *have* articulated a "rational connection" between the stay they

request and this litigation. The court in *Sierra Club* recognized that the existence of "litigation risk" would be a sufficient "rational connection"—the agency just had not attempted to base its stay notice on such risk. 833 F. Supp. 2d at 34. Here, precisely that sort of "rational connection" is present, as Plaintiffs (for the reasons explained further below) have established a substantial case on the merits on at least some of their claims.[1]

Finally, contrary to Amici's suggestion (Amici Br. at 4), this Court's grant of a § 705 stay does not violate the notice-and-comment requirements of the APA, because those requirements apply only to agencies and not to reviewing courts such as this Court. And although Amici complained (Amici Br. at 4 n.1) that the Bureau's rulemaking to reconsider the Payday Rule "has no deadline," the Court has since ordered the Bureau to file periodic status reports on the progress of the rulemaking process. *See* Order (ECF No. 29). Because this Court retains the inherent authority to lift the stay in the event of undue delay, Amici's concern (Amici Br. at 4) that the parties seek an indefinite stay that would essentially repeal the Rule is unfounded. It is well within the Court's power under § 705 to stay the Rule's compliance date in these circumstances.

## II.     Staying the Compliance Date under § 705 of the APA Is Warranted Here

Staying the Payday Rule's compliance date is appropriate in the circumstances here. When deciding whether to stay agency action under § 705 of the APA, the Fifth Circuit applies

---

[1]     In *Sierra Club*, the court held that the agency could not stay its own rules on the ground that it was reconsidering those rules. 833 F. Supp. 2d at 34. The Parties do not ask the Court here to stay *the Rule* on the ground that the Bureau is reconsidering it. Rather, they ask the Court to stay the Rule on the ground that this case presents a serious legal question, Plaintiffs have presented a substantial case on the merits, and the balance of equities tips heavily in favor of a stay. The Parties separately sought a stay of *the litigation* on the ground that the Bureau is reconsidering the Rule. There can be no serious dispute that an agency's planned reconsideration of a rule is a proper basis to stay the litigation challenging that rule.

the same factors that govern stays pending appeal. *Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016). In particular, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418 (2009)). Where, however, "there is a serious legal question involved and the balance of equities heavily favors a stay," a party "only needs to present a substantial case on the merits" in order to satisfy the first stay factor. *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011). As the Parties stated in the Joint Motion, these factors are fully satisfied here.

### A.  Plaintiffs Have Presented a "Substantial Case on the Merits"

Plaintiffs need only present a "substantial case on the merits" to obtain a stay here because this case involves a "serious legal question"[2] and the balance of equities heavily favors a stay, as explained below. Plaintiffs have made this showing for at least some of the claims in their complaint.[3] In particular, Plaintiffs have presented a substantial case on the merits of their

---

[2]   The legality of the Bureau's Payday Rule is plainly a "serious legal question." A "serious legal question" is one that could have broad impact. *See Weingarten Realty*, 661 F.3d at 910 n.9 (explaining that question that "could have had a broad impact on relations between the states and the federal government" was serious); *compare United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 40 (5th Cir. 1983) (holding that "[w]hether Medicare and Medicaid payments constitute federal financial assistance within the meaning of the Rehabilitation Act is a serious legal question"), *with Weingarten Realty*, 661 F.3d at 910 (holding that no serious legal question was involved in "merely a private contractual matter"). Whether the Payday Rule is valid undoubtedly has sufficiently sweeping impact to constitute a "serious legal question." *Cf. Nevada v. Dep't of Labor*, 227 F. Supp. 3d 696, 698 (E.D. Tex. 2017) (holding that "there is no question that the issues presented on appeal—whether the Department of Labor's proposed overtime regulations are legal—are serious").

[3]   Although the Bureau recognizes that Plaintiffs have made this preliminary showing with respect to the stay factors, the Bureau does not concede the ultimate merits of Plaintiffs' claims.

claims that the rulemaking record did not provide substantial evidence for several findings underpinning critical elements of the Rule and that, to that extent, the Rule is therefore arbitrary and capricious.[4] *See* Compl. ¶¶ 91-94, 99, 101. The Bureau's forthcoming notice-and-comment rulemaking will provide an opportunity for the Bureau, and the public, to reexamine the evidentiary basis for the Rule, among other issues.

