IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD.** *et al.*, <br><br>　　　　　**Plaintiffs,** <br><br>　　v. <br><br>**CONSUMER FINANCIAL PROTECTION BUREAU** *et al.*, <br><br>　　　　　**Defendants.** | Civil Action No. 1:18-cv-295 <br><br> **ORAL ARGUMENT REQUESTED** |

## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Michael A. Carvin
 D.C. Bar No. 366784
 Admitted *pro hac vice*
 macarvin@jonesday.com
Christian G. Vergonis
 D.C. Bar No. 483293
 Admitted *pro hac vice*
 cvergonis@jonesday.com
**Jones Day**
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Laura Jane Durfee
Texas Bar No. 24069653
ldurfee@jonesday.com
**Jones Day**
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

BACKGROUND ............................................................................................................... 1

    I.      THE CONSUMER FINANCIAL PROTECTION ACT ...................................... 2

    II.     PAYDAY AND INSTALLMENT LOANS ....................................................... 3

    III.   THE RULEMAKING PROCESS AND THE 2017 RULE ................................. 6

    IV.   PROCEDURAL HISTORY ................................................................................ 8

ARGUMENT .................................................................................................................... 10

    I.      THE RULE CHALLENGED HERE WAS VOID *AB INITIO* AND MUST
         BE SET ASIDE BECAUSE THE BUREAU THAT PROMULGATED IT
         WAS UNLAWFULLY STRUCTURED ........................................................... 12

    II.     THE GOVERNMENT'S PURPORTED RATIFICATION OF THE
         PAYMENT PROVISIONS IS INEFFECTIVE, UNCONSTITUTIONAL,
         PROCEDURALLY IMPROPER, AND ARBITRARY AND
         CAPRICIOUS ................................................................................................... 14

    III.   THE PAYMENTS PROVISIONS ARE INCONSISTENT WITH THE
         BUREAU'S STATUTORY UDAAP AUTHORITY AND ARBITRARY
         AND CAPRICIOUS ......................................................................................... 23

    IV.   THE PAYMENTS PROVISIONS REST ON A DEFECTIVE COST-
         BENEFIT ANALYSIS ..................................................................................... 28

    V.     THE BUREAU'S DENIAL OF PLAINTIFF MEMBER'S
         RULEMAKING PETITION WAS ARBITRARY AND CAPRICIOUS .......... 29

    VI.   THE BUREAU'S ACTIONS ARE INVALID BECAUSE ITS
         STRUCTURE CONTINUES TO VIOLATE CORE SEPARATION-OF-
         POWERS PRINCIPLES ................................................................................... 31

CONCLUSION ................................................................................................................. 32

CERTIFICATE OF SERVICE ......................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935).................................................................................................32

*Advanced Disposal Servs. E., Inc., v. NLRB*,
   820 F.3d 592 (3d Cir. 2016)....................................................................................18

*Bowsher v. Synar*,
   478 U.S. 714 (1986).........................................................................................13, 14

*Bus. Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011) .........................................................................22, 28

*CFPB v. Gordon*,
   819 F.3d 1179 (9th Cir. 2016) ................................................................................18

*CFPB v. RD Legal Funding, LLC*,
   332 F. Supp. 3d 729 (S.D.N.Y. 2018)....................................................................17

*Collins v. Mnuchin*,
   938 F.3d 553 (5th Cir. 2019) (en banc) ..................................................................18

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016).......................................................................................19, 31

*FCC v. ITT World Commc'ns, Inc.*,
   466 U.S. 463 (1984).................................................................................................29

*FEC v. Legi–Tech, Inc.*,
   75 F.3d 704 (D.C. Cir. 1996) .................................................................................18

*FEC v. NRA Political Victory Fund*,
   513 U.S. 88 (1994)...................................................................................................17

*FEC v. NRA Political Victory Fund*,
   6 F.3d 821 (D.C. Cir. 1993) ...................................................................................13

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010).................................................................................................12

*Gen. Motors Corp. v. Nat'l Highway Traffic Safety Admin.*,
   898 F.2d 165 (D.C. Cir. 1990) ...............................................................................29

*Gundy v. United States*,
   139 S. Ct. 2116 (2019).............................................................................................32

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935).................................................................................................13

*IBS, Inc. v. Copyright Royalty Bd.*,
   684 F.3d 1332 (D.C. Cir. 2012) .............................................................................14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
140 S. Ct. 2367 (2020) ............................................................................................16

*Lucia v. SEC,*
138 S. Ct. 2044 (2018) ..................................................................................14, 15, 16

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) .................................................................................................32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ........................................................................................25, 26, 27

*Myers v. United States,*
272 U.S. 52 (1926) ..................................................................................................13

*Nat. Res. Def. Council, Inc. v. EPA,*
683 F.2d 752 (3rd Cir. 1982) ..................................................................................22

*Nat'l Ass'n of Home Builders v. EPA,*
682 F.3d 1032 (D.C. Cir. 2012) ....................................................................22, 28, 29

*NCTA v. Brand X Internet Servs.,*
545 U.S. 967 (2005) .................................................................................................19

*Nguyen v. United States,*
539 U.S. 69 (2003) ...................................................................................................14

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) .................................................................................................14

*Norton v. Shelby Cnty.,*
118 U.S. 425 (1886) .................................................................................................16

*Ringling v. City of Hempstead,*
193 F. 596 (5th Cir. 1911) .......................................................................................16

*Ryder v. United States,*
515 U.S. 177 (1995) ........................................................................................13, 14, 16

*Safe Extensions, Inc. v. FAA,*
509 F.3d 593 (D.C. Cir. 2007) .................................................................................29

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) ...................................................................................... *passim*

*Synar v. United States,*
626 F. Supp. 1374 (D.D.C. 1986) ............................................................................14

*United States v. Johnson,*
632 F.3d 912 (5th Cir. 2011) ...................................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Weight Watchers Int'l., Inc. v. FTC,*
   47 F.3d 990 (9th Cir. 1995) ...........................................................................29

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const., art. I ....................................................................................31, 32

U.S. Const., art. II ...........................................................................................13

5 U.S.C. § 551 ..................................................................................................32

5 U.S.C. § 552 ..................................................................................................32

5 U.S.C. § 553 ...................................................................................14, 16, 32

5 U.S.C. § 554 ..................................................................................................32

5 U.S.C. § 555 ..................................................................................................32

5 U.S.C. § 556 ..................................................................................................32

5 U.S.C. § 557 ..................................................................................................32

5 U.S.C. § 558 ..................................................................................................32

5 U.S.C. § 559 ..................................................................................................32

5 U.S.C. § 603 ..................................................................................................18

5 U.S.C. § 604 ..................................................................................................18

5 U.S.C. § 701 ..................................................................................................32

5 U.S.C. § 702 ..................................................................................................32

5 U.S.C. § 703 ..................................................................................................32

5 U.S.C. § 704 ..................................................................................................32

5 U.S.C. § 705 ..............................................................................................8, 32

5 U.S.C. § 706 ...................................................................................12, 24, 32

The Consumer Financial Protection Act

   12 U.S.C. § 5491 ..........................................................................................2, 8

   12 U.S.C. § 5497 ........................................................................................2, 31

   12 U.S.C. § 5511 ..............................................................................................2

   12 U.S.C. § 5512 ...............................................................................2, 22, 28

   12 U.S.C. § 5517 ........................................................................................3, 27

   12 U.S.C. § 5531 ................................................................................. *passim*

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**RULES AND REGULATORY MATERIALS**

12 C.F.R. § 1041.4 .............................................................................................1, 7

12 C.F.R. § 1041.7 .............................................................................................1, 7

12 C.F.R. § 1041.8 .............................................................................................7, 8

12 C.F.R. § 1041.9 .............................................................................................7, 8

81 Fed. Reg. 47,864 (July 22, 2016) ...........................................................6, 7, 27, 30

82 Fed. Reg. 54,472 (Nov. 17, 2017) ........................................................... *passim*

84 Fed. Reg. 4,252 (Feb. 14, 2019) ...............................................................9, 19

85 Fed. Reg. 41,905-02 (July 13, 2020) ........................................................10

85 Fed. Reg. 44,382 (July 22, 2020) .............................................................. *passim*

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 3.04 (2006) ...............................................17

Restatement (Third) of Agency § 4.01 (2006) ...............................................17

Restatement (Third) of Agency § 4.02 (2006) ...............................................18

