**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., and CONSUMER SERVICE ALLIANCE OF TEXAS, | |
| *Plaintiffs,* | Civil Action No. 1:18-cv-295 |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU and KATHLEEN KRANINGER, in her official capacity as Director, Consumer Financial Protection Bureau, | |
| *Defendants.* | |

## DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A. The Consumer Financial Protection Act ................................................................ 2

    B. The 2017 Payday Rule .......................................................................................... 4

    C. Subsequent Developments ..................................................................................... 6

        1. This Litigation and the Stay of the 2017 Rule's Compliance Date ........................... 6

        2. 2020 Rule Revoking the Underwriting Provisions ................................................... 7

        3. Advance Financial's Petition for Rulemaking .......................................................... 8

        4. *Seila Law* and Ratification of the Payment Provisions ............................................ 8

ARGUMENT ....................................................................................................................... 9

I. Plaintiffs' Separation-of-Powers Challenge Provides No Basis To Set Aside the Payment Provisions Because a Director Fully Accountable to the President Has Ratified Them. ............................................................................................................ 9

    A. The ratification by a Director fully accountable to the President cured any Article II defect in the initial adoption of the Payment Provisions. .............................. 9

    B. The ratification of the Payment Provisions is valid. ................................................... 12

        1. The nature of the prior constitutional problem does not preclude ratification. ....... 13

        2. The Bureau was not required to redo the notice-and-comment process. ................. 15

        3. The ratification is not arbitrary and capricious. ...................................................... 20

II. The Payment Provisions Are Consistent with the Bureau's Statutory Authority and Are Not Arbitrary and Capricious. ...................................................................... 26

    A. The Bureau reasonably determined that the proscribed payment-withdrawals practice is "unfair." .......................................................................................................... 27

    B. The Bureau reasonably determined that the proscribed payment-withdrawals practice is "abusive." ...................................................................................................... 31

    C. The Bureau reasonably declined to exempt certain types of payment transfers from the Payment Provisions ......................................................................................... 31

    D. The Payment Provisions do not establish a usury limit or improperly rely on "public policy." ....................................................................................................... 33

III. The Bureau Reasonably Considered the Payment Provisions' Benefits and Costs. .......... 34

IV.  The Bureau Appropriately Denied Advance Financial's Petition for Rulemaking............ 36

V.  There Is No Remaining Separation-of-Powers Problem with the Bureau's Organic Statute. ....................................................................................................... 37

VI.  The Bureau Observed All Required Procedures in Promulgating the Payment Provisions. ................................................................................................................. 39

CONCLUSION ............................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanced Disposal Servs. E., Inc. v. NLRB*,
    820 F.3d 592 (3d Cir. 2016) ....................................................................... 10, 11, 15

*Alfa Int'l Seafood v. Ross*,
    264 F. Supp. 3d 23 (D.D.C. 2017) ............................................................. 10, 16, 22

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*,
    388 F.3d 405 (3d Cir. 2004) ........................................................................... 38

*Am. Horse Prot. Ass'n, Inc. v. Lyng*,
    812 F.2d 1 (D.C. Cir. 1987) ...................................................................... 36, 37

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
    826 F.3d 215 (5th Cir. 2016) ......................................................................... 27

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    140 S. Ct. 2335 (2020) .................................................................................. 20

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ....................................................................................... 11

*CFPB v. All Am. Check Cashing, Inc.*,
    2018 WL 9812125 (S.D. Miss. Mar. 21, 2018) ............................................. 38

*CFPB v. Gordon*,
    819 F.3d 1179 (9th Cir. 2016).......................................................... 10, 11, 13, 14

*CFPB v. ITT Educ. Servs., Inc.*,
    219 F. Supp. 3d 878 (S.D. Ind. 2015) ......................................................... 37, 39

*CFPB v. Morgan Drexen, Inc.*,
    60 F. Supp. 3d 1082 (C.D. Cal. 2014)......................................................... 37, 39

*CFPB v. Navient Corp.*,
    2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)................................................... 37

*CFPB v. RD Legal Funding, LLC*,
    332 F. Supp. 3d 729 (S.D.N.Y. 2018)......................................................... 14, 15

*CFPB v. Think Finance LLC*,
    2018 WL 3707911 (D. Mont. Aug. 3, 2018)................................................... 37

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .................................................................................... 26

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937) .................................................................................... 38

*Collins v. Mnuchin*,
  938 F.3d 553 (5th Cir. 2019) (en banc) ...................................................... 11

*Ctr. for Auto Safety v. Peck*,
  751 F.2d 1336 (D.C. Cir. 1985) .................................................................. 35

*Doolin Sec. Sav. Bank, FSB v. OTS*,
  139 F.3d 203 (D.C. Cir. 1998) ...................................................... 15, 16, 17

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ............................................................................... 21

*FEC v. Legi-Tech, Inc.*,
  75 F.3d 704 (D.C. Cir. 1996) ............................................................... 15, 17

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
  864 F.3d 738 (D.C. Cir. 2017) ............................................................. 36, 37

*FTC v. Neovi, Inc.*,
  604 F.3d 1150 (9th Cir. 2010) .................................................................... 30

*FTC v. Wyndham Worldwide Corp.*,
  799 F.3d 236 (3d Cir. 2015) ....................................................................... 30

*Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
  920 F.3d 1 (D.C. Cir. 2019) ........................................................................ 16

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ............................................................................... 39

*Huntco Pawn Holdings, LLC v. Dep't of Def.*,
  240 F. Supp. 3d 206 (D.D.C. 2016) ............................................................ 16

*In the Matter of Orkin Exterminating Co.*,
  108 F.T.C. 263 (1986) ................................................................................. 28

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  796 F.3d 111 (D.C. Cir. 2015) ............................................................. 18, 19

*John Doe Co. v. CFPB*,
   849 F.3d 1129 (D.C. Cir. 2017) ................................................................. 12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) ............................................................................ 40

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) .................................................................. 18, 19, 20

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................ 36

*McKinney v. Ozburn-Hessey Logistics, LLC*,
   875 F.3d 333 (6th Cir. 2017) ..................................................................... 11

*Moose Jooce v. FDA*,
   2020 WL 680143 (D.D.C. Feb. 11, 2011) ................................................ 16, 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 32, 35

*Nat'l Broad. Co. v. United States*,
   319 U.S. 190 (1943) ................................................................................ 39

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................................ 21

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ................................................................................ 11

*Noel Canning v. NLRB*,
   823 F.3d 76 (D.C. Cir. 2016) .................................................................... 11

*OPM v. Richmond*,
   496 U.S. 414 (1990) ................................................................................ 38

*Orkin Exterminating Co., Inc. v. FTC*,
   849 F.2d 1354 (11th Cir. 1988) ................................................................. 25

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................................................. 17

*PHH Corp. v. CFPB*,
   881 F.3d 75 (D.C. Cir. 2018) (en banc) ................................................ 37, 38

*Rop v. FHFA*,
    2020 WL 5361991 (W.D. Mich. Sept. 8, 2020) ....................................................................... 37

*Ryder v. United States*,
    515 U.S. 177 (1995) ....................................................................................................................... 18

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ........................................................................... 3, 8, 9, 10, 13, 15

*State Nat'l Bank of Big Spring v. Lew*,
    197 F. Supp. 3d 177 (D.D.C. 2016) ............................................................ 10, 16, 17, 19

*STG LLC v. United States*,
    147 Fed. Cl. 790 (2020) ................................................................................................................ 35

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ...................................................................................................... 26

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ................................................................................................... 13

*Touby v. United States*,
    500 U.S. 160 (1991) ...................................................................................................................... 39

*WildEarth Guardians v. EPA*,
    751 F.3d 649 (D.C. Cir. 2014) ................................................................................................... 37

*Wilkes-Barre Hosp. Co. v. NLRB*,
    857 F.3d 364 (D.C. Cir. 2017) ........................................................................................... 10, 11

*Yakus v. United States*,
    321 U.S. 414 (1944) ...................................................................................................................... 39

**Constitutional and Statutory Provisions**

U.S. Const. art. I, § 9, cl. 7 ............................................................................................................... 38

5 U.S.C. § 553(b) .............................................................................................................................. 17

5 U.S.C. § 553(c) ........................................................................................................................ 17, 40

5 U.S.C. § 603 ................................................................................................................................... 40

5 U.S.C. § 604 ................................................................................................................................... 40

12 U.S.C. § 16 ..................................................................................................................................... 3

12 U.S.C. § 243 ........................................................................................................................... 3

12 U.S.C. § 1815(d) .................................................................................................................... 3

12 U.S.C. § 1820(e) .................................................................................................................... 3

12 U.S.C. § 5481(5) .................................................................................................................... 3

12 U.S.C. § 5481(15)(A)(i) ......................................................................................................... 3

12 U.S.C. § 5491 ......................................................................................................................... 2

12 U.S.C. § 5491(b) .................................................................................................................... 2

12 U.S.C. § 5491(c) ..................................................................................................................... 2

12 U.S.C. § 5491(c)(3) ................................................................................................................ 3

12 U.S.C. § 5497 ......................................................................................................................... 3

12 U.S.C. § 5497(a) ................................................................................................................... 38

12 U.S.C. § 5497(a)(1) ................................................................................................................ 3

12 U.S.C. § 5497(a)(2) ................................................................................................................ 3

12 U.S.C. § 5511 ......................................................................................................................... 2

12 U.S.C. § 5512 ....................................................................................................................... 14

12 U.S.C. § 5512(b) .................................................................................................................... 3

12 U.S.C. § 5512(b)(2)(A) ......................................................................................................... 34

12 U.S.C. § 5517(o) ................................................................................................................... 33

12 U.S.C. § 5531 ......................................................................................................................... 6

12 U.S.C. § 5531(b) ......................................................................................................... 3, 14, 26

12 U.S.C. § 5531(c) ....................................................................................................... 25, 27, 39

12 U.S.C. § 5531(c)(1) ................................................................................................................ 3

12 U.S.C. § 5531(c)(1)(B) ................................................................................................... 28, 30

12 U.S.C. § 5531(c)(2) ............................................................................................ 33, 34

12 U.S.C. § 5531(d) ................................................................................................... 3, 39

12 U.S.C. § 5531(d)(2)(A) ........................................................................................ 23, 31

12 U.S.C. § 5531(d)(2)(B) ........................................................................................ 25, 31

12 U.S.C. § 5532 ............................................................................................................. 6

12 U.S.C. § 5532(a) .................................................................................................... 4, 14

12 U.S.C. § 5536(a)(1)(B) ............................................................................................... 3

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................................... 2

**Regulations**

12 C.F.R. § 1041.7 ........................................................................................................... 4

12 C.F.R. § 1041.8(b)(1) ................................................................................................. 4

