IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD. *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU *et al.*, <br><br> Defendants. | Civil Action No. 1:18-cv-295 |

**RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

In *Collins v. Yellen*, the Supreme Court struck down the statutory removal protection for the Director of the Federal Housing Finance Agency (FHFA) and remanded for the lower courts to consider what relief is appropriate. Nos. 19-422 & 19-563, 2021 WL 2557067 (U.S. June 23, 2021). The Bureau now argues that *Collins* somehow bars the relief that Plaintiffs seek here. It does no such thing. First, *Collins* did *not* address whether a legislative rule adopted by an unlawfully insulated agency head is void *ab initio*, because the action at issue there was a contractual agreement, and it was adopted by a duly removable agency head. Second, *Collins* created a standard for deciding when to grant "retrospective relief" that would have required hundreds of millions of dollars in payments to the federal Treasury to be "completely undone." *Id.* at *19–20. It did not purport to limit *prospective* relief, which Plaintiffs seek here by requesting an injunction against the *future* enforcement of the Payments Provisions (*see* Am. Compl. at 41). Third, even if the *Collins* test for retrospective relief did apply here, it would powerfully *support* Plaintiffs' requested remedy because it is clear that, in the absence of the unconstitutional removal restriction, the Director would have been removed.

1

Equally unavailing is Defendants' reliance on a second recent case, *United States v. Arthrex, Inc.*, Nos. 19-1434, 19-1452, & 19-1458, 2021 WL 2519433 (U.S. June 21, 2021), where the Court addressed a different type of constitutional violation and provided a remedy that differs from the "ratification" here in several dispositive ways.

**I.     *Collins* says nothing about whether rules like the Payments Provisions are void *ab initio*.**

*Collins* did not address whether a rule promulgated by an unaccountable agency head is void *ab initio*. It did not involve rulemaking at all. Instead, it involved a contractual agreement that the Supreme Court held was valid when the FHFA entered into it, because the agency was then headed by an Acting Director who was removable at will and thus fully accountable to the President. *See* 2021 WL 2557067, at *19. The only remedies question in *Collins* was whether to undo later "implement[ation]" of the agreement by Directors who were insulated from removal. *Id.* And given that the initial agreement was created by an Acting Director answerable by the President, there was "no reason to regard" the subsequent implementation of the agreement's terms as invalid. *Id.* Here, by contrast, the 2017 rule was promulgated by a Bureau Director who was *not* subject to presidential control—and who was indeed explicitly opposed to the President's policy preferences, as detailed below. In this situation, there is *every reason* to think that the 2017 rule—including the Payments Provisions—was void *ab initio*.

**II.    *Collins* limited costly retrospective remedies, not the prospective relief sought here.**

Collins also does not apply here because that case involved only a request for retrospective monetary relief, not the prospective injunctive relief at issue here. Under *Collins*, a party seeking "retrospective relief" from the effects of an unlawful removal restriction must show "that the [restriction] inflicted harm." 2021 WL 2557067, at *20. *Collins* required this showing of "compensable harm" for retrospective relief to ensure that separation-of-powers

violations do not require every hard-to-reverse governmental action (including the collection of hundreds of millions of dollars stretching back nearly a decade) to "be completely *undone*." *Id.* at \*19–20, \*7 (emphasis added). Neither this holding nor its logic applies to *prospective* relief against future regulatory enforcement. Indeed, Justice Kagan joined the *Collins* Court's remedies analysis precisely on the ground that it "well explains why *backwards-looking* relief is not always necessary to redress a removal violation." *Id.* at \*29 (Kagan, J., concurring in part and concurring in the judgment in part) (emphasis added).