"The Administrative Procedure Act, which governs the proceedings of administrative agencies and related judicial review, establishes a scheme of 'reasoned decisionmaking.'" *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). For an agency's decision to be reasonable, "the agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted); *accord Louisiana Envtl. Action Network v. EPA*, 382 F.3d 575, 582 (5th Cir. 2004) ("While our deference to the agency's expertise is significant, we may not defer to an agency decision that is without substantial basis in fact." (quotation marks omitted)). Thus, courts "set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce." *Allentown Mack Sales*, 522 U.S. at 374.

---

[4]   Plaintiffs may also have met this threshold showing for other claims. For example, as Plaintiffs emphasized in their Response to Amici's Opposition to Joint Motion for Stay, Plaintiffs allege that the Rule is invalid because the Bureau's organic statute violates the constitutional separation of powers. Plaintiffs' Response to Amici's Opposition to Joint Motion for Stay, at 5-6 (ECF No. 25); *see also* Compl. ¶¶ 68-76. Although the Bureau does not concede the merits of that claim in this Court, as it conflicts with binding Supreme Court precedent, the Fifth Circuit recently accepted the issue for interlocutory appeal in another case, suggesting that the Fifth Circuit believes the question is one "as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b); *CFPB v. All American Check Cashing, Inc.*, No. 18-60302 (5th Cir. Apr. 24, 2018).

The Payday Rule imposes specialized requirements for lenders making certain short-term and balloon-payment consumer loans to determine that the borrower has an ability to repay the loan. *See* 82 Fed. Reg. 54874 (codified at 12 C.F.R. § 1041.5). The Bureau's authority to impose these requirements stems from the provision in its organic statute authorizing the Bureau to issue rules to identify and prevent, *inter alia*, "unfair" and "abusive" acts or practices in connection with the offering or providing of consumer financial products or services. *See* 12 U.S.C. § 5531(b). Under the statute, the Bureau has no authority to declare an act or practice unfair unless "the Bureau has a reasonable basis to conclude" that the act or practice "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *Id.* § 5531(c). The Bureau has no authority to declare an act or practice abusive unless, as relevant here, it "takes unreasonable advantage of" either "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or of "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." *Id.* § 5531(d)(2). Rules in which the Bureau identifies specific unfair or abusive acts or practices "may include requirements for the purpose of preventing such acts or practices." *Id.* § 5531(b); *see also Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 988 (D.C. Cir. 1985) (such preventative requirements must bear a "reasonable relationship" to the unlawful acts or practices).

In the Payday Rule, the Bureau identified it as unfair and abusive for a covered person to make certain short-term and balloon-payment consumer loans "without reasonably determining" the borrowers' "ability to repay the loans according to their terms." 12 C.F.R. § 1041.4. To prevent that practice that the Bureau determined was unfair and abusive, the Rule prescribes in

some detail the steps lenders must take to determine borrowers' ability to repay. *Id.* § 1041.5. These steps include meeting verification requirements with respect to a borrower's net income and major financial obligations and making "a reasonable determination" that the borrower will have the ability to repay the loan according to its terms while still being able to afford basic living expenses. *Id.* § 1041.5(b). Ultimately, all of these requirements derive from the Bureau's determination that it is unfair and abusive to make loans subject to the Rule without assessing the borrower's ability to repay (*i.e.*, without underwriting).

Plaintiffs have raised a substantial case on the merits that the evidence before the Bureau when it issued the Rule may not have supported the unfairness and abusiveness findings on which the Rule's specific underwriting requirements were based. With respect to unfairness, Plaintiffs contend that the Bureau lacked evidence that consumers could not reasonably avoid the harms the Bureau found were caused by non-underwritten short-term and balloon-payment loans—the second of the three statutory elements of unfairness, without which a practice cannot be deemed unfair. Compl. ¶¶ 49, 99; *see also* 12 U.S.C. § 5531(c)(1)(A).