Restatement (Third) of Agency § 4.04 (2006) ...............................................17

Restatement (Third) of Agency § 4.07 (2006) ...............................................22

*The Federalist* No. 58 (James Madison) (C. Rossiter ed., 1961) ..................31

Neil Bhutta, et al., *Consumer Borrowing after Payday Loan Bans*
(Jan. 14, 2015) (unpublished manuscript) .................................................5, 24

Neil Bhutta et al., *Payday Loan Choices and Consequences*
(Vanderbilt L. Sch., L. & Econ., Working Paper No. 12-30, 2013) ..................4, 24

Campbell, et al., *Bouncing out of the banking system: an empirical analysis of
involuntary bank account closures*, 36 J. of Banking and Fin. 1224 (2012) ............5

Anna Palmer, *Emails reveal consumer protection agency's cozy ties*,
Politico (Nov. 19, 2015) ...............................................................................6

Gary Stein, *Understanding the Overdraft "Opt-in" Choice*,
Consumer Financial Protection Bureau (Jan. 19, 2017) .............................30

Todd J. Zywicki, *The Case Against New Restrictions on Payday Lending*
(George Mason U., Mercatus Cent., Working Paper No. 09-28, 2009) ..............5, 6, 24

## BACKGROUND

Plaintiffs are associations of companies that offer payday loans and installment loans—small, short- and medium-term loans for borrowers who often lack access to more traditional forms of credit.  Plaintiffs have brought constitutional and statutory challenges to the "Payday, Vehicle Title, and Certain High-Cost Installment Loans" rule, issued by the Consumer Financial Protection Bureau on November 17, 2017 ("2017 Payday Rule" or "2017 Rule"), 82 Fed. Reg. 54,472 (Nov. 17, 2017).  In that Rule, the Bureau had invoked its statutory authority to identify and prohibit "unfair, deceptive, or abusive acts or practices."  12 U.S.C. § 5531(b) ("UDAAP").  In particular, the 2017 Rule imposed two major limits on covered lenders.  First, through its "underwriting provisions," the Rule prohibited lenders from making payday and vehicle-title loans unless the borrower could satisfy a government-mandated test for "ability to repay."  12 C.F.R. § 1041.4.  Those provisions have now been revoked.  Second, the Rule's "payments provisions" forbade a covered lender to make or attempt an authorized withdrawal from a borrower's bank account in connection with any payday loan and certain installment loans after the lender's second consecutive attempt has failed due to a lack of sufficient funds, unless the lender obtains the consumer's new and specific authorization for further withdrawals.  *Id.* § 1041.7.  The Bureau designated any departures from either rule as practices that are both "unfair" and "abusive."

As the Supreme Court recently confirmed, at the time of the 2017 Rule's issuance, the Bureau was unconstitutionally structured, because its single director was insulated from removal by the President, except for cause.  To permit the Bureau to operate prospectively, the Supreme Court invalidated the director's for-cause-removal protection.  Soon afterward, the newly reconstituted Bureau purported to ratify the payments provisions that had been issued by the unlawfully structured Bureau in 2017.  But that supposed ratification cannot save the payments provisions.

1

I.       **THE CONSUMER FINANCIAL PROTECTION ACT**

In 2010, Congress enacted the Consumer Financial Protection Act ("CFPA"), which established a new "independent" regulatory agency known as the Bureau of Consumer Financial Protection ("Bureau" or "CFPB"). 12 U.S.C. § 5491. The Act provides for a single "Director" to "serve as the head of the Bureau" for a term of five years. *Id.* § 5491(b)–(c). Before it was invalidated by the Supreme Court, a provision of the Act provided that the Director may be removed by the President only "for cause." *Id.* § 5491(c). The Director is authorized to set the agency's budget without congressional approval at an "amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau," subject to a cap of 12% of the Federal Reserve's operating expenses. *Id.* § 5497(a).

Among its many other powers, the Bureau may "prescribe rules … identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(b). Such rules "may include requirements for the purpose of preventing such acts or practices." *Id.* However, because Congress recognized that excessive regulation could do more harm than good, it directed the Bureau to "ensur[e] that all consumers have access to markets for consumer financial products," and that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions." *Id.* § 5511(a)–(b); *see also id.* § 5512(b)(2)(A) (in prescribing rules, the Bureau "shall consider … the potential reduction of access by consumers to consumer financial products").

Congress also imposed four specific restrictions on the Bureau's rulemaking power. *First*, the Bureau has "no authority … to declare an act or practice … to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably

avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *Id.* § 5531(c)(1).

*Second*, the Bureau has "no authority … to declare an act or practice abusive … unless the act or practice—

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of—

    (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

    (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

    (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."

*Id.* § 5531(d).

*Third*, the Bureau has no authority "to establish a usury limit applicable to an extension of credit offered or made by a covered person to a consumer, unless explicitly authorized by law." *Id.* § 5517(o). *Fourth*, public policy considerations "may not serve as a primary basis" for an unfairness determination and may not be considered at all in determining whether an act or practice is abusive. *Id.* § 5531(c)–(d).

## II.   PAYDAY AND INSTALLMENT LOANS

The loans at issue here are short- and medium-term, small-dollar consumer-finance products provided by non-bank lenders to consumers who lack access to, or choose not to use, more traditional forms of credit. *See* Comment Submitted by Dennis Shaul, Community Financial Services Association of America ("Shaul Comment"), CFPB-2016-0025-142779, at 6 (Oct. 18, 2016) (A166). A typical payday-loan transaction involves a two-week or thirty-day loan for a few hundred dollars with a service charge of $15 per $100 borrowed. *Id.* at 7 (A172). To obtain the

loan, a borrower presents evidence of a bank account and employment or other income, and writes a check or authorizes an electronic withdrawal for the amount of the loan plus the service charge. *Id.* The lender promises not to cash the check or make the withdrawal until the end of the loan term. *Id.* At that time, the borrower may pay off the loan in cash or the lender may cash the check or make the withdrawal. *Id.* Sometimes a borrower will extend the duration of his borrowing by paying an additional service charge to renew or roll over the loan for an additional term. *Id.* Payday lending is a lawful business subject to extensive state regulation in thirty-five states.

Another form of small-dollar consumer credit is the installment loan. These loans typically involve a larger principal balance than payday loans, and are repaid in multiple installments over a longer period of time, which each installment typically due at the consumer's payday. Like traditional payday loans, the borrower typically provides the lender with authorization to obtain repayment by withdrawing the funds from the borrower's bank account. As in other contexts (e.g., automatic bill payment), the use of preauthorized payments provides numerous benefits to consumers, including greater access to credit, convenience, fewer missed payments, and lower costs. *See generally id.* at 55–58.

These and other consumer credit products provide a financial lifeline for millions of consumers who need access to funds and choose these products over other available forms of credit. Currently, approximately twelve million Americans per year rely on payday loans to help with their financial needs, and millions more rely on installment lending. *See* Neil Bhutta et al., *Payday Loan Choices and Consequences*, at 4 (Vanderbilt L. Sch., L. & Econ., Working Paper No. 12-30, 2013), Administrative Record ("AR") at 1620 (A6).[1] Without payday and installment loans, these consumers would be forced into more costly alternatives, such as pawn loans, defaults

---

[1] Cited materials from the administrative record are included in an appendix filed herewith.

on other debts, late-payment fees, and the use of unregulated and illegal underground sources of credit. Consumers understand this, which is why they consistently and overwhelmingly praise these products and value the flexibility they provide. *See* Todd J. Zywicki, *The Case Against New Restrictions on Payday Lending*, at 9, 21 (George Mason U., Mercatus Cent., Working Paper No. 09-28, 2009), AR at 13185, 13197 (A100, A112).

Indeed, numerous studies demonstrate that consumers will substitute more costly alternative forms of credit when they lack access to payday loans. *See, e.g.*, Neil Bhutta, et al., *Consumer Borrowing after Payday Loan Bans* 1 (Jan. 14, 2015) (unpublished manuscript), AR at 1671 (A57). In States that have banned payday loans, the reduction in payday borrowing leads to increases in pawn loans. *See id.*, AR at 1674 (A60). Consumers subject to payday-loan bans also bounce more checks and pay more bank overdraft fees. When Georgia and North Carolina banned payday lending, for example, the number of bounced checks skyrocketed. *See* Bhutta, *Consumer Borrowing*, at 10, AR at 1681 (A67) (citing Campbell, et al., *Bouncing out of the banking system: an empirical analysis of involuntary bank account closures*, 36 J. of Banking & Fin. 1224 (2012)). According to several studies, the number of consumer bankruptcies also grows. *See id.* at 3, AR at 1673 (A59).