12 C.F.R. § 1041.9(b) ...................................................................................................... 6

12 C.F.R. § 1041.9(b)(2)(i)(B)(2) ................................................................................. 33

12 C.F.R. § 1041.9(b)(3)(i)(B)(2) ................................................................................. 33

12 C.F.R. pt. 1041, Supp. I, ¶ 9(b)(2)(i)(B)(2)-1 ........................................................ 33

*Payday, Vehicle Title, and Certain High-Cost Installment Loans* (Proposed Rule),
   81 Fed. Reg. 47864 (July 22, 2016) ................................................................... 17, 40

*Payday, Vehicle Title, and Certain High-Cost Installment Loans* (Final Rule),
   82 Fed. Reg. 54472 (Nov. 17, 2017) ..................................................................*passim*

*Payday, Vehicle Title, and Certain High-Cost Installment Loans* (Proposed Rule),
   84 Fed. Reg. 4252 (Feb. 14, 2019) ............................................................................. 7

*Ratification of Bureau Actions*,
   85 Fed. Reg. 41330 (July 10, 2020) ......................................................................... 12

*Payday, Vehicle Title, and Certain High-Cost Installment Loans; Ratification of Payment
  Provisions*,
   85 Fed. Reg. 41905 (July 13, 2020) ............................................................... 9, 10, 18

*Payday, Vehicle Title, and Certain High-Cost Installment Loans* (Final Rule),
   85 Fed. Reg. 44382 (July 22, 2020) ................................................................... 7, 21, 24, 25, 26

## Other Authorities

Black's Law Dictionary (9th ed. 2009) ..................................................................... 33

Brief of Mortg. Bankers Ass'n *et al.* as *Amicus Curiae*, *Seila Law, LLC v. CFPB,*
   140 S. Ct. 2183 (2020), 2019 WL 6910300 (Dec. 16, 2019) .................................... 12

Brief for Pet'rs, *Lucia v. SEC*,
   138 S. Ct. 2044 (2018), 2018 WL 1027816 (Feb. 21, 2018) ................................... 18

*Designating an Acting Director of the Bureau of Consumer Financial Protection*,
   41 Op. O.L.C. ---, 2017 WL 6419154 (Nov. 25, 2017) ........................................... 13

Fed. Trade Comm'n, Policy Statement on Unfairness (1980) ..................................... 28

Restatement (Third) of Agency § 4.01(1) (2006) ....................................................... 20

Restatement (Third) of Agency § 4.02(1) (2006) ....................................................... 20

Restatement (Third) of Agency § 4.04 (2006) ............................................................ 14

Restatement (Second) of Torts § 449 (1965) .............................................................. 30

## INTRODUCTION

Plaintiffs brought this suit in 2018 to challenge the "Payday, Vehicle Title, and Certain High-Cost Installment Loans" Rule ("2017 Rule") that Defendant the Consumer Financial Protection Bureau issued in 2017.   As initially promulgated, the 2017 Rule contained two primary components.   First, the Rule contained "Underwriting Provisions" that generally required lenders to confirm a borrower's ability to repay before making a payday or other covered loan.   Second, the 2017 Rule also imposed more modest requirements relating to lenders' withdrawal of payments for covered loans from consumers' accounts.   These "Payment Provisions" (1) require lenders to provide consumers advance notice about certain upcoming withdrawals from their accounts that they may not expect, and (2) prohibit lenders from continuing to attempt to withdraw payment directly from a consumer's account in certain circumstances where the attempt would likely result in substantial fees for the (likely already financially distressed) consumer, without much chance of resulting in payment for the lender. The Underwriting Provisions, but not the Payment Provisions, were expected to have dramatic impacts on the market for covered loans.

The Bureau revoked the Underwriting Provisions in July 2020, and all that remains of this case are Plaintiffs' challenges to the Payment Provisions.

Those challenges fail.   Plaintiffs principally contend that the Payment Provisions must be set aside because they were initially promulgated by a Bureau whose Director was unconstitutionally insulated from removal by the President.   But that problem has been fixed. The Supreme Court recently invalidated the statutory restriction on the President's ability to remove the Bureau's Director, and following that decision, the Bureau's Director—now undeniably subject to the President's plenary supervision—ratified the Payment Provisions.   As

case after case confirms, this sort of ratification cures a separation-of-powers problem that affected an agency's earlier action. Plaintiffs' contrary view that ratification cannot remedy the constitutional problem here finds no support in case law or in any separation-of-powers principle. While Plaintiffs may want a more drastic remedy—wholesale invalidation of a rule they do not like—they can no longer complain that the Payment Provisions were adopted without adequate presidential oversight. That defeats their constitutional claim.

Plaintiffs' challenges to the merits of the Payment Provisions fare no better. Plaintiffs claim that the Payment Provisions are "inconsistent" with the Bureau's 2020 decision to revoke the Underwriting Provisions, but that claim badly distorts the record—there is no inconsistency. And while Plaintiffs also take issue with various judgments the Bureau made in adopting the Payment Provisions, its challenges are at bottom policy disagreements, not viable Administrative Procedure Act (APA) claims.

The Court should accordingly grant summary judgment in favor of the Bureau.

## BACKGROUND

### A.    The Consumer Financial Protection Act

In response to the 2008 financial crisis, Congress enacted the Consumer Financial Protection Act of 2010 (CFPA or Act) as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376. The CFPA created the Consumer Financial Protection Bureau (Bureau) and charged the new agency with implementing and enforcing the federal consumer financial laws. *See* 12 U.S.C. §§ 5491, 5511.

The CFPA provides for the Bureau to be led by a single Director appointed by the President and confirmed by the Senate. 12 U.S.C. § 5491(b)-(c). Although the Act states that the President may remove the Director only for "inefficiency, neglect of duty, or malfeasance in

office," that provision was recently invalidated by the Supreme Court.  12 U.S.C. § 5491(c)(3);

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).

Congress chose to fund the Bureau primarily outside the annual appropriations process, just as it has done with other financial regulators.  *Compare* 12 U.S.C. § 5497 (Bureau), *with id.* § 243 (Federal Reserve Board); §§ 1815(d), 1820(e) (Federal Deposit Insurance Corporation); § 16 (Office of the Comptroller of the Currency).  In particular, the CFPA authorizes the Bureau to obtain funds from the earnings of the Federal Reserve System as needed "to carry out the authorities of the Bureau," up to a specified annual cap.  *Id.* § 5497(a)(1)-(2).

The CFPA grants the Bureau a host of rulemaking, enforcement, and other authorities. As most relevant here, the CFPA empowers the Bureau to write rules implementing federal consumer financial law, including rules to "identify[]" and "prevent[]" "unfair, deceptive, or abusive" acts and practices in connection with consumer loans or other consumer financial products and services.  12 U.S.C. §§ 5512(b), 5531(b); *see also id.* §§ 5481(5), (15)(A)(i), 5536(a)(1)(B).  The CFPA further specifies what can qualify as "unfair" or "abusive" under the Act.  In particular, an act or practice is "unfair" only if the Bureau has a reasonable basis to conclude (1) that it "causes or is likely to cause substantial injury to consumers," and that this injury is (2) "not reasonably avoidable by consumers," and (3) "not outweighed by countervailing benefits to consumers or to competition."  *Id.* § 5531(c)(1).  Similarly, an act or practice is "abusive" only if it meets one of four specified standards, including (as relevant here) "tak[ing] unreasonable advantage" of either (1) "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or (2) "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service."  *Id.* § 5531(d).

The Act also separately authorizes the Bureau to issue disclosure rules.   12 U.S.C. § 5532(a).

**B.      The 2017 Payday Rule**

Pursuant to its authorities under the CFPA, the Bureau published a rule entitled "Payday, Vehicle Title, and Certain High-Cost Installment Loans" in the Federal Register on November 17, 2017.  82 Fed. Reg. 54472.  As initially promulgated, the 2017 Rule imposed two main sets of requirements on lenders making covered loans.   First, subpart B (the "Underwriting Provisions") identified it as an "unfair" and "abusive" practice for lenders to make a covered loan without first reasonably determining that the consumer would be able to repay it according to its terms.  *Id.* at 54874.  The Underwriting Provisions accordingly prohibited that practice and prescribed specific steps lenders had to take to assess consumers' ability to repay (unless they made the loan in accordance with an exemption).  *Id.* at 54874-77.

The Rule's second set of requirements, the "Payment Provisions" in subpart C, regulate covered lenders' payment-withdrawal practices in two ways.   First, those Provisions prohibit lenders from attempting to withdraw payment for a covered loan from a borrower's account after two consecutive attempts have failed due to lack of sufficient funds, unless the borrower specifically provides new authorization to do so.  12 C.F.R. § 1041.8(b)(1).  This prohibition is based on the Bureau's finding that it is "unfair" and "abusive" to make such repeated withdrawal attempts without the consumer's renewed authorization.  *See id.* § 1041.7; 82 Fed. Reg. at 54731.

In reaching that finding, the Bureau determined that while the (common) practice of obtaining upfront authorization to withdraw payments from a consumer's account can benefit lenders and consumers alike, lenders making covered loans were using these authorizations in ways that caused significant harm.  82 Fed. Reg. at 54720.  In particular, unlike lenders in other

4

markets, lenders of loans covered by the Payment Provisions often repeatedly try to withdraw payment even after initial attempts fail. *Id.* at 54720-21. Each failed attempt causes consumers to incur significant fees—including nonsufficient funds fees, overdraft fees, and lender-imposed return fees—and makes it more likely that the bank will involuntarily close the consumer's account. *Id.* at 54725-26.

The Bureau further determined that it was very difficult for consumers to guard against these significant (and continually mounting) fees and other harms by blocking lenders' account access. *Id.* at 54737. That difficulty stems from a host of factors. Revoking a lender's authorization can be challenging because lenders may require written notice days in advance, purport to prohibit revocation, require authorization for a different type of account access before one authorization may be revoked, or even automatically debit payments through another method if a consumer revokes authorization for a certain kind of payment. *Id.* at 54726-27. In some cases, consumers can face difficulty even contacting the lender at all. *Id.* at 54726. It is no less challenging for consumers to direct their bank to stop payment, including because effectively blocking a withdrawal attempt can involve navigating complex procedures, generally costs upwards of $30, and often requires the consumer to provide information (like a merchant code or other lender-identifying information, none of which is standardized and which lenders sometimes vary to evade detection) that can be anywhere from difficult to nearly impossible to find. *Id.* at 54727-28. In addition, lenders may make multiple withdrawal attempts in quick succession, making it that much harder for consumers to block access before fees pile up. *Id.* at 54501.