As Justice Gorsuch's partial concurrence observed, a separation-of-powers defect in an official's authority "normally" warrants "set[ting] aside the [official's] ultra vires actions as 'contrary to constitutional right.'" *Id.* at \*26 (Gorsuch, J., concurring in part) (quoting 5 U.S.C. § 706(2)(B)). The Supreme Court has held as much in cases "involving appointment and removal defects alike," and "th[o]se cases ... remain good law." *Id.* at \*29 (emphasis added). The limited remedy in *Collins* arose from "its unique context," where the plaintiffs sought retrospective relief "unwinding or disgorging hundreds of millions of dollars that have already changed hands." *Id.*; *cf. Ryder v. United States*, 515 U.S. 177, 180–81 (1995) (explaining that retrospective remedies have been denied in some separation-of-powers cases to avoid "the chaos that would result from" challenges to past actions, including criminal "conviction[s] and sentence[s]") (internal citation omitted). Although the Court in *Collins* declined to "authoriz[e] such relief," it did not disturb any of the "prior guidance authorizing more meaningful relief in other situations." 2021 WL 2557067, at \*29 (Gorsuch, J., concurring in part). In particular, it says nothing about the *forward*-looking relief that Plaintiffs seek here (*see* Am. Compl. at 41): an injunction against future enforcement of the unlawful Payments Provisions, which as a result of stays entered in this case have never been in effect.

3

### III. Even if the *Collins* test for retrospective relief applied here, it would support Plaintiffs' requested remedy.

In any event, Plaintiffs are entitled to relief even if *Collins* requires them to show that the unlawful removal restriction made a concrete difference. Here it is clear that, "[w]ere it not for that [removal] provision," the President would have "replaced" the Director before he adopted the unlawful regulation in November 2017. 2021 WL 2557067, at *20.

Replacement would have been the normal course because single-member agency heads who are not insulated from removal typically resign when a new President takes office, especially when they are of a different political party. And those who do not resign are typically removed. Thus, when the Trump administration began, virtually every significant single-member agency head was replaced *except* at the Bureau and the FHFA, where removal was restricted by the statutory provisions later held unconstitutional in *Seila Law* and *Collins*. This alone shows that Director Cordray remained in office solely because of the unconstitutional removal restriction.

Sure enough, the public record is *full* of evidence that President Trump wanted to fire Cordray, but was deterred from doing so by the statutory removal restriction. No one doubted that the two had many policy disagreements, and that the Trump administration was keen "to block the [Bureau's] new regulations" of "payday lenders" in particular.[1] As Director Cordray himself explained in a book released after he left office, "[t]he threat that I would be fired as soon as President Trump took office loomed over everything."[2] Most notably, it loomed over

---

[1] Consumer Loans, *Payday lending is declining*, The Economist (Apr. 8, 2017), https://www.economist.com/finance-and-economics/2017/04/08/payday-lending-is-declining.

[2] Richard Cordray, *Watchdog: How Protecting Consumers Can Save Our Families, Our Economy, and Our Democracy* 185 (2020); Kate Berry, *In tell-all, ex-CFPB chief Cordray claims Trump nearly fired him*, American Banker (Feb. 27, 2020), https://www.americanbanker.com/news/in-tell-all-ex-cfpb-chief-cordray-claims-trump-nearly-fired-him.

what Cordray described as his last piece of unfinished business—"[o]ur last big fight[,which] was over the payday lending rule."[3] The threat of removal was so acute that Cordray had taken "steps in the final days of the Obama administration to prepare a legal case to try to keep his job, even asking President Obama to write a letter attesting to his fitness to lead the CFPB to bolster the argument that President Trump lacked the legal cause to fire him."[4]

But "President Trump was advised to hold off on firing Cordray because the Supreme Court had not yet weighed in on Dodd-Frank's 'for cause' provision,"[5] while the D.C. Circuit, less than one month into the new president's term, had vacated and agreed to reconsider en banc a panel decision invalidating the for-cause removal protection. Feb. 16, 2017 Order (per curiam), *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (No. 15-1177). In light of this legal uncertainty, the Trump administration (according to Cordray) tasked Gary Cohn with deciding "what to do about [Cordray's] situation," and Cohn and Cordray "negotiated a temporary truce to await further legal and political events."[6]

Then on November 1, 2017—the very day on which President Trump "held a private bill-signing in the Oval Office for a congressional resolution invalidating the [Bureau's] arbitration rule," and less than three weeks before the payday lending rule issued—Cordray received "an unscheduled call from the White House," in which "a secretary asked [him] to hold to speak with the president"—only to have the call "abruptly terminated."[7] The White House Chief of Staff

---

[3] Cordray, *Watchdog*, *supra* at 198.