The Bureau concluded that the harm to consumers here was not reasonably avoidable because consumers could not predict accurately how long they would remain in debt (and the total cost they would incur) after taking an initial short-term loan that they often end up reborrowing, or "rolling over," multiple times. 82 Fed. Reg. 54597-98 (describing this as "the heart" of the Bureau's finding with respect to reasonable avoidability); *see also id.* at 54568-72. Plaintiffs dispute the reasonableness of this finding, based in part on empirical research that they describe as "show[ing] that payday borrowers understand the nature of the product … and accurately predict how long it will take to repay their loans." Compl. ¶ 49.

Plaintiffs have met their burden of showing a substantial case on the merits that the evidence before the Bureau may not have supported a conclusion that the relevant harms were "not reasonably avoidable," even though the Bureau acknowledged such research and responded to it in the final rule, 82 Fed. Reg. 54568-69. The Bureau's finding on this issue rests in large part on a study that surveyed payday-loan borrowers about their expectations for repaying their loans and compared those stated expectations with the consumers' actual outcomes.[5] 82 Fed. Reg. 54597 (citing Ronald Mann, "Assessing the Optimism of Payday Loan Borrowers," Sup. Ct. Econ. Rev. (2013)); *id.* at 54568-70. The Bureau interpreted this study (the "Mann study") as showing that few if any borrowers who experienced long sequences predicted that outcome *ex ante* and that those who had borrowed the most in the past did not do a better job than other borrowers of predicting their future use of the product. *Id.* at 54597.

At the same time, the Bureau acknowledged not only that the results of the Mann study were open to multiple interpretations, but that the study's author himself "draws different interpretations from his analysis than does the Bureau." *Id.* at 54569 n.546. Indeed, the author submitted a comment to the Bureau during the notice-and-comment process taking issue with the Bureau's analysis of his findings. *Id.* at 54569. The author (as well as other commenters) argued, among other things, that the study shows instead that most borrowers accurately predicted how long they would reborrow. *Id.* While not conceding the ultimate merits of this claim, the Bureau

---

[5]   The Bureau noted two other contributing factors. First, "the way the product is marketed and presented" to consumers as a short-term solution to immediate liquidity problems "is calculated to obscure the risks" of long-term reborrowing. 82 Fed. Reg. 54598; *see also id.* at 54561-62. Second, inherent biases in consumer decisionmaking, such as people's tendency to focus on immediate problems and discount future consequences, "may especially degrade the borrower's ability to evaluate the risks presented in their circumstances." *Id.* at 54598; *see also id.* at 54570-72. The Rule does not state, however, that these factors would be enough on their own to establish that the relevant injury is not reasonably avoidable.

agrees that Plaintiffs have raised a substantial case on the merits with respect to their attack on the evidentiary basis for the unfairness determination.

For much the same reason, Plaintiffs have made a substantial case on the merits of their parallel claim that the Bureau's abusiveness determination was not supported by the evidence before the Bureau when it issued the Rule and is therefore arbitrary and capricious. *See, e.g.*, Compl. ¶ 101. The Bureau's abusiveness determination was based on a finding that lenders' failure to assess borrowers' ability to repay takes unreasonable advantage of (1) "a lack of understanding on the part of the consumer of the material risks, costs, or conditions" of these loans, and (2) "the inability of the consumer to protect the interests of the consumer in selecting or using" these loans. 82 Fed. Reg. 54614; *see also* 12 U.S.C. § 5531(d)(2). The Bureau's critical findings supporting these conclusions are in turn based in substantial part on the same disputed Mann study. *See, e.g.*, 82 Fed. Reg. 54617 (borrowers may not understand that they will "find themselves caught up in extended loan sequences" of reborrowing, referring to previous discussion of the Mann study).[6] Again, without conceding the merits of this claim, the Bureau acknowledges that Plaintiffs have thus presented a substantial case on the merits with respect to their challenge to the evidentiary grounds for the abusiveness analysis that, alongside the unfairness finding, provides the foundation of the final Rule.