These alternative forms of credit are both more expensive and have equivalent or higher annual percentage rates ("APRs") than payday and installment loans. Pawn loans in many states, for example, have an average fee of $20 for each $100 borrowed, which translates to an APR of about 250 percent. *Id.* at 5, AR at 1675 (A61). And unlike payday lenders, pawn shops also require the borrower to part with valuable personal property that is forfeited upon default.

It is unsurprising, therefore, that payday borrowers praise the product and the companies who offer it in overwhelming numbers. The Bureau's own "Tell Your Story" and consumer-

complaint portals demonstrate the overwhelmingly positive reaction of borrowers.  Nearly all of the stories submitted to the "Tell Your Story" portal on payday lending and similar products are positive.  *See* Shaul Comment at 14 (A174) (reporting results of a FOIA request that showed that over five years, 98.8% of the 12,456 comments submitted on short-term loans praised the industry and its products).  The Bureau receives a minuscule number of complaints related to regulated, storefront payday lenders, far fewer than complaints about other products and services monitored by the Bureau.  *Id.*  Social-science studies showing widespread borrower satisfaction confirm that an overwhelming number of borrowers are satisfied with the product.  *See* Zywicki at 24–27, AR at 13200–03 (A115–A118).

## III.     THE RULEMAKING PROCESS AND THE 2017 RULE

Yet rather than strengthen and protect access to these critical forms of consumer credit, the Bureau decided to virtually eliminate payday lending through the 2017 Rule.  On June 2, 2016, the Bureau published a notice of proposed rulemaking heralding draconian new restrictions on the extension of payday loans, vehicle-title loans (i.e., short-term, small-dollar loans secured by an interest in a vehicle), and installment loans with interest rates above 36%.  *See* 81 Fed. Reg. 47,864 (July 22, 2016).  In targeting these loans, the Bureau followed substantial guidance from special-interest groups opposed to payday lending.  *See* Exhibits Submitted by Dennis Shaul, Community Financial Services Association of America, CFPB-2016-0025-143347, Exhibits H & I (Oct. 18, 2016); *see also* Anna Palmer, *Emails reveal consumer protection agency's cozy ties*, Politico (Nov. 19, 2015), goo.gl/DRCiTV.  The 2017 Rule was published in the Federal Register on November 17, 2017.  *See* 82 Fed. Reg. 54,472.

One part of the 2017 Rule consisted of ability-to-repay provisions, also known as underwriting provisions, that deemed it "an unfair and abusive practice for a lender to make covered short-term loans . . . without reasonably determining that the consumers will have the

ability to repay the loans" and satisfy all other financial obligations by the end of their original terms (typically two weeks or thirty days).  12 C.F.R. § 1041.4.  By the Bureau's own assessment, these provisions would have eliminated more than 90% of the market for storefront payday loans. 82 Fed. Reg. at 54,826–27.  The underwriting provisions have since been revoked by the Bureau and therefore are not currently being challenged in this lawsuit.  *See* 85 Fed. Reg. 44,382 (July 22, 2020) (the "Revocation Rule").

A second part of the 2017 Rule prohibited, as an "unfair" and "abusive" practice, lenders of certain loans (including payday loans, vehicle-title loans, and installment loans with an APR greater than 36%) from attempting to withdraw pre-authorized payments from a consumer's account after the lender's second consecutive attempt to do so has failed due to a lack of sufficient funds, without obtaining a new, specific authorization for further withdrawals from the consumer. 12 C.F.R. §§ 1041.7–.8.  The Bureau's purported rationale for this prohibition is that failed attempts at withdrawal lead to the imposition of nonsufficient-funds fees on consumers by their banks, which can be "quite costly for borrowers."  *See* 81 Fed. Reg. at 47,929.  However, this prohibition applies to payments made by debit card and prepaid card, even though failed card payments typically do not result in bank nonsufficient funds (NSF) fees.  *See* 82 Fed. Reg. at 54,746.  And the prohibition applies to the subsequent pre-authorized payments of a multi-payment installment loan, even though there typically is ample time between installments for a consumer to ensure that sufficient funds are deposited into his account or to contact the lender to obtain an extension or arrange other payment options.  *See* Shaul Comment at 54 (A177).

Under the 2017 Rule, in order to obtain a new, specific authorization for further withdrawals from the consumer, a lender must first provide the consumer with a required consumer rights notice within three business days of the second consecutive failed attempt.  12 C.F.R.

§§ 1041.8(c)(3), 1041.9(c).  The 2017 Rule imposes limitations on the lender's ability to obtain the new, specific authorization electronically or by telephone communication.  *Id.* § 1041.8(c)(3). The payments provisions of the 2017 Rule also require lenders to provide each consumer with a payment notice prior to initiating the first payment withdrawal or an unusual withdrawal from a consumer's account.  *Id.* § 1041.9(b).

The 2017 Rule included a compliance date, for both the underwriting provisions and the payments provisions, of August 19, 2019—twenty-one months after the Rule's publication in the Federal Register.  82 Fed. Reg. at 54,472.  That lenders would not need to comply with the Rule for nearly two years reflected the Bureau's judgment that "an orderly implementation period" of 21 months was needed for "lenders [to] be able to reasonably adjust their practices to come into compliance with the rule."  *Id.* at 54,814.

The 2017 Rule was promulgated by an agency whose substantial power over the U.S. economy was at the time concentrated in a single Director insulated from both the President and Congress.  *See* 12 U.S.C. §§ 5491(c)(1), (3).  The Bureau's policies—including the 2017 Rule— were therefore those of the Director alone, unchecked by any mechanism of political accountability.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020).

**IV.   PROCEDURAL HISTORY**

Plaintiffs are two non-profit trade associations suing on behalf of their members, payday lenders and Texas-based credit access businesses who are directly regulated by the 2017 Rule. They filed this action on April 9, 2018, seeking to set aside the 2017 Rule under the Constitution and the Administrative Procedure Act.  ECF No. 1.  On May 31, 2018, Plaintiffs and the government defendants filed a joint motion seeking a stay of the compliance date of the rule pursuant to 5 U.S.C. § 705 pending the outcome of this litigation, as well as a stay of the litigation pending the outcome of a rulemaking proceeding that the Bureau had announced it would

undertake with a view to revisiting the 2017 Rule.  ECF No. 16.  After motion practice and a hearing, this Court stayed both the compliance date of the 2017 Rule and the litigation.  ECF Nos. 29 & 53.

In early 2019, the Bureau initiated rulemaking proceedings to revoke the underwriting provisions of the 2017 Rule.  *See* Notice of Proposed Rulemaking, 84 Fed. Reg. 4,252 (Feb. 14, 2019).  In doing so, the Bureau acknowledged certain key flaws in the 2017 Rule, including that the evidence supporting the 2017 Rule was insufficiently robust and reliable and that the prior Director has misinterpreted the proper scope of the Bureau's statutory UDAAP authority to regulate unfair, deceptive, and abusive acts and practices.  *Id.*

Numerous commenters, including Plaintiff CFSA, urged the Bureau to revoke the payments provisions as well, pointing out that they suffered from similar legal flaws as the underwriting provisions, including the very same misinterpretation of the Bureau's UDAAP authority that formed one basis for the Bureau's revocation of the underwriting provisions.  But the Bureau ultimately declined these requests.  *See generally* 85 Fed. Reg. 44,382.

On June 29, 2020, while the revocation rulemaking was pending, the U.S. Supreme Court held that the Bureau had been unconstitutionally structured.  *Seila Law*, 140 S. Ct. at 2183.  To allow the Bureau to operate prospectively, the Court invalidated the statutory provision that had insulated the Bureau's director from removal by the President except for cause.  *Id.*

Less than one month later, the Bureau—now led by a Director removable by the President—finalized a rule revoking the underwriting provisions of the 2017 Rule.  *See* 85 Fed. Reg. 44,382.  Among other things, the Revocation Rule disavowed the legal standard used in the 2017 Rule for assessing unfairness and abusiveness under section 1031(c) & (d) of the Act and adopted what the Bureau determined was a better interpretation of the relevant statutory language.