At the same time, continuing to make withdrawal attempts after initial attempts fail is unlikely to result in payment for the lender. *Id.* at 54500. After two failed attempts, a third succeeds only about a quarter of the time, and further attempts' success rates are even lower. *Id.*

In addition to prohibiting the repeated withdrawal attempts that the Bureau determined were unfair and abusive, the Payment Provisions also contain a second set of requirements for lenders to give consumers advance notice before attempting to withdraw a payment for the first time and before making an "unusual" withdrawal attempt that deviates from what the consumer might expect in certain specified ways.  12 C.F.R. § 1041.9(b).  Unlike the limit on payment-withdrawal attempts, these notification requirements are based on the Bureau's authority to prescribe disclosure rules, 12 U.S.C. § 5532, not its authority to identify and prevent unfair and abusive practices, *id.* § 5531.  82 Fed. Reg. at 54760.

The 2017 Rule established August 19, 2019, as the compliance date for both the Underwriting Provisions and the Payment Provisions.  *Id.* at 54472.

### C.     Subsequent Developments

#### 1.    *This Litigation and the Stay of the 2017 Rule's Compliance Date*

Plaintiffs filed this suit challenging the 2017 Rule in April 2018.  ECF No. 1.  The next month, the parties jointly moved the Court to stay the litigation and the compliance date in light of the Bureau's plans to undertake a rulemaking process to reconsider the Rule.  ECF No. 16. The Court initially stayed the litigation but declined to stay the compliance date.  ECF No. 29. Plaintiffs sought reconsideration.  ECF No. 30.

In a brief supporting reconsideration, the Bureau explained that staying the 2017 Rule's compliance date was warranted because the Bureau planned to reconsider the Rule, and because the Rule's Underwriting Provisions (which were expected to reduce loan volumes by around 90 percent and thus force many businesses out of the market) were likely to cause Plaintiffs' members irreparable harm in the meantime.  ECF No. 34 at 6-7, 16.  The Bureau further explained that Plaintiffs had established a substantial case on the merits of their challenge to the

Underwriting Provisions because the evidence may not have supported certain factual findings on which those particular provisions were based. *Id.* at 13-15.

That reasoning did not justify staying the Payment Provisions, but the Bureau acknowledged that Plaintiffs may have established a substantial case with respect to those Provisions as well because Plaintiffs claimed that the entire Rule was promulgated by an agency whose Director was insulated from presidential removal in violation of the separation of powers. *See id.* at 11 n.4. That was the sole reason either party ever gave for why it was appropriate to stay the compliance date for the Payment Provisions.

The Court ultimately stayed the compliance date for the entire 2017 Rule on November 6, 2018. ECF No. 53.

### 2. *2020 Rule Revoking the Underwriting Provisions*

The Bureau issued a notice of proposed rulemaking in February 2019 that proposed to rescind the Underwriting Provisions of the 2017 Rule. 84 Fed. Reg. 4252 (Feb. 14, 2019). Consistent with an earlier, October 2018 announcement that the planned rulemaking would address only the Underwriting Provisions, and not the Payment Provisions,[1] the notice made clear that the Payment Provisions were outside the scope of the rulemaking. After considering the comments, the Bureau finalized a rule revoking the Underwriting Provisions on July 7, 2020. 85 Fed. Reg. 44382 (July 22, 2020) ("2020 Rule" or "2020 Revocation Rule"). Consistent with the proposal, the final rule did not alter the Payment Provisions. *See id.* at 44388.

After this rulemaking concluded, the Court lifted the stay of this litigation. ECF No. 74.

---

[1]   CFPB, *Public Statement Regarding Payday Rule Reconsideration and Delay of Compliance Date* (Oct. 26, 2018), *available at* https://go.usa.gov/xGeC6.

### 3. *Advance Financial's Petition for Rulemaking*

While the process to reconsider the Underwriting Provisions was underway, Advance Financial, a member of Plaintiff Community Financial Services Association (CFSA), filed a petition for rulemaking urging the Bureau to exempt debit- and prepaid-card transactions from the Payment Provisions on the ground that failed attempts to withdraw payment from those cards rarely result in non-sufficient funds fees.  Appx.1-35 (PAYD-R-18073-107).

The Bureau denied that petition on July 7, 2020.  Appx.36-43 (PAYD-R-18108-15).  In its letter denying the petition, the Bureau reiterated the reasons it had already given in the 2017 Rule for declining to exempt debit- and prepaid-card payments, including that failed debit- and prepaid-card transactions still result in *other* harms to consumers (such as overdraft fees and return fees) even if they did not result in non-sufficient funds fees.  Appx.39-40 (PAYD-R-18111-12).  In addition, the Bureau explained that it had a busy rulemaking agenda and chose to use its limited resources on other, more urgent matters, particularly given that Advance Financial had not presented any new evidence or changed circumstances that might warrant reconsidering the conclusions the Bureau had just reached in 2017.  Appx.41-42 (PAYD-R-18113-14).

### 4. **Seila Law** *and Ratification of the Payment Provisions*

While the proposal to revisit the Underwriting Provisions was still under consideration, the Supreme Court decided *Seila Law LLC v. CFPB*, which held that the Bureau's "leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers" by improperly impeding the President's executive authority under Article II of the Constitution.  140 S. Ct. 2183, 2197 (2020).  It further held that the CFPA provision purporting to insulate the Bureau's Director from removal was severable from the remainder of

the statute, and accordingly invalidated that provision, while making clear that "[t]he agency

may … continue to operate" with a Director "removable by the President at will."  *Id.* at 2192.

Following the decision in *Seila Law*, the Bureau's Director—now subject to the

President's plenary supervision—ratified the Payment Provisions on behalf of the Bureau.  85

Fed. Reg. 41905 (July 13, 2020).  The notice of the ratification specified that the Bureau was

also ratifying the "procedural steps" that led to the Payment Provisions' issuance, including the

"the decision to propose [them] for public comment."  *Id.* at 41905 n.10.

## ARGUMENT

I.  **Plaintiffs' Separation-of-Powers Challenge Provides No Basis To Set Aside the Payment Provisions Because a Director Fully Accountable to the President Has Ratified Them.**

The separation of powers provides no basis to set aside the Payment Provisions.

Plaintiffs complain that the Payment Provisions were initially adopted by a Bureau Director

unconstitutionally insulated from presidential control in violation of Article II of the

Constitution.  Pls.' Mot. for Summ. J. ("Mot.") at 12-14 (ECF No. 80).  But any such Article II

problem with the initial adoption of the Payment Provisions was cured when a Director fully

accountable to the President ratified them.  As case after case confirms, such a ratification by an

official unaffected by a separation-of-powers violation remedies an earlier constitutional

problem—and Plaintiffs cite no authority suggesting otherwise.  Although Plaintiffs offer a

hodgepodge of arguments why the ratification here is not valid, those arguments find no support

in precedent or in any separation-of-powers principle.

A.  **The ratification by a Director fully accountable to the President cured any Article II defect in the initial adoption of the Payment Provisions.**

Plaintiffs principally contend (at 12-14) that the Payment Provisions are invalid because

they were initially promulgated by a Bureau Director unconstitutionally insulated from the

President's removal power.  This objection, however, ignores that any such problem has since been fixed.  In *Seila Law*, the Supreme Court held that the statutory restriction on the President's authority to remove the Bureau's Director improperly impeded the President's executive authority under Article II of the Constitution.  140 S. Ct. at 2197.  But the Court invalidated the unconstitutional removal restriction, while leaving the rest of the CFPA intact, and leaving the Bureau free to "continue to operate" with a Director "removable by the President at will."  *Id.* at 2192, 2209.  Following that decision, the Bureau's Director—now fully accountable to the President—ratified the Payment Provisions of the Rule.  85 Fed. Reg. at 41905-06.

With that ratification by a Director removable at the President's will, any cause to complain that the President lacked sufficient oversight over the Payment Provisions' adoption disappeared.  Courts have held time and again that ratification by an official unaffected by any constitutional problem can "cure[] any Article II deficiencies" with an agency action initially taken by an official who exercised executive authority in violation of Article II.  *See CFPB v. Gordon*, 819 F.3d 1179, 1190-91 (9th Cir. 2016) (refusing to dismiss enforcement action initially approved by official appointed in violation of Article II because properly appointed official ratified the action); *see also, e.g.*, *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 372 (D.C. Cir. 2017) (holding that ratification "remedie[s] the defect in [the] original issuance of the complaint" by officials appointed in violation of Article II); *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 602 (3d Cir. 2016) (holding that ratification by properly appointed official "adequately addressed" the constitutional problem with action initially approved by official appointed in violation of Article II); *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 43 (D.D.C. 2017) (concluding that official's "ratification of the Rule cures any potential Appointments Clause defects in its promulgation"); *State Nat'l Bank of Big Spring v. Lew*, 197 F. Supp. 3d 177, 182

(D.D.C. 2016) (holding that "ratification [by properly appointed official] saves the regulations from [the] challenge" that they were adopted by official appointed in violation of Article II).

The same holds true here.  The Payment Provisions were initially adopted by a Bureau Director whom a statute purported to protect from removal by the President in violation of Article II, but a Director undoubtedly subject to the President's plenary oversight has since ratified the Provisions.  This ratification "cures any initial Article II deficiencies" with the Provisions' adoption.  *Gordon*, 819 F.3d at 1190-91.  Indeed, to invalidate the Provisions now—after the President's fully accountable subordinate has approved them—would undermine, not respect, the executive authority granted by Article II.  *Cf. Collins v. Mnuchin*, 938 F.3d 553, 594 (5th Cir. 2019) (en banc), *cert. granted*, Nos. 19-422, 19-563 (holding that it would not "make sense" to invalidate agency action taken by an official unconstitutionally insulated from removal where the President still "had full oversight" over the action through other means).

Because the Payment Provisions have been approved by a Director fully accountable to the President, Plaintiffs miss the point in arguing (at 12-14) that "the acts of an unconstitutionally insulated Director," including the 2017 Rule, are invalid.[2]  Regardless of whether the Payment Provisions were initially approved by an "unconstitutionally insulated Director," they have now

---

[2]   By the same token, Plaintiffs err (at 14) in relying on cases in which the Supreme Court invalidated actions taken by agencies affected by a separation-of-powers violation.  Those cases involved agency actions that had *not* been ratified by an official unaffected by the constitutional problem.  *See generally NLRB v. Noel Canning*, 573 U.S. 513 (2014); *Bowsher v. Synar*, 478 U.S. 714 (1986).  Indeed, following the decision in *Noel Canning*, which held that members of the National Labor Relations Board had been improperly appointed under Article II, a properly appointed Board adopted the order against Noel Canning as well as many other prior decisions—and courts have routinely upheld those ratified actions.  *Noel Canning v. NLRB*, 823 F.3d 76, 78, 81 (D.C. Cir. 2016) (enforcing "new decision and order essentially adopting" the earlier decision made by improperly appointed officials); *see also, e.g.*, *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 338 (6th Cir. 2017); *Wilkes-Barre Hosp*, 857 F.3d at 371-72; *Advanced Disposal*, 820 F.3d at 604-06.

also been approved by a Director who is subject to the President's plenary supervision.  So, whether or not the Payment Provisions would have been invalid absent the ratification is irrelevant here,[3] for the need to protect the President's Article II powers provides no basis to set aside a Rule that the President's fully accountable subordinate has approved.