[4] Berry, *In tell-all, ex-CFPB chief Cordray claims Trump nearly fired him*, *supra*; Cordray, *Watchdog*, at 186.

[5] Berry, *In tell-all, ex-CFPB chief Cordray claims Trump nearly fired him*, *supra*.

[6] Cordray, *Watchdog*, *supra* at 187.

[7] *Id.* at 198; Berry, *In tell-all, ex-CFPB chief Cordray claims Trump nearly fired him*, *supra*; John Heltman, *Trump signs resolution killing CFPB arbitration rule*, American Banker (Nov. 1, 2017), https://www.americanbanker.com/news/trump-signs-resolution-killing-cfpb-arbitration-rule.

"apparently intervened at that point, and [Cordray] never heard anything further."[8] As one expert noted, "Trump [was] learning . . . that he doesn't have all the powers that he thought he had as president."[9]

Ultimately, before the courts could rule, Cordray promulgated the Payday Rule at issue here, and subsequently resigned, finally giving the President the chance to appoint his own director and implement his own policy preferences. The Trump administration quickly named as the Bureau's Acting Director Mick Mulvaney, who "[w]ithin weeks . . . announced that he would reconsider one of the bureau's major long-term initiatives: rules to restrict payday loans."[10] As Mulvaney put it to reporters, "[a]nybody who thinks that a Trump-administration [Bureau] would be the same as an Obama-administration [Bureau] is simply being naïve."[11]

In sum, a President known to oppose the policies of the Director who took the action challenged here sought to fire the Director but was advised to hold off until courts could rule on the lawfulness of the Director's removal protection. It is hard to imagine better evidence that the unlawful removal restriction made a difference, as required by the *Collins* test. That test, as Justice Kagan noted in concurrence, serves to protect "actions the President supports" and actions "that would never have risen to the President's notice." 2021 WL 2557067, at *31 (Kagan, J., concurring in part and concurring in the judgment in part). The payday lending rule, by contrast, was one of the Bureau's most significant and high-profile decisions, and the public

---

[8] Cordray, *Watchdog*, *supra* at 198; Chris Clow, *Former CFPB Director Cordray Reveals Near Firing by Trump*, Reverse Mortgage Daily (Mar. 1, 2020), https://reversemortgagedaily.com/2020/03/01/former-cfpb-director-cordray-reveals-near-firing-by-trump/.

[9] Kate Berry, *Why hasn't Trump fired CFPB's Cordray?*, American Banker (Feb. 8, 2017) https://www.americanbanker.com/news/why-hasnt-trump-fired-cfpbs-cordray.

[10] Nicholas Confessore, *Mick Mulvaney's Master Class in Destroying a Bureaucracy From Within*, N.Y Times (Apr. 16, 2019), https://www.nytimes.com/2019/04/16/magazine/consumer-financial-protection-bureau-trump.html.

[11] *Id.*

record makes clear that the President would have fired then-Director Cordray before the Bureau's promulgation of the Payday Rule but for the unconstitutional removal restriction. This challenge thus satisfies the test for relief set forth in *Collins*.

Accordingly, Plaintiffs are entitled to a remedy on their constitutional claim, and the Court should grant Plaintiffs' motion for summary judgment and deny the Bureau's cross-motion on that claim. At a minimum, if the Court has any doubts about whether President Trump would have removed then-Director Cordray, the Court must deny the Bureau's motion for summary judgment and permit discovery on that issue. *See* Fed. R. Civ. P. 56(d); *Bisby v. Garza*, 342 F. App'x 969, 973 (5th Cir. 2009) ("Generally, summary judgment may be granted only after an adequate time for discovery.") (internal quotation marks omitted).