---

[6]   Specific to its abusiveness determination, the Bureau noted "further reasons why consumers may be unable to protect their interests in using these loan products": Such borrowers "typically have an immediate need for credit" and many are "financially vulnerable and have very limited access to other sources of credit." 82 Fed. Reg. 54619. The Rule does not state, however, that these factors would be enough on their own to support a finding on this element of abusiveness.

**B.  The Balance of Equities Tips Heavily in Favor of a Stay**

The remaining three stay factors—irreparable harm to Plaintiffs, injury to the other parties, and the public interest—tip heavily in favor of a stay, particularly given that the Rule may change following the Bureau's rulemaking process.

First, Plaintiffs' members will suffer significant irreparable harm absent a stay. Plaintiffs are two non-profit trade associations whose members offer payday loans, vehicle-title loans, and similar products and who are therefore regulated by the Rule. Compl. ¶¶ 18-19. These companies will suffer substantial irreparable injury without a stay. As the Bureau estimated in promulgating the Rule, the ability-to-repay requirement would reduce the volume of storefront payday loans by approximately 92-93 percent, with a corresponding reduction in lenders' revenue.[7] 82 Fed. Reg. 54826. The Rule would similarly prevent 89-93 percent of vehicle-title loans that are currently being made, resulting in a corresponding reduction in lenders' revenue. *Id.* at 54834. As a result, once the compliance date arrives, many businesses are expected to shut down or otherwise exit the market. *Id.* at 54817.

Amici objected that harms that will occur after the compliance date are irrelevant because this lawsuit, if litigated, could reasonably be expected to end before then. Amici Br. at 6. But, to begin, there is no guarantee that this case could be resolved before the compliance date if the

---

[7]    The reduction in loan volume was projected to be 51-52 percent (with a corresponding reduction in revenue of 67-68 percent) if lenders were able to make loans under the conditional exemption discussed above. *See* 82 Fed. Reg. 54827; *see also* Joint Motion at 2 (explaining that Rule could decrease loan volume by 51 to 93 percent). But, as noted, this alternative is an option only if a registered information system is available. *See* 12 C.F.R. § 1041.6(a); 12 C.F.R. pt. 1041, Supp. I, ¶ 6(a)-2. No such systems are currently available or expected to be available before the compliance date. *See* CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans Registered Information Systems registration program, Waiver requests and Bureau determinations, *available at* https://go.usa.gov/xQ6Q5. Thus, lenders will only be able to make covered loans by following the ability-to-repay requirements, and those requirements are expected to reduce the volume of covered loans by 92-93 percent.

litigation were not stayed. The case is complex, and the record is sizeable: Plaintiffs' complaint

contains six counts, many of which contain multiple independent challenges to the Rule; the

Rule itself spans 450 pages in the Federal Register; and the administrative record contains more

than 1.4 million comments, among other things. In any event, even before the compliance date,

companies subject to the Rule will suffer irreparable injury in preparing to comply. For instance,

lenders will have to develop procedures to comply with the Rule's requirements, train their staff

on those procedures, and modify their automated loan-origination systems or buy upgrades to

those systems. 82 Fed. Reg. 54819. Although less significant than the reduction in revenue that

Plaintiffs' members will suffer following the Rule's compliance date, these pre-compliance-date

costs also doubtless constitute irreparable harm, as "[n]o mechanism here exists for [companies]

to recover the compliance costs they will incur if the Final Rule is invalidated on the merits."

*Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016).

These irreparable harms cannot be disregarded on the ground that the Bureau has

announced that it will reconsider the Rule through notice-and-comment rulemaking, which could

result in a repeal of the Rule. The Bureau's judgment based on its experience with previous

rulemakings is that an undertaking of this complexity reasonably cannot be completed in

accordance with all applicable legal requirements before the current Rule's compliance date.[8]

Moreover, although section 705 of the APA also authorizes an agency itself to "postpone the

effective date" of a rule "pending judicial review" if it "finds that justice so requires," recent

decisions have read this provision narrowly to mean that an agency cannot invoke § 705 to delay

a rule's compliance date once the rule's effective date has passed, as is true of the Payday Rule.