*See id.* at 44,390–94. And yet, around the same time, the Bureau published in the Federal Register a "ratification" stating that "[t]he Bureau, through its Director, hereby affirms and ratifies the payments provisions of the 2017 Final Rule." 85 Fed. Reg. 41,905-02, 41,905 (July 13, 2020) (the "Ratification"). This purported ratification did not go through notice-and-comment rulemaking and failed to explain, or even address, why the Bureau was purporting to affirm and ratify components of a rule that had relied, in the Bureau's own assessment, on an incorrect interpretation of the Bureau's statutory UDAAP authority. *Id.*

The Bureau also denied a petition filed in 2018 by CFSA member Advance Financial requesting that the Bureau undertake a rulemaking to amend the payments provisions of the 2017 Rule to exclude debit-card transactions on the ground, among others, that denied debit-card payments rarely (if ever) result in consumers being charged nonsufficient funds fees, and therefore do not present the risk of consumer harm that the Bureau relied upon as the basis for the payment provisions. *See* Petition for Rulemaking and Supplementary Comment from Advance Financial, To the Bureau of Consumer Financial Protection ("Petition"), AR at 18073 (A123); Petition Denial, AR at 18108 (A158).

Following these events, the Court lifted the stay of litigation. On August 28, 2020, Plaintiffs filed an amended complaint reasserting their constitutional and statutory challenges to the remaining portion of the 2017 Rule—the payment provisions—and also challenging the Bureau's purported ratification of those provisions and its denial of Advance Financial's rulemaking petition.

## ARGUMENT

The Bureau's 2017 payments provisions must be held unlawful and set aside for several reasons. The most basic is that they were part of a rule issued by an invalidly constituted agency. As binding precedent makes clear, an invalid agency cannot take lawful action. So the provisions

were void from the start.  Nor can the Bureau cure this problem by waving the magic wand of ratification.  A legislative rule must follow a notice-and-comment process.  That process here was invalid, having been undertaken by an agency that lacked the power to do anything.  So the proper remedy is a new notice-and-comment process, conducted by a validly constituted agency.  Unless the now validly reshaped Bureau undertakes a new rulemaking, there can be no valid rule to enforce.

Moreover, even if ratification could cure some kinds of defects, it cannot cure the ones at issue here for several reasons particular to this case.  First, as a matter of agency law, ratification requires two actors: a principal who had authority to act at the relevant time, and an agent who lacked that authority, and whose actions the principal must now approve.  But here the problem was not a rogue agent straying from a valid principal's directions.  All along, there was only one entity—an invalidly constituted Bureau—that lacked authority to act when the payments provisions issued.  So no official or body now has the authority to ratify them.  Second, the attempted ratification here is arbitrary three times over, because it seeks to bless payments provisions that rested on three premises the Bureau has since flatly rejected or rendered false, in the course of revoking the 2017 Rule's other half, the underwriting provisions.  In particular, the payments provisions rest on now-disavowed or outdated judgments about the scope of the Bureau's statutory UDAAP authority, the costs of enforcing the payments provisions, and the time that covered entities would need in order to come into compliance with those provisions.

More broadly, ratification cannot get around the fact that the policy sought to be ratified in this case is itself arbitrary and capricious and inconsistent with several statutory limits on the Bureau's authority.  The payments provisions flout statutory limits on what can and cannot count as "unfair" or "abusive"; a statutory ban on Bureau rules that target high loan rates; and another

prohibition on Bureau rules that are driven by policy preferences.  The payments provisions also rest on a defective cost-benefit analysis.  In its 2017 analysis, the Bureau assumed that the costs of those provisions would be reduced by operation of the 2017 Rule's underwriting provisions.  Now the latter have been revoked.  Yet the Bureau has not measured the new and higher costs of the payments provisions, much less weighed them against any alleged benefits.  Moreover, the Bureau has all along simply ignored other important costs of the payments provisions.  A valid rulemaking process would have to take those costs into account, as the CFPA statute makes clear.

For all these reasons, the 2017 payments provisions are null and void and must be set aside.

Alternatively, this Court should order the Bureau to undertake a rulemaking sought by Plaintiff member Advance Financial in a 2018 petition denied by the Bureau.  As that petition shows, the Bureau's main reason to limit automatic withdrawals via the payments provisions was to reduce the fees imposed on consumers when a check bounces.  But those fees almost never arise in connection with credit or debit card transactions.  So limiting withdrawals of the latter sort was clearly arbitrary and capricious.  By the same token, it was arbitrary and capricious for the Bureau to deny Advance Financial's petition for a rulemaking to fix the payment provisions' overbreadth.

I.  **THE RULE CHALLENGED HERE WAS VOID *AB INITIO* AND MUST BE SET ASIDE BECAUSE THE BUREAU THAT PROMULGATED IT WAS UNLAWFULLY STRUCTURED.**

Private plaintiffs have the right to equitable relief to restrain government action that violates separation-of-powers principles.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).  Moreover, the APA forbids agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

As the Supreme Court has now confirmed, when the 2017 Rule was promulgated, the Bureau lacked the constitutional authority to act.  At the time, the Bureau exercised all its powers through a single Director who could be removed by the President only "for cause," that is "for

inefficiency, neglect of duty, or malfeasance in office."  Because the Constitution provides that "[t]he executive Power shall be vested in a President," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, it is generally unconstitutional for Congress to vest executive power in officers who are not removable by, and hence not accountable to, the President.  *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 119 (1926); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 632 (1935) (narrow exception for certain independent commissions headed by bipartisan, multimember bodies).  While this case was pending, the Supreme Court held that "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."  *Seila Law*, 140 S. Ct. at 2197.

It follows that the acts of the unconstitutionally insulated Director—including the 2017 Rule—were void ab initio, or invalid from the outset.  Actions taken by an officer or agency that violates the Constitution's separation-of-powers protections are themselves unconstitutional and invalid.  *Ryder v. United States*, 515 U.S. 177, 182–83 (1995).  Whether officers are unlawfully insulated or invalidly appointed, they wield authority unmoored from the political controls imposed by the Constitution.  *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.") (internal quotation marks and citation omitted).  For this reason, the Director's past actions (prior to the Supreme Court's severance of the removal restrictions) were "constitutional[ly] defect[ive]."  *Seila Law*, 140 S. Ct. at 2208.[2]  The appropriate remedy for this "constitutional defect" in the 2017 Rule is to set aside

---

[2] Since an unlawfully structured agency "lacks authority to bring [even an] enforcement action" against a single party, *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993), it surely lacks the power to promulgate legislative rules that are enforced against whole

that rule and require the Bureau, should it wish to effectuate the payments provisions contained in the rule, to conduct a new notice-and-comment rulemaking. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) ("the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official") (quoting *Ryder*, 515 U.S. at 183, 188.)); *NLRB v. Noel Canning*, 573 U.S. 513 (2014) (invalidating an order issued by unlawfully composed Board); *Bowsher*, 478 U.S. at 736. (affirming a decision setting aside, as "without legal force and effect," *Synar v. United States*, 626 F. Supp. 1374, 1404 (D.D.C. 1986), the order of an official unlawfully insulated from presidential removal).

## II.   THE GOVERNMENT'S PURPORTED RATIFICATION OF THE PAYMENT PROVISIONS IS INEFFECTIVE, UNCONSTITUTIONAL, PROCEDURALLY IMPROPER, AND ARBITRARY AND CAPRICIOUS.

The government tries to get around the required process here with a stroke of a pen—by ratification.   But the ratification proposed here is ineffective and invalid as a matter of constitutional law as well as agency law.   It was also arbitrary and capricious under the APA because it conflicts with the Bureau's current interpretation of the scope of its authority and alters the original terms of and justifications for the payments provisions.

**a.**   This attempt at ratification is ineffective and invalid for several reasons rooted in the constitutional and statutory principles governing agency actions.   For a legislative rule like the payments provisions to be valid under the APA, the rule must follow notice-and-comment procedures.   *See* 5 U.S.C. § 553(b).   But for that or any other agency process to have any legal

classes of actors.  Lacking the authority to conduct notice-and-comment rulemaking, the Bureau lacked the authority to issue legislative rules, like the 2017 Rule, whose validity depends on such rulemaking.  *See Nguyen v. United States*, 539 U.S. 69, 83 & n.17 (2003) (observing that a government body that is not "properly constituted" is not "empowered to exercise" the authority that is otherwise entrusted to it); *IBS, Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1340–42 (D.C. Cir. 2012) (vacating Copyright Board decision "[b]ecause the Board's structure was unconstitutional at the time it issued its determination").

effect under the Constitution, it must be undertaken by a constitutionally structured agency. *See supra* Part I. Since the Bureau in 2017 was unconstitutionally structured, its 2017 Rule was void *ab initio*, and there is nothing there to be ratified now. *See id.* If the Bureau wants to enforce its payments rule, it must launch a new rulemaking, under a Director now answerable to the President. *Post hoc* ratification is not enough.