**B.      The ratification of the Payment Provisions is valid.**

In an attempt to avoid the overwhelming authority holding that ratification can cure an Article II problem, Plaintiffs make various (meritless) arguments (at 14-23) that *this* ratification was ineffective.   In particular, Plaintiffs contend (at 17-18) that ratification cannot cure the particular type of Article II problem here and (at 11, 14-17) that rules affected by a separation-of-powers problem can never be ratified and instead must be re-adopted through a new notice-and-comment process.   In other words, Plaintiffs maintain that, no matter what the President or a Director fully accountable to him may want, the Bureau simply cannot ratify any rule or other action it has taken over the past decade.   Nothing in the Constitution, the Administrative Procedure Act (APA), or any other statute supports such a draconian result.[4]   Nor is there any

---

[3]      That the Payment Provisions would be invalid absent the ratification is far from settled.  As the D.C. Circuit has observed, "the Supreme Court and [other courts] have often accorded validity to past acts of unconstitutionally structured governmental agencies."  *John Doe Co. v. CFPB*, 849 F.3d 1129, 1133-34 (D.C. Cir. 2017) (citing cases not involving ratification).  The Court, however, need not decide here whether the Payment Provisions would be valid even without the ratification, because the ratification clearly resolves any constitutional problem.

[4]      The implications of Plaintiffs' position could be profound.  If accepted, Plaintiffs arguments could be used to raise doubts about the validity of countless other actions that the Bureau has taken since its creation in 2010 and that a fully accountable Director has now also ratified. Those actions include, for example, regulations governing the nation's multi-trillion-dollar mortgage market.  *See* 85 Fed. Reg. 41330 (July 10, 2020).  It would be difficult to overstate the potential disruption that a decision calling these actions into question could produce.  *See, e.g.*, Amicus Br. of Mortg. Bankers Ass'n at 10-11, *Seila Law*, No. 19-7, 2019 WL 6910300 (Dec. 16, 2019)  (explaining that "a ruling calling into question the ongoing legitimacy of the [Bureau's] past actions … could be catastrophic," potentially causing "the mortgage markets … [to] all but grind to a halt" and leaving "consumers … largely unable to buy or sell their homes").

merit to Plaintiffs' contention (at 18-23) that this ratification was arbitrary and capricious for failing to account for supposed "inconsistencies" that do not actually exist.

### 1. *The nature of the prior constitutional problem does not preclude ratification.*

Plaintiffs err in contending (at 17-18) that "black-letter agency law" makes ratification "impossible" here because the Bureau itself "lacked authority" to promulgate the Rule in the first place. This contention badly misunderstands both the Supreme Court's decision in *Seila Law* and basic ratification principles.

a. As an initial matter, under *Seila Law*, the unconstitutional removal restriction did not strip *the Bureau* of authority to act: The Court in *Seila Law* expressly rejected the argument that the unconstitutional removal restriction meant that "the entire agency is unconstitutional and powerless to act." *Seila Law*, 140 S. Ct. at 2208. While the unconstitutional removal restriction may have affected the authority of an unconstitutionally insulated Director, it did not affect the "remainder of th[e] Act," including the provisions vesting the Bureau with authority to promulgate rules. *Id.* at 2209; *cf. also Gordon*, 819 F.3d at 1192 (holding that, by statute, the Bureau "had the authority" to bring enforcement action even though its improperly appointed Director lacked authority). Indeed, the presence of the removal restriction would not have precluded the Bureau from taking action through a different director—such as an acting or holdover director to whom the CFPA's removal restriction would not have applied. *See Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. ---, 2017 WL 6419154, at *7 (Nov. 25, 2017) ("[T]he removal protections for the Director would not insulate an *Acting* Director from displacement" (emphasis in original)); *Swan v. Clinton*, 100 F.3d 973, 988 (D.C. Cir. 1996) (holding that statutory removal protection for members of National Credit Union Administration would "not extend to holdover members"). The Bureau

has at all relevant times had authority to promulgate rules like the Payment Provisions.  *See* 12 U.S.C. §§ 5512, 5531(b), 5532(a).

b.  In any event, whether the Bureau had authority to take the action initially (it did) is irrelevant, because the ratification cured any prior problem regardless.  Plaintiffs' arguments to the contrary misunderstand how agency law applies here in three respects.  First, while it is true that ratification involves a principal that sanctions a prior action of an agent who lacked authority, Plaintiffs are wrong to contend (at 17) that there is no principal and agent here, and instead "just one entity," the Bureau.  The Bureau is the principal, and the Director is the agent who acts on the Bureau's behalf.  *See Gordon*, 819 F.3d at 1191 (identifying Bureau as the principal).  Although the Payment Provisions were initially adopted by an agent of the Bureau whose authority was in doubt (the Director insulated from presidential removal), the Bureau, as the principal, validly ratified the Provisions when its valid agent (a Director indisputably removable at will) approved them.

Second, Plaintiffs err in contending (at 17) that a ratification is valid under agency law principles only if the principal "had authority to act" initially.  While some older cases imposed such a requirement, "[c]ontemporary cases do not support restricting ratification on [that] basis." Restatement (Third) of Agency § 4.04 cmt. b (2006).  So, even if the constitutional problem with the Bureau Director's insulation from removal somehow left the Bureau itself without authority to act (it did not), the ratification of the Payment Provisions would still be valid under common-law ratification principles.[5]

---

[5]  To support their claim that ratification cannot cure the constitutional problem with the "authority of the [Bureau]" here, Plaintiffs cite (at 17) *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 785 (S.D.N.Y. 2018).  But the court in *RD Legal* held that ratification could not cure the constitutional problem because the removal provision was not severable and instead

Third, any limitations to be found in common-law principles would not necessarily apply to the kind of government ratification at issue here—indeed, courts regularly give effect to government-agency ratifications without even referring to common-law rules.  *See, e.g.*, *Advanced Disposal*, 820 F.3d at 602 (upholding ratifications after assessing whether they "adequately addressed the prejudice" stemming from constitutional violation, without referring to common-law agency principles); *Doolin Sec. Sav. Bank, FSB v. OTS*, 139 F.3d 203, 213 (D.C. Cir. 1998) (upholding ratification without "go[ing] down th[e] path" of assessing whether ratification followed agency-law rules); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 708-09 (D.C. Cir. 1996) (holding that ratification was "an adequate remedy" for earlier constitutional problem with agency's composition, without considering common-law ratification requirements).   This is because, in the government-agency context, ratification is essentially an "equitable remedy" that should be "applied flexibly."[6]  *Advanced Disposal*, 820 F.3d at 603.  There can be no real dispute that the "equitable" result here is to uphold Provisions that are designed to protect consumers from harmful practices and that a Director fully accountable to the President has approved.

### 2. *The Bureau was not required to redo the notice-and-comment process.*

Plaintiffs also miss the mark in contending (at 14-17) that the Bureau could not ratify the Payment Provisions without starting notice-and-comment over from scratch.  This is really an argument that rules cannot ever be ratified—and there is no support for that sweeping claim.

---

rendered the entire CFPA, and the Bureau itself, invalid.  *Id.* at 784.  That conclusion, of course, has since been rejected by *Seila Law*, 140 S. Ct. at 2192.

[6]   In applying this approach, it has not mattered whether the agency had authority initially (just as it would not matter under common-law rules).  In *FEC v. Legi-Tech, Inc.*, for example, the D.C. Circuit upheld a government agency's ratification even though a separation-of-powers problem meant that the agency initially "had no authority" to take the ratified action.  75 F.3d at 706, 709 (upholding ratification of enforcement action initially filed by agency whose membership unconstitutionally included two ex officio agents of Congress).

On the contrary, courts that have considered ratifications of rules have uniformly upheld them without requiring the agency to redo the notice-and-comment process.  *See Moose Jooce v. FDA*, No. 18-cv-203, 2020 WL 680143, at *5 (D.D.C. Feb. 11, 2011), *appeals pending*, Nos. 20-5048, 5049, 5050 ("[A]ll the district courts in this District that have confronted the issue … have not required agencies to undergo the entire APA notice-and-comment processes anew before upholding otherwise effective ratifications [of rulemakings]."); *State Nat'l Bank*, 197 F. Supp. 3d at 184 (rejecting argument that ratification was "ineffective because it did not involve repromulgation of the regulations pursuant to the APA's notice and comment rulemaking procedures" (quotations omitted)); *Alfa Int'l Seafood*, 264 F. Supp. 3d at 43 (concluding, in case where agency did not repeat notice-and-comment process, that Secretary's "ratification of [challenged] Rule cures any potential Appointments Clause defects in its promulgation"); *Huntco Pawn Holdings, LLC v. Dep't of Def.*, 240 F. Supp. 3d 206, 232 (D.D.C. 2016) (accepting ratification issued without notice and comment); *see also Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 920 F.3d 1, 12 (D.C. Cir. 2019) (accepting challengers' concession that properly appointed Attorney General validly ratified, without notice and comment, a rule initially promulgated by allegedly improperly appointed official).  Plaintiffs do not cite a single case holding otherwise.

Outside the rulemaking context as well, courts have not required procedural redos for ratifications, even where a statute required the agency to follow certain procedures before taking the action initially.  In *Doolin*, for example, the D.C. Circuit held that a properly appointed official did not need to "sign a new notice" of charges or otherwise "redo[] the administrative proceedings" initiated by an official who may not have been properly appointed.  139 F.3d at 213-14.  Instead, a ratification by a properly appointed official was enough.  *Id.*  Similarly, the

Federal Election Commission must, by statute, "engage in a lengthy, elaborate series of administrative steps involving investigation and deliberation before it votes to bring an enforcement action in court." *Id.* at 213 n.9.  Nonetheless, the court in *Legi-Tech* did not require the FEC to repeat this "entire administrative process" before ratifying an enforcement action initially approved by an unconstitutionally composed commission.  75 F.3d at 708.  No matter the "type of administrative action involved," courts "have consistently declined to impose formalistic procedural requirements before a ratification is deemed to be effective."  *State Nat'l Bank*, 197 F. Supp. 3d at 184.