**IV.    The remedy approved in *Arthrex* is nothing like the "ratification" challenged here.**

In *Arthrex*, the Supreme Court held that the adjudicatory decisions of administrative patent judges (APJs), who had been appointed as inferior officers, were not adequately subject to review by the APJs' superior officer, the Director of the Patent and Trademark Office (PTO). 2021 WL 2519433, at *11, *13. To remedy this defect, the Court invalidated a statutory provision restricting the Director's authority to review the APJs' decisions, and remanded the case to allow that review to occur. *Id.* at *12. The Bureau contends that that remedy is akin to ratification in this case, but it is not.

*Arthrex* had nothing to do with ratification. The only constitutional defect that the Court identified in *Arthrex* was that the statute unlawfully prohibited the PTO Director from reviewing adjudications *after* they had been conducted by patent judges. To address that defect, the proper remedy was to remand so that the Director could review the decisions in question, *i.e.*, to give the parties the full review to which they were entitled in the first instance. That is a far cry from

7

ratification, which would allow reassessment (without required administrative procedures) of a prior director's decision by a new director.

In other words, in *Arthrex* there was no constitutional requirement that the patent judges be subject to the Director's supervision and control *during* the adjudications. Here, by contrast, Article II of the Constitution required the Bureau Director to be subject to the President's control (via the removal power) *during* the extensive rulemaking process required by the Administrative Procedure Act, so that the process itself would be properly supervised and politically accountable. *See* ECF 80 at 17–18. If President Trump's Bureau Director had been in charge, the 2017 rule would not have been promulgated at all. That problem cannot be "cure[d]" by a mere *ipse dixit* ratification now. *Id.* The agency needs to go through the constitutionally and statutorily required process for the first time with an accountable Director. Any other position would reduce the APA-mandated rulemaking process to a meaningless irrelevancy. (Indeed, *Arthrex*'s holding that the APJs' decisions are invalid absent the constitutionally required review by the PTO Director contradicts the Bureau's assertion that, under *Collins*, no remedies are required for the constitutional violation that occurred here.)

There is another contrast. Because the PTO Director has always been vested with the "powers and duties" of his agency, *Arthrex*, 2021 WL 2519433, at *4, his *post hoc* review of tainted APJ decisions fully comports with the agency law principle "that the party ratifying should be able" "to do the act ratified at the time the act was done," not just "at the time the ratification was made." *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994) (citation and emphasis omitted); *see also* Restatement (Third) of Agency §§ 3.04(1), 4.01(3)(b), 4.04(1) (2006). Here, by contrast, the unlawfully structured Bureau lacked authority to act when the Payments Provisions issued, so those provisions cannot now be ratified. *See* ECF 80 at 17–18.

## CONCLUSION

In light of *Collins*, and fully consistent with *Arthrex*, this Court should grant Plaintiffs' motion for summary judgment and deny the Bureau's cross-motion. In the alternative, if the Court believes that the publicly available evidence is insufficient to warrant summary judgment for Plaintiffs at this time, the Court should deny summary judgment to the Bureau so that Plaintiffs may have the opportunity to take discovery on the issue whether President Trump would have removed Director Cordray but for the statutory removal restriction.

Dated: June 30, 2021

Respectfully submitted,

/s/ Laura Jane Durfee
  MICHAEL A. CARVIN
    D.C. Bar No. 366784
    Admitted *pro hac vice*
    macarvin@jonesday.com
  CHRISTIAN G. VERGONIS
    D.C. Bar No. 483293
    Admitted *pro hac vice*
    cvergonis@jonesday.com
  **JONES DAY**
  51 Louisiana Avenue NW
  Washington, DC 20001
  Telephone: (202) 879-3939
  Facsimile: (202) 626-1700

  LAURA JANE DURFEE
    Texas Bar No. 24069653
    ldurfee@jonesday.com
  **JONES DAY**
  2727 North Hardwood Street
  Dallas, TX 75201
  Telephone: (214) 220-3939
  Facsimile: (214) 969-5100

  *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of June 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: June 30, 2021

*/s/ Laura Jane Durfee*
Laura Jane Durfee
*Counsel for Plaintiffs*