---

[8]    As noted, the Bureau received more than 1.4 million comments on the Payday Rule, and it is possible that the forthcoming rulemaking could require the Bureau to review and respond to a similar number of comments.

*See, e.g.*, *California v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017). Although the Bureau doubts the correctness of those decisions, they make it uncertain whether the Bureau could prevent the irreparable harm here by itself staying the rule.[9]

Second, granting a stay also will not injure the other party in this proceeding, the Bureau. The Bureau has announced that it intends to engage in a rulemaking process to reconsider the Payday Rule. CFPB, *Statement on Payday Rule* (Jan. 16, 2018), *available at* https://go.usa.gov/xQ6SE. The Bureau included the anticipated rulemaking in the Spring 2018 rulemaking agenda submitted to the Office of Management and Budget, and stated that it expected to issue a notice of proposed rulemaking for this purpose by February 2019. *See* CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans (Spring 2018), *available at* https://go.usa.gov/xQ6QN. Because the Bureau plans to reconsider the Rule through the rulemaking process, it faces no appreciable injury in having its Rule stayed in this litigation. In addition, contrary to amici's contention (Amici Br. at 6), staying the Rule would not harm the Bureau's ability to pursue its mission of protecting consumers from unfair and abusive practices. The planned rulemaking will revisit whether, in light of the evidence, the identified practices are unfair and abusive and, if so, what measures are appropriate to protect consumers. Moreover, the Bureau continues to have the legal authority to enforce the statutory prohibition on unfair, deceptive, and abusive acts and practices. *See* 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

---

[9]   In addition, although the Bureau could undertake a notice-and-comment rulemaking to delay the current Rule's compliance date, the outcome of such a rulemaking would be uncertain, as it would depend, for example, on the considerations raised by public commenters. In any event, Plaintiffs represent that their members are already suffering irreparable harm by preparing to comply with the Rule, and the Bureau therefore could not prevent that harm by issuing a rule to delay the compliance date.

Finally, the public interest also favors a stay. Like Plaintiffs' members, lenders throughout the market will face substantial decreases in revenue once the Rule's compliance date takes effect, which will lead many to exit the market. *See* 82 Fed. Reg. 54817. Amici emphasized that consumers will face substantial harm in not receiving the benefits of the Rule during the stay. Amici Br. at 7. But because the Bureau could substantially revise or even repeal the Rule through the rulemaking process, it is entirely speculative whether or for how long the current Rule would operate. Even apart from that, any potential harm to consumers from staying the Rule is inherently uncertain in these circumstances given the Bureau's intention to reexamine the legal determinations underpinning the rule, as well as the evidentiary basis for those determinations. Indeed, the public interest is in affording the Bureau the time necessary to reconsider the Rule through notice and comment without requiring the parties and the Court to invest substantial resources in litigation that may prove unnecessary. Because the downsides of a stay are uncertain while the harm that lenders will face absent a stay is substantial and certain, the balance of equities tips heavily in favor of a stay.

## CONCLUSION

For these reasons, the Court should grant the Motion for Reconsideration and stay the

Payday Rule's compliance date as set forth in the Joint Motion.

Dated:  June 22, 2018

Respectfully submitted,

MARY McLEOD
General Counsel

JOHN R. COLEMAN
Deputy General Counsel

STEVEN Y. BRESSLER
Assistant General Counsel

 /s/ Kristin Bateman
KRISTIN BATEMAN (Cal. Bar No. 270913)
KEVIN E. FRIEDL (NY Bar No. 5240080)
NANDAN JOSHI (DC Bar No. 456750)
Attorneys
Consumer Financial Protection Bureau
1700 G Street, NW
Legal Division
Washington, D.C. 20552
Telephone: (202) 435-7821
Fax: (202) 435-7024
Kristin.Bateman@cfpb.gov

*Counsel for Defendants Consumer Financial Protection Bureau and John Michael Mulvaney*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Kristin Bateman
Kristin Bateman
*Counsel for Defendants*