The Supreme Court followed the same course in *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018), which vacated an adjudication conducted by an officer who had not been properly appointed. The Court emphasized that courts in such cases must fashion meaningful remedies to "create incentives" for plaintiffs to challenge actions taken by agencies that are unconstitutionally structured. *Id.* at 2055 & n.5 (internal quotation marks and citation omitted). To allow the Bureau to lean on ratification now would do just the opposite, enabling the agency to sidestep an essential APA requirement (notice and comment) based on a previous agency action (an attempted rulemaking) that everyone now agrees had no legal force whatsoever. And it would deny Plaintiffs a meaningful remedy here, even though Plaintiffs highlighted this constitutional flaw during the rulemaking process, timely filed this lawsuit seeking to vindicate their constitutional claim, and prevailed, via the Supreme Court's decision in *Seila Law*, on the merits of that claim.

But even if this sort of ratification workaround were a coherent possibility in the abstract, here the Bureau's attempted ratification is ineffective and violates the APA for several other reasons specific to this case.

*First*, as the Supreme Court has made clear, the remedy for a proceeding led by officials who lacked the power to act as a constitutional matter is a *new* proceeding, conducted by officials who *have* the requisite power, not some ratification of the unconstitutional officers' act. This was the clear lesson of *Lucia v. SEC*, 138 S. Ct. 2044 (2018). When the *Lucia* Court found that an

enforcement proceeding had been presided over by an invalidly appointed ALJ, it did not even entertain the possibility that the resulting decision could simply be ratified by a duly appointed ALJ. Instead, the Court held that "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a *new 'hearing* before a properly appointed' official," *id.* at 2055 (quoting *Ryder*, 515 U.S. at 183, 188.) (emphasis added); s*ee also Norton v. Shelby Cnty.*, 118 U.S. 425, 449 (1886) ("Where no office legally exists, the pretended officer is merely a usurper, to whose acts no validity can be attached."); *Ringling v. City of Hempstead*, 193 F. 596, 601 (5th Cir. 1911) ("If . . . the tribunal acting had no authority in law to act at all in the premises, then its attempted action cannot be validated by subsequent legislation . . . . An unconstitutional law is null and void, and proceedings had under it afford no basis for subsequent ratification or retroactive validation."). Simply put, if an enforcement action requires a hearing by an ALJ, a valid action requires a hearing by a validly appointed ALJ. It follows that since legislative rules require notice-and-comment led by an agency, *see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020) (citing 5 U.S.C. § 553(b)), *valid* rules require notice-and-comment by a *validly* constituted agency. In this case, no one denies that the payments provisions embody a legislative rule, and all now agree that they flowed from a notice-and-comment process undertaken by a Bureau that lacked the power to act. So a new process, led by a lawfully reconstituted Bureau, is indispensable.

To demand as much is not to insist on an empty formality, but to vindicate the essential "purpose[s] of notice-and-comment rulemaking," including that of ensuring "fairness and mature consideration of rules having a substantial impact on those regulated." *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) (internal quotation marks and citation omitted). Here, after all, the Director weighed the proposed rule's vast costs and purported benefits with "no colleagues to

persuade, and no boss or electorate looking over [his] shoulder." *Seila Law*, 140 S. Ct. at 2204. More is required by the Constitution, and by the APA's criteria for a valid rulemaking. To be enforceable, the Bureau's proposed Rule must be adopted through a notice-and-comment process led by a director who answers to the President.

*Second*, even if ratification could somehow cure constitutional defects in other cases, it cannot do so where, as here, the constitutional violation limited the power of the agency to act. That is because, under black-letter agency law, "it is essential that the party ratifying should be able" "to do the act ratified at the time the act was done," and not only "at the time the ratification was made." *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) (citation and emphasis omitted); *see also* Restatement (Third) of Agency §§ 3.04(1), 4.01(3)(b), 4.04(1) (2006) (requiring the ratifier to have existed—*and possessed the relevant powers*—at the time of the act that it seeks to ratify). In other words, ratification requires two entities—a principal who had authority to act at the time in question, and an agent who did not. But here there has always been just one entity— the CFPB—which lacked authority from the start. So the principal-agent model that is essential to the whole idea of ratification has no purchase here. Simply put, ratification is impossible because the constitutional infirmity in this case "concerns the structure and authority of the CFPB itself, not the authority of an agent to make decisions on the CFPB's behalf." *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 785 (S.D.N.Y. 2018). Thus, "the effort of the [Bureau] to authorize the [rulemaking] did not breathe life into it." *NRA Political Victory Fund*, 513 U.S. at 90. Since the Bureau was not lawfully constituted when it purported to adopt the 2017 Rule, it did not then have the power to conduct that rulemaking, and so it cannot now ratify that process or its result. *See* Restatement (Third) of Agency § 4.04, Comment *c* ("[A] person not in existence at the time of an act or transaction may not subsequently ratify it."). And that must be the outcome as a

constitutional matter:  a ratification is retroactive to the date of the act, *id.* § 4.02(1), and it cannot be that a person devoid of any lawful authority under the Constitution may create prospectively enforceable legal obligations that bind the public.

Instead, the now-lawfully shaped Bureau must launch a new rulemaking if it wants to enforce its 2017 payments provisions.[3]  The Bureau is in the same position it would have been in had the old Bureau not taken any rulemaking action at all.  An unconstitutional agency's action is void *ab initio* and thus equivalent to non-action.  Accordingly, the Bureau must start from the beginning, just as it would have to do if the unconstitutionally structured Bureau had not initiated a rulemaking.  An agency does not *benefit* from a prior unconstitutional structure.

**b.**  Even apart from the Bureau's general inability to ratify a rulemaking in light of the constitutional flaw identified in *Seila Law*, the specific ratification here is both ineffective and itself arbitrary and capricious under the APA.  Specifically, the Bureau cannot be said to have validly ratified the payments provisions since it has just *rejected* three crucial judgments underlying those provisions.  So its purported ratification violates the Administrative Procedure

---

[3] Going back through the appropriate process with a duly constituted agency may not be necessary when the action at issue (unlike rulemakings and adjudications) had few if any hard-and-fast procedural requirements to begin with.  For example, in *Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) (en banc), *cert. granted by Mnuchin v. Collins*, No. 19-563, 2020 WL 3865249 (July 9, 2020), the action at issue was a mere agreement, a kind of contract entered into partly by certain officials.  But although the court did not reach the issue, it could be argued that since agreements are formed by consent, and depend on nothing but consent, agreements with infirm roots can equally well be cured by consent.  But the action challenged here, a legislative rule, required more than an official's signature in the first place.  It required a panoply of procedures, including a regulatory flexibility analysis that gives voice to small businesses, *see* 5 U.S.C. §§ 603–04, and extensive engagement with comments—in this case, more than a million of them.  A wave of the hand (or the pen) cannot substitute for these trademark requirements of lawful rulemaking.  Likewise, while some circuits have upheld ratifications of prior agency actions, none of them were reviewing actions that required notice and comment.  *See FEC v. Legi–Tech, Inc.*, 75 F.3d 704, 708–09 (D.C. Cir. 1996); *Advanced Disposal Servs. E., Inc., v. NLRB*, 820 F.3d 592 (3d Cir. 2016); *CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016).

Act, under which "an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

The Bureau's ratification of the payments provisions flouted this constraint in three ways. *First*, it introduced a glaring "unexplained inconsistency" (*id.*) in the agency's test for identifying "unfair, deceptive, or abusive acts or practices," 12 U.S.C. § 5531(b). Specifically, the ratification embraced the 2017 Rule's payments provisions (in utterly conclusory terms), even though they rested on the very same UDAAP standard that the Bureau had just *rejected* in revoking the underwriting provisions. Under the APA, the Bureau cannot ratify an action perched on a UDAAP analysis that it has just dismantled root-and-branch, much less do so without explaining or even acknowledging the contradiction.