Nor is there any basis to impose such requirements here, for neither the APA nor the Constitution requires the notice-and-comment redo that Plaintiffs seek.  The APA generally requires notice and an opportunity to comment before an agency issues a rule, 5 U.S.C. § 553(b)-(c), but the Bureau satisfied that requirement when it adopted the Payment Provisions initially. *See* 81 Fed. Reg. 47864 (July 22, 2016).  Nothing in the APA requires an agency to conduct notice-and-comment a second time simply to affirm a previously-promulgated rule.  And because it is well established that "reviewing courts are … not free to impose" additional "procedural requirements" beyond those that the APA establishes, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (quotations omitted), Plaintiffs cannot ask this Court to require a second notice-and-comment process either.

The Constitution likewise provides no grounds to require the new notice-and-comment rulemaking that Plaintiffs seek.  The constitutional problem here was that a statutory removal restriction impeded the President's power to oversee the decisions the Bureau's Director made. That problem was cured when the Supreme Court invalidated the removal restriction and a Director subject to the President's plenary supervision ratified both the decision to propose the

17

Payment Provisions for public comment and the ultimate decision to adopt them. *See* 85 Fed. Reg. at 41905 & n.10. The President had sufficient oversight over that ratification, and the Constitution demands nothing more.

Contrary to Plaintiffs' contention (at 15-16), the Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), does not suggest otherwise. In *Lucia*, the Supreme Court held that the administrative law judge (ALJ) who presided over an administrative enforcement proceeding against Lucia had not been constitutionally appointed. *Id.* at 2055. The Court further held that, under its prior decision in *Ryder v. United States*, the remedy for this Article II violation was "a new 'hearing before a properly appointed' official." *Id.* (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)).

That holding in no way supports Plaintiffs' contention (at 15-16) that a separation-of-powers problem can be remedied only by an entirely "new proceeding" (here, a new notice-and-comment rulemaking), not a ratification. For one, the Court in *Lucia* did not consider ratification, let alone reject it as an adequate remedy.[7] Moreover, Plaintiffs are wrong to assume that the "new hearing" required by *Lucia* must entail a complete do-over of the entire administrative process. The D.C. Circuit has made clear it does not. As that court has explained, the "new hearing" required by *Ryder* (the case that *Lucia* applied) did not need to be a "completely new proceeding," but could instead entail a "de novo review" of the existing record by officials unaffected by the separation-of-powers violation. *Intercollegiate Broad. Sys., Inc. v.*

---

[7]   Lucia asked the Court to reject the agency's later ratification of the appointments of its ALJs, but the Court saw "no reason to address that issue." *Lucia*, 138 S. Ct. at 2055 n.6. Lucia had also urged the Court to hold that a properly appointed ALJ could not ratify the prior ALJ's decisions on remand. *See* Br. for Pet'rs at 49-57, *Lucia v. SEC*, 2018 WL 1027816 (filed Feb. 21, 2018). The Court did not address the validity of such a hypothetical future ratification either. *See generally Lucia*, 138 S. Ct. at 2055.

*Copyright Royalty Bd.*, 796 F.3d 111, 120 (D.C. Cir. 2015).   That is what Plaintiffs received here:   A fully accountable Director conducted a de novo review of the basis for the Payment Provisions and concluded they should be ratified.   That is all that the Constitution, or the Supreme Court's decisions in *Lucia* and *Ryder*, requires.

Plaintiffs complain (at 15) that this denies them a "meaningful remedy," but Plaintiffs can offer no reason why they will suffer constitutional harm unless a properly accountable Director repeats the notice-and-comment process.   Plaintiffs already had, and took advantage of, the chance to comment, and they cannot credibly claim that the Director's prior insulation from removal somehow impaired their ability to raise issues they wanted the agency to consider. Although Plaintiffs might wish to raise new issues now, "[t]here is no [separation-of-powers] problem in limiting [a party] to the [comments] that it decided, on its own volition, to submit" before.   *Intercollegiate*, 796 F.3d at 122.[8]   Plaintiffs do not suffer constitutional harm simply from being subject to a regulation they do not like.

Nor is there any merit to Plaintiffs' contention (at 15) that recognizing the ratification's validity disregards *Lucia*'s admonition that remedies for separation-of-powers violations should "create incentives" to raise separation-of-powers challenges.   *Lucia*, 138 S. Ct. at 2055 n.5 (alterations omitted).   Creating incentives does not mean giving challengers whatever relief they

---

[8]   Nor can Plaintiffs claim any entitlement to a new round of notice-and-comment so that they can make new comments based on events that occurred after the Rule's initial adoption—the repeal of the Underwriting Provisions and this Court's stay of the compliance date.   Plaintiffs were unable to make those comments before because the relevant events had not happened yet, not because the constitutional problem stood in their way.   Circumstances change all the time, and nothing requires agencies to reopen rules for comment when they do.   Besides, for the reasons explained in section I.B.3 below, those subsequent events are irrelevant to the Bureau's decision to ratify the Payment Provisions, so there is no "reason to believe that the outcome would change if [Plaintiffs] were permitted to comment" again.   *State Nat'l Bank*, 197 F. Supp. 3d at 185.

prefer.  In *Lucia*, the remedy that provided an adequate "incentive" was a new decision by a different official (if one was available), not throwing the action out entirely (Lucia's preferred course).  *See id.* at 2055 & n.5.  Likewise, here, the prospect of a new decision properly supervised by the President on whether a rule should remain in place provides parties an adequate incentive to raise separation-of-powers challenges like that here—and there is no basis to throw a rule out entirely and require the agency to start over from scratch.  After all, "[c]onstitutional litigation is not a game of gotcha" allowing litigants to "ride a discrete constitutional flaw … to take down [a] whole, otherwise constitutional" action.  *Cf. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) (discussing why unconstitutional statutory provisions are presumptively severable).  Just as Lucia was entitled only to a new decision by a properly appointed ALJ, here Plaintiffs are entitled to (at most) a decision by an official fully accountable to the President on whether the Payment Provisions should remain in place.  The ratification gave them exactly that.

### 3.  *The ratification is not arbitrary and capricious.*

Finally, Plaintiffs err in contending (at 18-23) that the ratification is arbitrary and capricious for failing to explain various (supposed) "inconsisten[cies]."

a.  As an initial matter, Plaintiffs do not point to a single case requiring an agency to provide an explanation for a *ratification* separate and apart from the explanation that the agency already provided for the ratified rule.  *Cf. Moose Jooce*, 2020 WL 680143, at *6 (rejecting argument that agency had to address "intervening studies" that had come out between the issuance of a rule and its ratification because that argument erroneously "conflate[d] ratification doctrine with APA requirements prior to agency action").  Ratification is simply the retroactive "affirmance of a prior act"—here, the adoption of the Payment Provisions.  Restatement (Third)

of Agency §§ 4.01(1), 4.02(1).  And the preamble to the 2017 Rule already provided a thorough explanation for those Provisions, which the ratification simply affirms.

Plaintiffs object (at 18-19) that, in ratifying the Payment Provisions, the Bureau was obligated to explain various (supposed) "inconsistenc[ies]" between those Provisions and the 2020 Rule repealing the Underwriting Provisions.  But the administrative law principle on which Plaintiffs rely requires an agency to explain "inconsisten[cies] *with its past practice*"—i.e., policy changes.  *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (emphasis added); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (explaining that agency must "provide a reasoned explanation for [a] change" in "existing policies").  That requirement has no application to the ratification because the ratification effects no "change" in "past practice"; it affirms what the Bureau already did in 2017.  And while the 2020 Rule did effect a change in policy, the preamble to that rule explains those changes at length.  85 Fed. Reg. 44382 (July 22, 2020).  Nothing required the Bureau to explain those changes in the ratification as well.

b.   In any event, the three "inconsistencies" that Plaintiffs point out are not inconsistencies at all.  First, the ratification does not change the amount of time companies have to come into compliance with the Payment Provisions.  *Contra* Mot. at 21-22.  The 2017 Rule gave companies 21 months—until August 19, 2019—to prepare for compliance.  82 Fed. Reg. at 54472, 54813-14.   The ratification of the Payment Provisions affirms that August 2019 compliance date along with everything else.[9]  It is unclear why Plaintiffs believe they are entitled to *another* 21 months *after the ratification* to make whatever remaining adjustments are needed

---

[9]   For this reason, Plaintiffs are wrong to contend (at 22) that the ratification improperly fails to "encompass[] the entirety" of the Payment Provisions.

to comply, especially when they have already had three years to prepare. *Cf. Alfa Int'l Seafoods*, 264 F. Supp. 3d at 46 (noting that it was "unclear" how a "recent ratification" of a rule allegedly adopted by improperly appointed official "impairs [the plaintiffs'] interests" where they had "known since December 9, 2016, that the Rule's … requirements would take effect on January 1, 2018, and thus were on notice of the need" to come into compliance by that time). Indeed, Plaintiffs cite no authority for their apparent view that, in ratifying a rule, an agency must restart the clock for compliance.

True, because of the stay entered in this case, companies did not actually have to comply by the Rule's original compliance date (and do not have to comply yet)—but that leaves companies with more time to come into compliance, not less. If some lenders put preparations on hold in hopes that the Payment Provisions would be invalidated before the Court ever lifted the stay, that was a gamble they took. That gamble does not make it arbitrary and capricious for the Bureau to keep the same compliance date in place.[10]

Second, the 2020 repeal of the Underwriting Provisions did not give rise to an "inconsistency" in the 2017 Rule's discussion of the Payment Provisions' benefits and costs. To be sure, a couple of sentences in the 2017 Rule observed that the Underwriting Provisions would lessen certain impacts of the Payment Provisions. 82 Fed. Reg. at 54846. But the preamble's detailed discussion of the Provisions' benefits and costs did not rely on that observation in any way. *Id.* at 54846-50. On the contrary, the Bureau considered the Payment Provisions' benefits and costs against a baseline of the "regulatory regime" that existed before the 2017 Rule—when, like now, the Underwriting Provisions were not in place. *Id.* at 54815. Plaintiffs are therefore

---

[10]  Of course, compliance will not actually become mandatory until this Court lifts the compliance-date stay—but the timing of that will be determined by the Court, not the Bureau.

wrong to contend (at 23) that the repeal of the Underwriting Provisions undermined an "essential premise" of the Bureau's 2017 consideration of the Payment Provisions' benefits and costs.

Third, there is likewise no inconsistency between the interpretation of the standards for "unfair" and "abusive" practices that the Bureau applied in the 2020 Rule revoking the Underwriting Provisions and the standards that the Bureau applied in adopting the Payment Provisions in 2017. In the 2017 Rule, the Bureau found that the practice of continuing to attempt to withdraw payments from a consumer's account without renewed authorization after two consecutive attempts have failed is "unfair" or "abusive" under three separate prongs of the CFPA's provisions describing such practices. Contrary to Plaintiffs' contention (at 19-21), the way the Bureau applied each of those prongs in adopting the Payment Provisions is wholly consistent with the 2020 Revocation Rule.