The 2017 Rule's payments provisions and underwriting provisions alike rested on the Bureau's identifications of the two underlying industry practices as "unfair" and "abusive." *See id.* And both designations, in turn, sprang from the Bureau's interpretation of when consumers lack "an understanding of the likelihood and magnitude of risks of harm associated with payday loans." 84 Fed. Reg. at 4270; *see* 82 Fed. Reg. at 54,472, 54,597–98, 54,617, 54,740–41. But the Bureau has now rejected that definition of consumer "understanding" as too stringent.[4] Specifically, the Bureau's recent revocation faults the 2017 Rule for finding that an industry practice might be unfair or abusive whenever consumers lack a "*specific* understanding of their

---

[4] Indeed, the 2020 revocation found the 2017 Rule's analysis on underwriting to be riddled with legal and factual errors of all kinds, including mis-readings of the underlying statutes, *see* 85 Fed. Reg. 44,428 (to be codified at 12 C.F.R. pt. 1041); over-readings of the evidence, *id.*; miscalculations of costs and benefits, *see id.* at 44,406; and over-breadth of remedies, *see id.* at 44,420.

*individualized* risk" associated with the practice.  85 Fed. Reg. at 44,390 (to be codified at 12 C.F.R. pt. 1041) (emphasis added); *see also, e.g.*, *id.* at 44,394.  Under the Bureau's 2017 analysis, for example, it was not enough that consumers would "understand as a general matter that they may incur … fee[s]" for failed payment-transfer attempts, 82 Fed. Reg. at 54,740; they must also have been aware of the *particular degree* of the "severity of the risk they are exposing themselves to in the circumstances," *id.* at 54,741.  Now, by contrast, the Bureau holds that consumers need only have a "general" understanding of the risks at stake; "understand[ing] their individualized risk" is not necessary.  *See* 85 Fed. Reg. at 44,391, 44,394.  It was based on this broader definition of consumer "understanding" that the Bureau revoked the underwriting provisions.  But then it *ratified* the payments provisions, even though they were based on the sort of narrower definition that the Bureau has officially rejected. 82 Fed. Reg. at 54,740–41.  Simply put, the Bureau ratified payments provisions that rest on what the Bureau now acknowledges to be an unduly narrow view of consumer understanding.  That is arbitrary and capricious.  Indeed, the breezy ratification failed not only to explain this tension but to say *anything* about the Bureau's reasons for blessing the payments provisions.

A similar conflict exists between the Bureau's 2017 and 2020 analyses of what it means for a particular practice's harmful effects to be "not reasonably avoidable," which goes to whether the practice is "unfair" under the CFPA.  Whereas the 2017 Rule declared that a consumer's decision "not to participate in the market is not considered to be a valid means of reasonably avoiding" an alleged injury, *id.* at 54,737 (A422), the Revocation Rule regards it as "well-established that consumers *can* reasonably avoid injury through . . . 'anticipatory avoidance,'" such as by "declin[ing] a product or service" (at least where, as here, consumers "in the market for covered loans do not face a take-it-or-leave-it choice," but rather "can potentially access formal

credit options with varied terms and conditions and other informal credit options, such as borrowing from family and friends"), 85 Fed. Reg. at 44,397 (emphasis added). Likewise, as to whether a practice is "abusive" because it takes advantage of consumers' inability to protect their own interests, the 2017 Rule rejected the argument that consumers could guard their own interests "by not taking out loans in the first place." 82 Fed. Reg. at 54,743. But the Revocation Rule makes clear that consumers' "access to alternative sources of credit" proves that they *can* protect their interests by declining to take out a loan in the first place. 85 Fed. Reg. at 44,424. In this respect, too, then, the Bureau arbitrarily blessed a policy that was based on a 2017 UDAAP analysis that the Bureau has squarely rejected.

*Second*, the agency's attempted ratification embodies an unexplained about-face about another essential matter: the time needed to implement the payments provisions. In 2017, the Bureau gave companies 21 months to come into compliance with those provisions. And that was no mere accident or afterthought. The Bureau reasoned that "the interest of enacting protections for consumers as soon as possible" had to be balanced against "giving [lenders] enough time for an orderly implementation period," and concluded that 21 months were needed for "lenders [to] be able to reasonably adjust their practices to come into compliance with the rule." 82 Fed. Reg. at 54,814. The 21-month figure thus reflected the Bureau's considered judgment about the time *needed* for companies to comply—a judgment the Bureau had revised upward in light of comments gathered in the rulemaking process. *See id.* at 54,814. But its ratification now tries to re-impose the payment rules with *no* provision for an implementation period. And the agency has effectively proposed to replace the 21-month period with an impossible deadline of 60 days. So the Bureau has radically changed an integral part of a legislative rule (the implementation date) without

explaining its reversal.  This, too, makes the ratification both ineffective to cure the constitutional

defect and arbitrary and capricious in its own right.

This APA obstacle to the Bureau's ratification, like the constitutional obstacle identified

above, is reinforced by agency law, which governs all ratifications.  It is well-established that "[a]

ratification is not effective unless it encompasses the entirety of an act, contract, or other single

transaction."  Restatement (Third) of Agency § 4.07 (2006).  Thus, "[b]urdens" must "accompany

benefits"—which means, for example, that "[a] person may not, by ratifying an act, obtain its

economic benefits without bearing the legal consequences that accompany the act."  *Id.* at

Comment *b*.  In this case, analogously, the Rule's 21-month implementation period (a benefit to

regulated entities) is part and parcel of the Rule's payments provisions (a burden on those entities).

*Cf. Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 762 (3rd Cir. 1982) (an effective date is "an

essential part of any rule: without an effective date, the agency statement could have no future

effect, and could not serve to implement, interpret, or prescribe law or policy") (internal quotation

marks omitted).  So any attempt to ratify the payments rule and *not* its 21-month implementation

period is invalid.  Yet that is just what the Bureau has attempted to do here.  Its ratification fails

for that reason alone.

A *third* inconsistency concerns the Bureau's duty to consider "the potential benefits and

costs to consumers and covered persons [i.e., lenders], including the potential reduction of access

by consumers to consumer financial products."  CFPA § 1022(b)(2), 12 U.S.C. § 5512(b)(2).  A

cost-benefit analysis will be defective if it is internally inconsistent.  *Bus. Roundtable v. SEC*,

647 F.3d 1144, 1153–54 (D.C. Cir. 2011).  And such "serious flaw[s]" in an agency's cost-benefit

analysis "can render the [resulting] rule unreasonable."  *Nat'l Ass'n of Home Builders v. EPA*,

682 F.3d 1032, 1040 (D.C. Cir. 2012).

Here the Bureau's so-called cost-benefit analysis has such fatal flaws. Perhaps most glaringly, the Bureau in 2017 relied on its finding that the costs imposed by the payments provisions on lenders would be mitigated by the operation of the underwriting provisions:

> Note that the Bureau expects that unsuccessful payment withdrawal attempts will be less frequent under the rule. This is because . . . the ability-to-repay provisions or the requirements of the conditional exemption loans will reduce the frequency with which borrowers receive loans that they do not have the ability to repay. This should in turn lessen the impacts of the limitation on payment withdrawal attempts and the number of instances where a lender is required to notify consumers that the lender is no longer permitted to attempt to withdraw payments from a borrower's account.

82 Fed. Reg. at 54,846. This essential premise of the Bureau's cost-benefit analysis—that the underwriting provisions would "lessen" the costs to lenders of the payments provisions—no longer stands now that the underwriting provisions have been revoked. By the Bureau's own admission, the absence of the underwriting provisions means that the payments provisions will impose higher costs on lenders than the Bureau took into account in 2017. But rather than conduct a new cost-benefit analysis of the payments provisions, the Bureau has ratified those provisions without comment, apparently content to lean on an analysis that has just lost one of its legs. This dooms the action based on that analysis—here, the purported ratification of the payments provisions.

## III.   THE PAYMENTS PROVISIONS ARE INCONSISTENT WITH THE BUREAU'S STATUTORY UDAAP AUTHORITY AND ARBITRARY AND CAPRICIOUS.

Quite apart from the constitutional infirmity of the 2017 Rule and the ineffectiveness and invalidity of the Bureau's attempted "ratification," the payments provisions violated the CFPA and the APA when enacted. The Bureau has stepped beyond its authority under those provisions, and acted arbitrarily and capriciously, by declaring it unfair and abusive for payday lenders to attempt an authorized withdrawal from a borrower's bank account following two consecutive failed

attempts. *See* 5 U.S.C. § 706(2)(C) (barring action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

**a.**  Under the CFPA, a practice is "unfair" only if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by" them and "is not outweighed by countervailing benefits." 12 U.S.C. § 5531(c)(1)(A)–(B). So the injury must be substantial. It must be impossible to avoid by reasonable means. And it cannot be offset by related benefits.