For one, there is no conflict between the 2020 Rule and the Payment Provisions' application of the statutory provision specifying that it is "abusive" to "take[] unreasonable advantage" of consumers' "lack of understanding … of the material risks, costs, or conditions" of a covered financial product, 12 U.S.C. § 5531(d)(2)(A). In adopting the Payment Provisions, the Bureau found that the proscribed payment-withdrawals practice satisfied this standard because it took unreasonable advantage of consumers' "lack of understanding" of the risk that a lender would hit the consumer's account again and again if initial withdrawal attempts failed. 82 Fed. Reg. at 54741. In particular, the Bureau found that the statute's "lack of understanding" element was met because most consumers do not realize that lenders covered by the Provisions often keep trying to withdraw payment after initial attempts fail, and thus do not appreciate just how many fees they would face in the event their accounts lacked sufficient funds. *Id.*

Contrary to Plaintiffs' contention (at 19-20), nothing in the 2020 Rule undermines this approach to assessing consumers' "understanding."  In the 2017 Rule, the Bureau had concluded that consumers lacked "understanding" for purposes of the abusiveness standard if they *either* (1) did not understand that a risk existed as a general matter or (2) did not understand their individualized risk of suffering a particular harm given their personal circumstances.  *See, e.g.*, 82 Fed. Reg. at 54597-98, 54741.   In the 2020 Rule, the Bureau rejected the latter, individualized-risk standard with respect to the Underwriting Provisions, but left the former, general-risk standard in place.   85 Fed. Reg. at 44394-95, 44422.   The individualized-risk standard that the Bureau rejected was relevant only to the Underwriting Provisions—which were premised in part on a finding that consumers did not understand their own personal risk of ending up in a costly cycle of debt (even if they understood as a general matter that many consumers have difficulty repaying and suffer adverse consequences as a result).  82 Fed. Reg. at 54597-98.   The (later-rejected) individualized-risk standard had no bearing on the Payment Provisions.  In 2017, the Bureau did not base those Provisions on any finding that consumers lack an understanding of their personal risk of facing repeated payment withdrawal attempts, but on the fact that consumers are not aware that the risk exists even as a general matter.  *Id.* at 54741 ("[M]ost consumers do not realize that the identified practice involving multiple failed re-presentments happens.").   That conclusion is wholly consistent with the 2020 Rule's interpretation of consumer "understanding."

The 2020 Rule is likewise wholly consistent with the two other (independent) determinations on which the Bureau based the Payment Provisions—that the practice of continuing (without renewed authorization) to attempt to withdraw payment after two failed attempts meets the elements of "unfairness," as well as a separate "abusiveness" prong covering

practices that "take unreasonable advantage of" consumers' "inability … to protect the[ir] interests … in selecting or using a consumer financial product or service," 12 U.S.C. § 5531(d)(2)(B).  For a practice to be "unfair," it must cause substantial injury that (among other things) the consumer cannot "reasonably avoid[]."  *Id.* § 5531(c).  Applying that statutory standard, the Bureau concluded in the 2017 Rule that consumers could not "reasonably avoid" the injuries—costly fees and possible account closure—that the repeated-withdrawals practice was likely to cause.  82 Fed. Reg. at 54737.  This is because a host of factors make it very difficult for consumers to revoke a lender's account access or otherwise stop withdrawal attempts.  *Id.*; *see also id.* at 54726-28; *supra* at p. 5.  The Bureau further explained that consumers could not reasonably avoid injury by simply not taking out the loan.  82 Fed. Reg. at 54737.  It is well established that an injury is not "reasonably avoidable" if the consumer has no "reason to anticipate the impending harm" and thus does not appreciate the need to take steps to avoid it.  *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988); 82 Fed. Reg. at 54736 (adopting that standard in 2017 Rule); 85 Fed. Reg. at 44395 & n.147 (adopting same standard in 2020 Rule).  As explained above, consumers had no reason to anticipate that they could face repeated withdrawal attempts resulting in significant fees—and so would have no reason to decline the loan to avoid that (unknown) risk.  *See supra* at p. 24.

For the same reasons, the Bureau concluded (as relevant to the abusiveness standard) that consumers were unable to "protect the[ir] interests" in avoiding the fees and risk of account closure that result from lenders' repeated withdrawal practices.  82 Fed. Reg. at 54742-43.

Nothing in the 2020 Rule undermines these conclusions.  Plaintiffs claim (at 20-21) that the 2020 Rule establishes that consumers can avoid the harm of repeated withdrawal attempts and protect their interests by not taking out the loan in the first place—but the 2020 Rule says no

such thing.  To be sure, in the 2020 Rule, the Bureau determined that consumers can *sometimes* reasonably avoid injury by declining a product.  *See* 85 Fed. Reg. at 44397.  And it determined that consumers could reasonably avoid the injuries that result from the distinct practice addressed by the Underwriting Provisions—lenders making loans without first assessing borrowers' ability to repay—by not taking out the loan and instead seeking some other form of credit.  *Id.*  But, in so concluding, the Bureau made crystal clear that this did not mean that "any harm [would be] reasonably avoidable simply because a consumer can decline a product or service."  *Id.*  Rather, consumers' ability to decline the loan was "relevant" in the context there because the unfair and abusive underwriting practice involved lenders' "conduct when borrowers are making an initial decision to take out a new loan," at which point consumers are aware of the risk and have the option to decline the loan.  *Id.*  The unfair and abusive payment practice, by contrast, involves lenders' conduct later—after the consumer has taken out the loan and two consecutive payment attempts have failed.  At that point in time, consumers no longer have the option to decline the loan, and therefore cannot reasonably avoid the injury or protect their own interests.

## II.   The Payment Provisions Are Consistent with the Bureau's Statutory Authority and Are Not Arbitrary and Capricious.

Plaintiffs allege that the Bureau has exceeded its statutory authority, and acted in a manner that is arbitrary and capricious, in promulgating the Payment Provisions.  Under the APA, the standard of review for such claims is "highly deferential" to the agency.  *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019).  Because the CFPA provides "an express delegation of authority" to the Bureau to identify and prevent "unfair" and "abusive" practices, *see* 12 U.S.C. § 5531(b), rules promulgated pursuant to that authority must be "given controlling weight" so long as they are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).  In assessing

whether a rule is "arbitrary [or] capricious," the Court "appl[ies] a presumption of validity" and simply "determine[s] whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (quotations omitted).  In so doing, the Court "may not substitute [its] judgment for that of the agency." *Id.* at 220.  Plaintiffs cannot prevail under this "highly deferential" standard.

### A. The Bureau reasonably determined that the proscribed payment-withdrawals practice is "unfair."

Pursuant to the CFPA, the Bureau may declare a practice unfair where it "has a reasonable basis to conclude that [1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c).  In the 2017 Rule, the Bureau found that the identified payment practice—attempting to withdraw payment from a consumer's account in connection with certain covered loans after two consecutive withdrawal attempts have already failed, absent the consumer's new and specific authorization—met these elements, and it explained those findings at length.  82 Fed. Reg. at 54720-44.  Plaintiffs do not and cannot show that these findings were arbitrary and capricious or otherwise exceeded the Bureau's authority.

***Substantial Injury.***  The Bureau reasonably found that the identified practice caused or was likely to cause "substantial injury" to consumers because it subjected borrowers to substantial and repeated fees (including non-sufficient funds fees, overdraft fees, and returned-item fees) and an increased risk that their accounts would be closed. 82 Fed. Reg. at 54734-36.

Plaintiffs' first objection to this finding of "substantial injury" seems to be that costs like this are "injuries" only if they outweigh "the benefits to consumers and to competition."  Mot. at

24.  But this conflates the "substantial injury" element with a *different* element of the statutory unfairness test that provides that a practice is unfair only if the relevant "injury to consumers" is not outweighed by "countervailing benefits to consumers or competition." *See* 12 U.S.C. § 5531(c)(1)(B).  Plaintiffs do not and cannot point to any authority supporting their bizarre interpretation of "injury."

There is likewise no merit to Plaintiffs' contention (at 24-25) that the Bureau lacked adequate evidence of these injuries because the Bureau's "primary study" pertained only to online lenders, not storefront lenders.  Plaintiffs offer no reason why failed withdrawal attempts by online lenders would result in substantial fees (some of which are imposed not by the lender, but by the consumer's bank) and increased risk of account closure, but attempts by storefront lenders would not.  In any event, the Bureau relied on data pertaining to storefront lenders in addition to the online lender study.  *See* 82 Fed. Reg. at 54722-23, 54725, 54734.

**Not Reasonably Avoidable.**  The Bureau also determined in the 2017 Final Rule that consumers are not reasonably able to avoid the substantial injuries that result from the proscribed repeated-withdrawal-attempts practice.  It is well established that an injury is not "reasonably avoidable" if the consumer lacks reasonable "means to avoid it." *In the Matter of Orkin Exterminating Co.*, 108 F.T.C. 263, 366 (1986).  A theoretical way of avoiding injury is not enough; rather, the means must "be practicable for individual consumers to pursue."  FTC, Policy Statement on Unfairness at n.19 (1980), *available at* https://go.usa.gov/xGSbW. Applying this standard, the Bureau concluded that consumers could not reasonably avoid the fees and other harms that result from lenders' repeated failed withdrawal attempts because a variety of hurdles make it very difficult for consumers to revoke lenders' account access or otherwise to

stop the withdrawal attempts that trigger the substantial fees. 82 Fed. Reg. at 54737; *see also id.* at 54726-28; *supra* at p. 5.