Thus, it is not enough for the Bureau to note that bank fees for failed withdrawal attempts increase the cost of credit (through the "substantial additional fees" themselves and possible account-related effects). *See* 82 Fed. Reg. at 54,733. To show that these added costs are injuries, much less substantial injuries that outstrip any associated gains, would require a careful weighing of the benefits to consumers and to competition. And here the benefits are plain from consumers' own conduct and their explicit feedback, which the Bureau's paternalism consistently leads it to discount. Consumers often enter voluntary agreements with short-term lenders, fully informed of the terms (including the terms regarding automatic withdrawals for repayment), because their monthly net income does not cover their financial obligations, but it would be more onerous to resort to alternative ways of shouldering those obligations—pawn-shop loans, defaults on other debts, and late-payment fees, to say nothing of illegal sources of credit. *See generally* Zywicki, *supra*; Bhutta, *supra*. And if consumers' free choices were not enough evidence that the benefits of these products can outweigh the costs, consumers' overwhelming praise for these products should resolve doubts about their overall value. *See* Shaul Comment at 14 (A174).

On the cost side of the ledger, the Bureau lacked and still lacks substantial evidence even just for its estimations of the injuries supposedly addressed by the 2017 payments provisions. For by its own admission, the "Bureau's primary study on this topic was a report based on online

payday and high cost payday installment lenders *only*," and not the full gamut of covered entities, notably including, for instance, storefront lenders.  82 Fed. Reg. at 54,731 (emphasis added).

As for reasonable avoidability:  Consumers typically provide advance authorizations for withdrawals when they take out a payday loan, based on fully disclosed terms and with the understanding that other products are available.  So they can reasonably avoid any injuries by not entering into such transactions in the first place or not authorizing automatic withdrawals; by placing sufficient funds in their bank accounts to pay off their loans; by renewing or rolling over their loans; by negotiating repayment options with their lenders; or by invoking their rights under federal law to issue stop-payment orders or rescind authorized account access.  *See* Shaul Comment at 79 (A180).  The Bureau cannot show that these measures for avoiding injury are unreasonable.  On the contrary, it now *admits* that consumers can "reasonably avoid injury" by "declin[ing] a product or service" for alternatives (even informal alternatives, like borrowing from relatives).  85 Fed. Reg. at 44,397.  So by the Bureau's own standards, the practices targeted by the payments provisions do not satisfy a prerequisite for "unfair" practices under the CFPA.

More fundamentally, the Bureau overstepped its statutory charge, and acted arbitrarily and capriciously—by "entirely fail[ing] to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)—when it concluded that lenders are the "cause" of the purported injury here, 12 U.S.C. § 5531(c)(1)(A).  Payday lenders do not cause failed-payment fees or bank-account closures—the consumers' banks do that.  Payday lenders are not responsible for imposing or collecting the fees and do not coordinate in any way with consumers' banks in this regard.  Moreover, payday lenders do not intend to subject their borrowers to these fees and of course do not know any of the details of fees related to accounts that they do not own.  If the Bureau is concerned about injuries caused by these fees, the answer

is to regulate the conduct and practices of the banks that impose them.  Instead, the Bureau has chosen to hobble an authorization system that benefits borrowers and lenders alike by providing a relatively speedy, predictable, and low-cost means of loan repayment.  *See* 82 Fed. Reg. at 54,730.

**b.**  To be deemed "abusive" (under the two statutory prongs of the abusiveness test that were invoked by the Bureau to justify the payments provisions in 2017, *see id.* at 54,744 (A429), a practice must take "unreasonable advantage" of the consumer's (A) "lack of understanding … of the material risks, costs, or conditions," or of (B) his "inability … to protect [his] interests." 12 U.S.C. § 5531(d)(2).  But as noted earlier, the Bureau has since rejected the interpretations of "lack of understanding" and "inability … to protect interests" that had led it to designate withdrawal attempts as abusive—rightly so.  As the Bureau now recognizes, consumers' "access to alternative sources of credit" precludes a finding that they are unable to protect their own interests.  85 Fed. Reg. at 44,424.  Likewise, a "general" understanding of the risk of fees for failed withdrawal attempts, *see id.* at 44,394—such as the Bureau has always acknowledged consumers have, *see* 82 Fed. Reg. at 54,740 —is enough to preclude a finding that a practice takes advantage of consumers' "lack of understanding."  So the payments provisions find no firmer footing in the Bureau's authority to ban "abusive" practices than they did in the authority to forbid "unfair" ones.

**c.**  What is more, in restricting payment-transfer attempts, the Bureau arbitrarily and capriciously failed to heed important differences among the varieties of payment transfers covered, leaving itself unable to establish a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks and citation omitted). The 2017 payments provisions treat debit-card and prepaid-card payments the same as check and ACH payments even though these transactions are miles apart with respect to the precise evil the Bureau set out to cure:  Whereas ACH and check payment transfers may cause consumers to incur

fees from multiple failed attempts to withdraw funds, debit-card and prepaid-card payments *almost never* result in nonsufficient-funds fees. *See* 81 Fed. Reg. at 48,066. By riding roughshod over this difference, and basing the payments provisions entirely on data regarding ACH and check payments to the exclusion of debit-card payments, *see* 82 Fed. Reg. at 54,741, the Bureau acted arbitrarily. *See also infra* Part V.

Likewise, the 2017 Rule not only limited payment-transfer attempts for single-payment loans and for payments of a single installment of a multi-payment installment, but also limited payment-transfer attempts across multiple installments of a multi-payment installment loan, even though those installments are typically spaced two weeks or a month apart. In doing so, the Bureau again failed to acknowledge an "important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43—the fact that the longer periods between installments of an installment loan leave consumers more ample opportunity to replenish funds between repayments or renegotiate the terms of their loans, thus avoiding nonsufficient-funds fees. Even if the payments provisions are applied to limit lenders to two attempts to withdraw payment of a first installment of a loan, lenders should have another two chances to collect payment for each of the loan's later installments.[5]

**d.** Finally, the Bureau's payments provisions flout two other statutory limits. The first is Congress's command that the Bureau not "establish a usury limit." CFPA § 1027(o), 12 U.S.C. § 5517(o). The 2017 Rule violates this command because it improperly targets what the Bureau

---

[5] The Rule also harms consumers through its timing requirements for payment notices, by forcing consumers in some circumstances to incur additional interest costs resulting from loans of longer duration than they would prefer. The Rule requires a first payment withdrawal notice or an unusual withdrawal notice to be mailed no later than six business days prior to the first payment transfer or the unusual withdrawal. Thus, if an emailed notice is returned (because a consumer's mailbox is full), the lender cannot process the payment on the due date, but must rather wait six days for the mailed notice. Likewise, partial payment on a non-due date triggers the requirement to send an unusual withdrawal notice, which in some cases will delay the payment-process date.

deems to be "high-interest" loans and results from the Bureau's improper consideration of the cost of credit. Indeed, the Rule's applicability to installment loans turns solely on their interest rate and on the Bureau's view that the loans are harmful to consumers because of these rates. In particular, the Rule expressly targets installment loans "with an APR of more than 36 percent but not . . . those with a lower APR." 82 Fed. Reg. at 54,732. This type of blanket targeting of an entire category of loans based on the size of their interest rate is an attempt to subvert the statute, which clearly forbids the CFPB from establishing a usury limit.

Second, the 2017 Rule violates Congress's statutory command that public policy considerations may not serve as a primary basis for an unfairness determination and may not be considered at all in determining whether an act or practice is abusive. *See* CFPA § 1031(c)–(d), 12 U.S.C. § 5531(c)–(d). From top to bottom, the 2017 Rule is driven by public-policy considerations about the undesirability of expensive small-dollar loans—and ultimately by a paternalistic suspicion that customers are unable to make their own financial decisions.

## IV.   THE PAYMENTS PROVISIONS REST ON A DEFECTIVE COST-BENEFIT ANALYSIS

As noted above, the CFPA requires the Bureau to consider "the potential benefits and costs to consumers and covered persons [i.e., lenders], including the potential reduction of access by consumers to consumer financial products." CFPA § 1022(b)(2), 12 U.S.C. § 5512(b)(2). Such cost-benefit analyses are inadequate if, among other things, the agency "duck[s] serious evaluation of" certain costs or engages in internally inconsistent reasoning. *Bus. Roundtable*, 647 F.3d at 1150–55 (D.C. Cir. 2011). Any such "serious flaw" undermines the analysis, "render[ing] the rule unreasonable." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040. The Bureau's so-called cost-benefit analysis has at least two "serious flaw[s]."