Plaintiffs posit (at 25) various ways that consumers could reasonably avoid injury, but the rulemaking record specifically refutes each of Plaintiffs' suggestions. Borrowers cannot avoid injury by "not authorizing automatic withdrawals" (Mot. at 25) because covered lenders almost always require such authorization before they will extend the loan. 82 Fed. Reg. at 54737. Consumers cannot practicably avoid injury by putting "sufficient funds in their bank accounts" (Mot. at 25) both because (1) they simply do not have the money (indeed, that is generally why the withdrawal attempts have failed) and (2) even if they did, subsequent withdrawal attempts can occur very quickly, often on the same day, making it hard to get funds in the right account before the next withdrawal attempt. 82 Fed. Reg. at 54736-37. Because of this quick succession of repeated withdrawal attempts, "renewing … their loans" or "negotiating repayment options" (Mot. at 25) is not a viable option either. *See* 82 Fed. Reg. at 54737. Nor can consumers reasonably avoid the injuries from the proscribed repeated-withdrawals practice by not taking out a loan in the first place (Mot. at 25). 82 Fed. Reg. at 54737. As explained above, consumers have no reason to anticipate the risk of repeated, costly withdrawal attempts upfront, and by the time the problem is apparent, declining the loan is no longer an option. *See supra* at pp. 25-26.[11]

***Countervailing Benefits.*** The Bureau also determined that the substantial injury that is not reasonably avoidable by consumers was not "outweighed by countervailing benefits to consumers or to competition," including because a third withdrawal attempt after two

---

[11]   As also explained above, this conclusion is wholly consistent with the Bureau's conclusion in the 2020 Revocation Rule that the harm from the distinct practice addressed by the Underwriting Provisions could reasonably be avoided by simply declining to take out the loan in the first place. *See supra* at pp. 25-26.

consecutive attempts have failed is very unlikely to result in payment for the lender.   82 Fed. Reg. at 54737-39.    Plaintiffs' sole objection to the Bureau's countervailing benefits determination is that the Bureau "discount[ed]" the "benefits of these products" for consumers. Mot. at 24.    This objection is meritless because the unfairness standard looks to the "countervailing benefits" of the "act or practice," not of the products covered. 12 U.S.C. § 5531(c)(1)(B).    Covered loans may well provide consumers a host of benefits, but those benefits are not benefits of the relevant practice—making a third withdrawal attempt after two previous attempts have failed—and are therefore irrelevant under the CFPA's "countervailing benefits" analysis.[12]   82 Fed. Reg. at 54738.   Indeed, nothing in the Payment Provisions precludes consumers from continuing to enjoy the benefits Plaintiffs claim their loans provide.

*Cause of Injury.*   Plaintiffs likewise err in contending (at 25) that the Bureau improperly "concluded that lenders are the cause" of the injury that repeated withdrawal attempts cause consumers.   While it is true that some (but not all) of the fees that repeated failed attempts trigger are charged by the consumer's bank, not the lender, there is no question that lenders' repeated withdrawal attempts are a but-for cause of those harms to consumers.   And it is well established that the fact that "a company's conduct was not *the most* proximate cause of an injury generally does not immunize liability from foreseeable harms."   *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015) (emphasis in original) (citing Restatement (Second) of Torts § 449 (1965)) (finding conduct unfair under the FTC Act); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (holding, in the context of the FTC Act's prohibition on unfairness, that "the

---

[12]   For similar reasons, the convenience of recurring payment authorizations is not a benefit that should have been weighed.   *Contra* Mot. at 26.   The Payment Provisions do not prohibit such authorizations, so lenders and consumers can continue to enjoy their benefits.   82 Fed. Reg. at 54738-39.

contribution[s] of independent causal agents … do not magically erase the role" of others in causing a harm).  The Bureau made just this point in the rulemaking, 82 Fed. Reg. at 54735, so Plaintiffs cannot credibly claim (at 25) that the Bureau "fail[ed] to consider" this issue.

> **B.    The Bureau reasonably determined that the proscribed payment-withdrawals practice is "abusive."**

The Bureau also reasonably determined that the proscribed payment-withdrawals practice is "abusive"—a finding that independently supported prohibiting the practice.  As relevant here, pursuant to the CFPA, the Bureau may declare an act or practice abusive where it "takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; [or] (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service."  12 U.S.C. § 5531(d)(2)(A)-(B).  The Bureau found that the practice of attempting to withdraw payment from a consumer's account in connection with a covered loan after two consecutive failed attempts (unless the lender obtains the consumer's new and specific authorization) was abusive for both of these (independent) reasons.  82 Fed. Reg. at 54739-44.  Plaintiffs' sole objection to these findings is that they are inconsistent with the way the Bureau applied the "lack of understanding" and "inability to protect interests" standards in the 2020 Rule revoking the Underwriting Provisions.  But, as explained above, there is no such inconsistency, so Plaintiffs cannot prevail on this challenge.  *See supra* at pp. 23-26.

> **C.    The Bureau reasonably declined to exempt certain types of payment transfers from the Payment Provisions.**

Plaintiffs next contend (at 26) that the Bureau "arbitrarily and capriciously failed to heed important differences among the varieties of payment transfers covered" by the Rule.  But again, Plaintiffs' argument simply ignores the Bureau's considered treatment of these issues.

Plaintiffs claim (at 26-27) the Bureau ignored the difference between failed debit-card and prepaid-card payments, which generally do not result in non-sufficient funds fees, and check and ACH payment transfers, which do.  But the Bureau specifically considered this fact.  *See* 82 Fed. Reg. at 54747, 54750.  The Bureau explained that it declined to exempt debit cards and prepaid cards from the Payment Provisions because even though failed attempts to withdraw payments from those accounts may not trigger non-sufficient funds fees, they can trigger overdraft fees and fees for returned or declined payments, as well as various lender-imposed fees.  82 Fed. Reg 54723, 54747.  In setting forth this analysis, the Bureau more than met its obligation to establish a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

This is also true with respect to the Bureau's decision to limit payment transfer attempts across multiple installments of a multi-payment installment loan.  Plaintiffs claim (at 27) that the Bureau "failed to acknowledge an important aspect of the problem" by disregarding the fact that installment payments are spaced farther apart and thus leave consumers with more time to replenish their accounts or take other steps to avoid non-sufficient funds fees.  This contention again ignores the actual rulemaking record, which specifically explained the Bureau's decision to require new authorization after two failed attempts for different installments of a loan:  A third payment attempt in this context would still likely fail "even if two weeks or a month has passed."  82 Fed. Reg. at 54753.  Indeed, Plaintiffs do not provide any reason to think consumers in financial distress would be likely to scrape together funds in that time.[13]

---

[13]   Plaintiffs also argue in a footnote (at 27 n.5) that a different part of the Payment Provisions—the requirements to send consumers notice of an upcoming initial or unusual withdrawal a specified number of days in advance—"harms consumers" by forcing them to incur additional interest costs in certain circumstances.  The notice requirements do not have this effect.  Plaintiffs claim that if a lender (timely) sends notice by email three days before an upcoming

**D.     The Payment Provisions do not establish a usury limit or improperly rely on "public policy."**

Plaintiffs fare no better in claiming that the Payment Provisions violate statutory provisions that bar the Bureau from "establish[ing] a usury limit," 12 U.S.C. § 5517(o), and from relying on "public policy considerations … as a primary basis" for a finding that a practice is "unfair," 12 U.S.C. § 5531(c)(2).

In ordinary usage, a "usury limit" is "a law prohibiting moneylenders from charging illegally high interest rates." Black's Law Dictionary (9th ed. 2009); *see also* 82 Fed. Reg. at 54578. The Payment Provisions—which require certain notices and limit additional withdrawal attempts after two consecutive attempts have failed—in no way restrict the interest rates (or, indeed, any other amounts) that lenders may charge.

Nor does the fact that the Payment Provisions cover installment loans only if they have interest rates above 36 percent mean that the Bureau has improperly established a "usury limit." *Contra* Mot. at 27-28. Nothing in the Payment Provisions prohibits lenders from charging whatever interest rate they wish, and Plaintiffs offer no support for their view that covering certain loans based on their interest rate somehow constitutes a "usury limit." The Bureau covered those higher-interest loans not to prevent or even discourage lenders from making them, but because the evidence showed that lenders engaged in the harmful repeated-withdrawals

---

withdrawal, but that email bounces back, they will not be able to make the withdrawal as scheduled, and must instead send a new notice by mail and wait another six days to make the withdrawal—causing the consumer to incur additional interest. But the Rule requires no such thing. If an emailed notice does not go through, the lender may still make the upcoming withdrawal as planned, and must switch to sending notice by alternative means only for the *next* withdrawal.    12 C.F.R. §§ 1041.9(b)(2)(i)(B)(2), (b)(3)(i)(B)(2); *id.* pt. 1041, Supp. I, ¶ 9(b)(2)(i)(B)(2)-1.

practice in connection with those loans, but not in connection with lower-interest products.  82 Fed. Reg. at 54732.

Plaintiffs are likewise unpersuasive in arguing (at 28) that the Bureau improperly based the Payment Provisions on "public-policy considerations about the undesirability of expensive small-dollar loans," in violation of the CFPA's prohibition on allowing "public policy considerations" to "serve as a primary basis" for a finding that a practice is "unfair," 12 U.S.C. § 5531(c)(2).  It is hard to see how this argument makes sense even on its own terms, given that the Payment Provisions are not expected to meaningfully reduce usage of covered loans.  *See* 82 Fed. Reg. at 54738, 54818, 54847-48.  At any rate, even though the statute permits the Bureau to consider "established public policies" as evidence that a practice is unfair (so long as those are not the "primary" basis for the unfairness finding), *id.*, the Bureau did not rely on such public policy considerations at all in adopting the Payment Provisions, let alone "primar[il]y."  82 Fed. Reg. at 54739.  Instead, its unfairness finding was based on the extensive evidence showing that the repeated-withdrawals practice caused substantial injury that consumers could not reasonably avoid and that was not outweighed by countervailing benefits.  *Id.* at 54720-30, 54733-39.

## III.   The Bureau Reasonably Considered the Payment Provisions' Benefits and Costs.

The Bureau thoroughly considered the benefits and costs of the Payment Provisions in accordance with the CFPA's requirement that the Bureau "consider … the potential benefits and costs" of its rules "to consumers and covered persons," 12 U.S.C. § 5512(b)(2)(A).  82 Fed. Reg. at 54814-16, 54846-50.  Plaintiffs' claim (at 28) that this consideration of benefits and costs contained "serious flaws" cannot withstand scrutiny.

As explained above, Plaintiffs misread the record in contending (at 29) that the 2020 Rule revoking the Underwriting Provisions undermined a "pillar" the 2017 Rule's discussion of the

Payment Provisions' benefits and costs. *See supra* at pp. 22-23. Although the 2017 Rule noted that the Underwriting Provisions would lessen certain impacts of the Payment Provisions, it otherwise discussed the impact that the Provisions would have even if (as is currently the case) the Underwriting Provisions were not in place. *Id.*

Plaintiffs likewise err in contending (at 29) that the Bureau failed to consider two "important" costs that the Payment Provisions would impose on consumers. First, Plaintiffs are simply mistaken that consumers will face "additional accrued interest" as a result of the Rule's timing requirements for payment notices, *see supra* at pp. 32-33 n.13, so that was not a cost that the Bureau could or should have considered. Second, there was likewise no need for the Bureau to consider what Plaintiffs claim (at 29) is "the increased likelihood that a loan would enter into collections sooner." An agency need only consider "*important* aspect[s] of the problem" before it, *State Farm*, 463 U.S. at 43 (emphasis added), and is "not required to consider every single possible cost," *STG LLC v. United States*, 147 Fed. Cl. 790, 809 (2020); *accord Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1355 n.15 (D.C. Cir. 1985) (rejecting argument that agency acted arbitrarily by failing "to factor *insignificant* health and safety effects into the agency's cost-benefit analysis" (emphasis in original)). Even if the Payment Provisions' limitations on repeated withdrawal attempts might send some loans into collections sooner, that cost is hardly significant, particularly given that the alternative is repeated withdrawal attempts that cause consumers to incur more and more fees. Indeed, Plaintiffs cannot credibly claim now that the possibility of a loan entering collections sooner is so "important" that the Bureau had to discuss it—Plaintiff CFSA did not even bother to mention it in its nearly-100-page comment letter on the proposed rule (and CFSA's co-plaintiff did not comment at all). *See* Appx.44-139 (Doc. ID CFPB-2016-0025-142779).