First, as noted above, *see supra* Part II.b, in measuring the costs of enforcing the payments provisions, the Bureau in 2017 had assumed that those costs would be reduced by the effects of the underwriting provisions.  82 Fed. Reg. at 54,846.  So when the Bureau revoked the latter, it destroyed a pillar of its cost-benefit analysis.  Yet it never undertook a fresh analysis of the payments provisions before trying to ratify them.  So the latter action flouted the agency's duty to weigh costs and benefits.

But some problems have plagued the Bureau's (first and only) exploration of costs and benefits from the start.  For instance, the Bureau failed to weigh such important effects of the payments provisions as the increased likelihood that a loan would enter into collections sooner than it otherwise would have (if it would have at all)—an issue crucial to consumers, on which the Bureau is utterly silent.  *See id.* at 54,846–48.  The Bureau also failed to account for the additional accrued interest that consumers will incur as a result of the timing requirements of the notices that must be sent before payments can be processed.  *See supra* p. 27 n.5  The Bureau's reliance on a purported benefit that no longer exists, and its failure to consider serious costs, are flaws in the calculation of costs and benefits that "render the rule unreasonable." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040.

## V.   THE BUREAU'S DENIAL OF PLAINTIFF MEMBER'S RULEMAKING PETITION WAS ARBITRARY AND CAPRICIOUS.

A court must set aside a rule as arbitrary and capricious if the agency's decision is unsupported by substantial evidence or if the agency has made a clear error in judgment.  *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).  This applies just as well to agency denials of rulemaking petitions as to other final agency actions.  *See, e.g., FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463 (1984); *Weight Watchers Int'l., Inc. v. FTC*, 47 F.3d 990 (9th Cir. 1995); *Gen. Motors Corp. v. Nat'l Highway Traffic Safety Admin.*, 898 F.2d 165, 169 (D.C. Cir.

1990)).  Here the Bureau made a clear error in judgment, unsupported by evidence, when it denied Advance Financial's rulemaking petition asking the Bureau to "amend" the 2017 Rule "to exclude debit card payments" from the reach of the payments provisions.

The Bureau's express reason for limiting automatic withdrawals of payments through ACH and check payment transfers was that failed attempts of these sorts might cost consumers dearly, in the form of nonsufficient-funds fees.  *See* 81 Fed. Reg. 47,929 ("Bounced checks and failed [automated transaction] payments can be quite costly for borrowers.  The median bank NSF fee is $34[.]").  But by the Bureau's own admission, *debit*-card transactions almost *never* result in nonsufficient-funds fees.  *See id.* at 48,066; *see also* Gary Stein, *Understanding the Overdraft "Opt-in" Choice*, Consumer Financial Protection Bureau (Jan. 19, 2017), https://tinyurl.com/y4zuxqvr ("Your bank or credit union cannot charge you fees for overdrafts on ATM and most debit card transactions unless you have agreed ('opted in') to these fees.").  Thus, what the Bureau itself identified as "the harms underpinning the unfair and abusive practice" simply "would not occur" in these cases.  82 Fed. Reg. at 54,746.  By the same token, the practice of automatic withdrawals in such debit-card cases cannot be deemed unfair or abusive.  *See* 12 U.S.C. § 5531(c)–(d).

Thus, applying the payments provisions to debit-card transactions was arbitrary and contrary to the Bureau's UDAAP authority; so, then, was the Bureau's denial of Advanced Financial's petition for a rulemaking to correct this error.  *See* Petition Denial, AR at 18108 (A158).  Indeed, the Bureau's petition denial largely repeated the 2017 Rule's unsupported assertion that "an exclusion based on payment type would work to alleviate much compliance burden," Petition Denial at 5, AR at 18112 (A162) (quoting 82 Fed. Reg. at 54,747)—an assertion that contradicts submitted comments and commonsense, as Advance Financial's petition had made

clear, *see* Petition at 17–18, AR at 18091–92 (A141–A142). What's more, the Bureau's denial of Advance Financial's petition failed to explore whether—much less explain how—the relevant debit-card transfers would count as unfair and abusive under the Bureau's new and narrower reading of this UDAAP standard, *see id.*, as laid out in the Revocation Rule, *see supra* II.b. This failure by itself dooms the denial of Advance Financial's petition as arbitrary and capricious. *See Encino Motorcars*, 136 S. Ct. at 2126.

## VI.   THE BUREAU'S ACTIONS ARE INVALID BECAUSE ITS STRUCTURE CONTINUES TO VIOLATE CORE SEPARATION-OF-POWERS PRINCIPLES.

In all events, the challenged actions are invalid because the Bureau continues to violate two separation-of-powers principles that the Supreme Court had no occasion to address in *Seila*.

First, the Bureau's funding mechanism usurps Congress's essential role in the allocation of federal funds. As the Constitution provides, "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. James Madison called this "power over the purse" the "most complete and effectual weapon . . . for obtaining a redress of every grievance." *The Federalist* No. 58, at 359 (James Madison) (C. Rossiter ed., 1961). Yet the Bureau takes federal government money without an appropriations act: The director has exclusive authority to set the Bureau's budget at up to a set percentage of the Federal Reserve System's operating expenses (currently over half a billion dollars), *see* CFPA § 1017(a)(2)(A), 12 U.S.C. § 5497(a)(2)(A), a perpetual budget that is exempt even from mere "review by the Committees on Appropriations of the House of Representatives and the Senate," CFPA § 1017(a)(1)–(2), 12 U.S.C. § 5497(a)(1)–(2). This unconstitutional arrangement renders invalid any assertion of the Bureau's regulatory authority. For this reason alone, the 2017 Rule, and any current effort to enforce it, unconstitutionally regulates Plaintiffs and must be enjoined.

The Bureau's powers also usurp Congress's role in a second way. The Constitution

"vest[s]" Congress and Congress alone with "[a]ll legislative Powers herein granted." U.S. Const., art. I, § 1. And "[t]he framers understood . . . that it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892)). So Congress must give more guidance to agencies tasked with developing regulations; at the very least it must provide "an intelligible principle to guide the delegee's use of discretion." *Id.* at 2123. For example, the Court held that it was *not* enough for Congress to instruct its delegee to "approve 'codes of fair competition'" for slaughterhouses and other industries. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521–522 (1935). Yet here Congress has done something quite similar, giving the Bureau the vague and sweeping power to identify "unfair, deceptive, or abusive acts or practices" for the financing industry. 12 U.S.C. § 5531(b). That is no intelligible principle. Because, in the exercise of its UDAAP authority, the Bureau wields legislative power unconstitutionally delegated to it by Congress, the payments provisions, which rested on that UDAAP authority, are invalid and must be set aside.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment holding invalid and setting aside the payments provisions and purported ratification under the Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 (the "APA"). In the alternative, because the Bureau's denial of Advance Financial's rulemaking petition was arbitrary and capricious, the Court should order the Bureau to undertake the rulemaking requested in that petition.

Dated: September 25, 2020                    Respectfully submitted,


                                             /s/ Laura Jane Durfee
                                               MICHAEL A. CARVIN
                                                 D.C. Bar No. 366784
                                                 Admitted *pro hac vice*
                                                 macarvin@jonesday.com
                                               CHRISTIAN G. VERGONIS
                                                 D.C. Bar No. 483293
                                                 Admitted *pro hac vice*
                                                 cvergonis@jonesday.com
                                               **JONES DAY**
                                               51 Louisiana Avenue NW
                                               Washington, DC 20001
                                               Telephone: (202) 879-3939
                                               Facsimile: (202) 626-1700

                                               LAURA JANE DURFEE
                                                 Texas Bar No. 24069653
                                                 ldurfee@jonesday.com
                                               **JONES DAY**
                                               2727 North Hardwood Street
                                               Dallas, TX 75201
                                               Telephone: (214) 220-3939
                                               Facsimile: (214) 969-5100

                                               *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of September 2020, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to all counsel of record.


Dated:  September 25, 2020


*/s/ Laura Jane Durfee*
Laura Jane Durfee
*Counsel for Plaintiffs*

34