**IV.   The Bureau Appropriately Denied Advance Financial's Petition for Rulemaking.**

Plaintiffs' challenge to the Bureau's denial of Advance Financial's Petition for Rulemaking fares no better than Plaintiffs' challenges to the Payment Provisions themselves. The Petition asked the Bureau to revise the Payment Provisions to exclude debit- and prepaid-card payments—an exclusion that the Bureau already considered and rejected in adopting the Provisions in 2017.   Just as it was not arbitrary and capricious for the Bureau to decline to exclude such payments in the first place, *see supra* section II.C, it was not arbitrary and capricious for the Bureau to decline to initiate a whole new rulemaking to make that exclusion, particularly given that the rulemaking petition did not cite any new facts or changed circumstances that might call the basis for the Bureau's earlier decision into doubt.   *See* Appx.41 (PAYD-R-18113).  This is reason enough to reject Plaintiffs' claim.

But even if the merits of the denial were not so clear, Plaintiffs still could not prevail on this claim.   As the Supreme Court has made clear, an agency's "[r]efusal[] to promulgate [a] rule[]" is subject only to "extremely limited and highly deferential" review.  *Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007); *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987) (holding that a refusal to initiate a rulemaking "is to be overturned only in the rarest and most compelling of circumstances").  This is in part because "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."  *Massachusetts v. EPA*, 549 U.S. at 527; *see also, e.g.*, *Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 749 (D.C. Cir. 2017) ("[R]egulatory-effort and resource-allocation judgments … fall squarely within the agency's province.").

Here, in addition to reiterating the substantive reasons for not excluding debit- and prepaid-card payments from the Payment Provisions, the Bureau explained that it already had an

"active and busy" agenda that included work on rules required by law and other time-sensitive activity (like responding to the COVID-19 crisis).   Appx.41-42 (PAYD-R-18113-14).   The Bureau chose to prioritize these other items over the petition's request—especially given that the petition largely only repeated arguments that the Bureau already considered and rejected just a few years before.   *Id.*   There is no basis to "second-guess [this] decision" about how "to prioritize regulatory actions." *WildEarth Guardians v. EPA,* 751 F.3d 649, 656 (D.C. Cir. 2014).

In any event, even if Plaintiffs had demonstrated that the denial was arbitrary—which they have not—the remedy would not be to order the agency to commence a rulemaking, let alone to require the agency to adopt the regulatory changes that the petitioners request.  *See, e.g., Flyers Rts.*, 864 F.3d at 747 (holding that ordering an agency to "institute rulemaking … is appropriate only in the rarest and most compelling of circumstances" (quotations omitted)); *Am. Horse Prot. Ass'n,* 812 F.2d at 7 (similar).   The appropriate judicial remedy would only be to order the agency to reconsider the petition and respond again.  *See, e.g., Flyers Rts.*, 864 F.3d at 47 (ordering such relief); *Am. Horse Prot. Ass'n*, 812 F.2d at 7 (same).

## V.   There Is No Remaining Separation-of-Powers Problem with the Bureau's Organic Statute.

Plaintiffs cannot prevail on their claim (at 31-32) that the Payment Provisions are invalid because "the Bureau continues to violate" the separation of powers in two ways.   First, the way Congress chose to fund the Bureau does not violate the Appropriations Clause—as the courts that have considered the issue have unanimously held.[14]   The Appropriations Clause—which

---

[14]   *E.g.*, *PHH Corp. v. CFPB*, 881 F.3d 75, 95-96 (D.C. Cir. 2018) (en banc), *abrogated on other grounds, Seila Law*, 140 S. Ct. 2183; *CFPB v. Think Finance LLC*, No, 17-127, 2018 WL 3707911, at *1-2 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp.*, No. 3:17-101, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 896-97 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014); *see also Rop v. FHFA*, No. 1:17-CV-497, 2020 WL 5361991, at *26 (W.D. Mich. Sept. 8,

states that "[n]o Money shall be drawn from the Treasury but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7—simply requires that "the payment of money from the Treasury must be authorized by a statute." *OPM v. Richmond*, 496 U.S. 414, 424 (1990); *accord Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (the Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress"). The Bureau's funding is so authorized: The CFPA authorizes the Bureau to receive funds from the Federal Reserve up to a specified annual cap, 12 U.S.C. § 5497(a), and Congress remains free to change that funding at any time through the ordinary legislative process.

In contending (at 31) that the Bureau unconstitutionally gets funds "without an appropriations act," Plaintiffs mistakenly assume that Congress must fund agencies only through annual appropriations bills, not through other legislation providing funding through other means. Nothing in the Constitution ties Congress's hands in that way. On the contrary, it is well established that "Congress can, consistent with the Appropriations Clause, create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process." *PHH Corp.*, 881 F.3d 75 at 95; *accord, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004) ("Congress may … decide not to finance" an agency "through the normal appropriations process").

Second, Plaintiffs' contention (at 31-32) that Congress unconstitutionally delegated legislative power to the Bureau by authorizing it to promulgate rules prohibiting "unfair" and "abusive" financial practices is also meritless. Indeed, every court to have considered such a challenge has rejected it. *CFPB v. All Am. Check Cashing, Inc.*, No. 3:16-CV-356, 2018 WL

---

2020) (concluding that *Seila Law* "strongly implied that the [Bureau's] source of funding was not a problem by itself").

9812125, at *3 (S.D. Miss. Mar. 21, 2018), *en banc review pending on other grounds*, No. 18-60302 (5th Cir.); *ITT Educ. Servs.*, 219 F. Supp. 3d at 906 n.25; *Morgan Drexen*, 60 F. Supp. 3d at 1090.

The Supreme Court has held "time and again" that Congress may constitutionally delegate power to an executive agency so long as it provides an "intelligible principle" that the agency must follow. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quotations omitted). There can be "no doubt here" that, in authorizing the Bureau to identify and prevent "unfair" and "abusive" practices—terms whose meaning Congress spelled out in multi-pronged provisions, 12 U.S.C. §§ 5531(c)-(d)—"Congress has supplied an 'intelligible principle' to the Bureau." *ITT Educ. Servs.*, 219 F. Supp. 3d at 906 n.25. The Supreme Court has approved far-less-detailed principles in the past, including instructions for agencies to fix "fair and equitable" commodities prices, *Yakus v. United States*, 321 U.S. 414, 426-27 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943) (quotations omitted); and to take action to "avoid an imminent hazard to the public safety," *Touby v. United States*, 500 U.S. 160, 165-67 (1991).

## VI.   The Bureau Observed All Required Procedures in Promulgating the Payment Provisions.

Finally, the Bureau is entitled to summary judgment on count eight of Plaintiffs' amended complaint—which Plaintiffs do not even bother to pursue in their motion for summary judgment. Contrary to the allegations in that count, the Bureau did not "violate[] … procedural requirements" in promulgating the 2017 Rule. *See* Am. Compl. ¶¶ 144-150 (ECF No. 76).

At the outset, it is unclear what "procedural requirements" Plaintiffs claim the Bureau violated. The only procedural requirements that the Amended Complaint cites are the Regulatory Flexibility Act's requirements to publish initial and final regulatory flexibility

analyses that discuss a rule's impact on small entities and significant alternatives, 5 U.S.C. §§ 603, 604, and the APA's requirement to accept and consider public comments, 5 U.S.C. § 553(c).  Am. Compl. ¶¶ 149-150.  Plaintiffs do not explain how the Bureau failed to comply with those requirements, and there can be no serious dispute that it did.  82 Fed. Reg. at 54853-70 (final regulatory flexibility analysis); 81 Fed. Reg. at 48150-66 (initial regulatory flexibility analysis); 81 Fed. Reg. at 47864 (soliciting public comment); *see generally* 82 Fed. Reg. 54472 (considering comments throughout).

Plaintiffs' claim also fails to the extent they allege that the Bureau failed to "adequately" consider "evidence," lender and borrower "concerns," the "impact on small businesses," and "comments" (Am. Compl. ¶¶ 147-150).  The Bureau considered "the relevant matter presented" as required by the APA, 5 U.S.C. § 553(c), and Plaintiffs' barebones allegations—which do not even explain what the Bureau allegedly ignored—do not show otherwise.

Finally, the Bureau is also entitled to summary judgment to the extent that Plaintiffs claim that the Rule was "pre-ordained" and that the Bureau accordingly approached the rulemaking with an insufficiently open mind.  Am. Compl. ¶ 147; *see also id.* ¶ 149 (calling Rule a "foregone conclusion").  Besides being factually baseless, this claim is foreclosed by Supreme Court precedent rejecting such an "open-mindedness" requirement as having "no basis in the APA." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020) (quotations omitted).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Bureau on all of Plaintiffs' claims.

Dated:  October 23, 2020                    Respectfully submitted,

                                            MARY McLEOD
                                            General Counsel
                                            JOHN R. COLEMAN
                                            Deputy General Counsel
                                            STEVEN Y. BRESSLER
                                            Assistant General Counsel

                                             /s/ Kristin Bateman
                                            KRISTIN BATEMAN (Cal. Bar No. 270913)
                                            KAREN BLOOM (D.C. Bar No. 499425)
                                            KEVIN E. FRIEDL (NY Bar No. 5240080)
                                            Senior Counsel
                                            Consumer Financial Protection Bureau
                                            1700 G Street, NW
                                            Legal Division
                                            Washington, DC 20552
                                            Telephone: (202) 435-7821
                                            Fax: (202) 435-7024
                                            Kristin.Bateman@cfpb.gov

                                            *Counsel for Defendants Consumer Financial*
                                            *Protection Bureau and Kathleen L. Kraninger*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to the

following:

Michael A. Carvin
Christian G. Vergonis
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001-2113

Laura Jane Durfee
Jones Day
2727 N. Harwood
Dallas, TX 75201

/s/ Kristin Bateman
Kristin Bateman
*Counsel for Defendants*