IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., CONSUMER SERVICE ALLIANCE OF TEXAS, PLAINTIFFS, | § § § § § § | |
| V. | § § | CAUSE NO. 1:18-CV-00295-LY |
| CONSUMER FINANCIAL PROTECTION BUREAU, KATHLEEN KRANINGER, IN HER OFFICIAL CAPACITY AS DIRECTOR, CONSUMER FINANCIAL BUREAU; DEFENDANTS. | § § § § § § § | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the court is the above-styled and numbered cause that arises in response to the "Payday, Vehicle Title, and Certain High-Cost Installment Loans" Rule ("the 2017 Rule"), issued by the Consumer Financial Protection Bureau ("the Bureau") on November 17, 2017. Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54,472-01 (Nov. 17, 2017). The 2017 Rule limited certain practices by covered lenders deemed "unfair, deceptive, or abusive." *Id.* However, in 2020, the Supreme Court held that at the time of passing the 2017 Rule, the Bureau was unconstitutionally structured. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S.Ct. 2183, 2192 (2020). The Court did so because Congress improperly shielded the Director of the Bureau from at-will removal by the president, rendering the agency "accountable to no one," and violating the Separation of Powers Doctrine. *Id.* at 2203. Two weeks later, the Bureau—then led by a Director removable by the president—ratified a portion of the 2017 Rule known as the "Payment Provisions." Payday, Vehicle Title, and Certain High-Cost Installment Loans; Ratification of Payment Provisions, 85 Fed. Reg. 41,905-02 (July 13, 2020) (the "Ratification").

Plaintiffs, two trade associations ("the Associations"), bring this action on behalf of certain payday lenders and credit-access businesses affected by the 2017 Rule and the Ratification. The Associations challenge the validity of the Ratification and ask the court to set aside the Payment Provisions Section of the 2017 Rule.[1] Before the court now are the parties' cross-motions for summary judgment, responses, replies, exhibits, and supplemental authorities.[2] Having considered all of the parties' filings and the applicable law, the court renders the following order.

## I.    LEGAL STANDARD

"Summary judgment is required when 'the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting

---

[1]   The Associations' Original Complaint was filed April 9, 2018 (Dkt. No. 1). On June 12, 2018, the Court entered an order staying litigation in this case (Dkt. No. 29). On November 6, 2018, the Court entered an order staying the 2017 Rule's August 2019 compliance date (Dkt. No. 53). On August 20, 2020, the Court lifted the stay on litigation but did not lift the stay on the compliance date (Dkt. No. 74). The Associations filed an amended complaint on August 28, 2020 (Dkt No. 76). The Bureau filed an Answer to the Amended Complaint on September 18, 2020 (Dkt. No. 79).

[2]   The Associations' Motion for Summary Judgment was filed September 25, 2020 (Dkt. No. 80); The Bureau's Response and Cross-Motion for Summary Judgment was filed October 23, 2020 (Dkt. No. 82); The Associations' Response to Defendants' Cross-Motion for Summary Judgment was filed November 20, 2020 (Dkt. No. 84); The Bureau's Reply was filed December 18, 2020 (Dkt. No. 85); The Bureau's First Notice of Supplemental Authority was filed December 30, 2020 (Dkt. No. 86); The Associations' Response to the First Notice of Supplemental Authority was filed December 31, 2020 (Dkt. No. 87); The Bureau's Second Notice of Supplemental Authority was filed May 20, 2021 (Dkt. No. 88); The Associations' Response to the Second Notice of Supplemental Authority was filed May 21, 2021 (Dkt. No. 89); The Bureau's Third Notice of Supplemental Authority was filed June 28, 2021 (Dkt. No. 90); The Associations' Response to the Third Notice of Supplemental Authority was filed June 30, 2021 (Dkt. No. 91).

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)). A fact is material if "its resolution could affect the outcome of the action." *Aly v. City of Lake Jackson*, 605 Fed. App'x 260, 262 (5th Cir. 2015). "If the moving party fails to meet [its] burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

On cross motions for summary judgment, the court reviews each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party, determining for each side whether judgment may be rendered in accordance with the Rule 56 standard. *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (internal citation and quotation omitted); *Shaw Constr. v. ICF Kaiser Eng'rs., Inc.*, 395 F.3d 533 n.8, 9 (5th Cir. 2004).

In the context of a challenge to an agency action under the Administrative Procedure Act ("APA"), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *American Stewards of Liberty v. United States Dept. of Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)). When a party seeks review of an agency action under the APA, the district judge sits as an appellate tribunal. *See e.g., Redeemed Christian Church of God v. United States Citizenship & Immigr. Servs.*, 331 Fed. Supp. 3d 684, 694 (S.D. Tex. 2018). The entire case on review is a question of law. *Id.* Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. *Id.* Summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. *Id.*

## II.     BACKGROUND

The Bureau is charged with regulating individuals and entities that offer financial products or services. 12 U.S.C. § 5491. Congress authorized the Bureau to "prescribe rules . . . identifying as unlawful, unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* at § 5531(b).

Pursuant to its rulemaking authority, the Bureau passed the 2017 Rule, which consisted of two parts: the "Underwriting Provisions" and the "Payment Provisions." *See* 12 C.F.R. § 1041.4.

The Underwriting Provisions, *inter alia*, restricted lenders from making covered loans "without reasonably determining that the consumers will have the ability to repay the loans." 2017 Rule Official Interpretations, 82 Fed. Reg. at 54,826. Those provisions have since been revoked.

At issue here are the Payment Provisions. These provisions restrict lenders of certain loans from attempting to withdraw payments from a consumer's account after a second consecutive failed attempt to do so, without obtaining a new authorization for further withdrawals. 12 C.F.R. §§ 1041.7–.8. The Payment Provisions also set limitations on such a new authorization, including requiring a new consumer-rights notice, and restricting when the lender may obtain the new authorization electronically or by telephone. *Id.* at §§ 1041.8(c)(3), 1041.9(c).

In 2020, the Supreme Court held in *Seila Law* that the Bureau's "leadership by a single [Director] removable only for inefficiency, neglect, or malfeasance violates the separation of powers." 140 S.Ct. 2183, 2197. The Court was then left with the question of whether "the Director's removal protection was severable from the other provisions of the . . . Act that establish[es] the [Bureau]." *Id.* at 2207. "If so," the Court reasoned, "then the [Bureau] may continue to exist and operate notwithstanding Congress's unconstitutional attempt to insulate the agency's Director from removal." *Id.* at 2207–08. The Court found the provision was severable and remanded the case to the Ninth Circuit Court of Appeals for consideration of whether the Bureau's actions in that case were validly ratified. *Id.* at 2211.

Shortly after *Seila Law*, the Bureau's Director, now removable at will by the President, ratified the Payment Provisions of the 2017 Rule. Ratification, 85 Fed. Reg. at 41905-02.

### III.   ANALYSIS

#### a.  The Associations' motion for summary judgment

The Associations offer six arguments as to why the Payment Provisions should be set aside as a matter of law.

#### 1.  Payment provisions void *ab initio* due to Bureau's unconstitutional structure

The Associations contend that the 2017 Rule is void *ab initio* because the Bureau that promulgated it was unconstitutionally structured. The Associations further contend that the "appropriate remedy for this constitutional defect in the 2017 Rule is to set aside that rule and require the Bureau . . . to conduct a new notice-and-comment rulemaking."

Since the Associations' briefing was submitted, the Supreme Court clarified that the contention is an incorrect application of precedent:

> What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction. We held that a plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer and that the plaintiff alleges was void. But that holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone.

*Collins v. Yellen*, 141 S.Ct. 1761, 1787 n.24 (2021) (internal citations omitted).

The court concludes the 2017 Rule is not void *ab initio*.

#### 2.  Bureau's ratification of Payment Provisions was ineffective, unconstitutional, procedurally improper, and arbitrary and capricious

The Associations also contend that the Bureau's ratification of the Payment Provisions is ineffective and improper because: ratification cannot cure the type of constitutional problem present here; a new notice-and-comment process must be undertaken; ratification requires that the agency had the power to do the act ratified at the time it was done; and the ratification was arbitrary and capricious. The argument that ratification cannot cure the type of constitutional problem

present here is not persuasive, because the Supreme Court in *Seila Law* remanded to the lower court for consideration of whether ratification was appropriate—a futile step if ratification, like the Associations contend, is never appropriate for this sort of constitutional harm.

Next, the Associations point to the APA's requirement that legislative rules like the Payment Provisions follow notice-and-comment procedures. *See* 5 U.S.C. § 553(b). When those procedures were undertaken for the 2017 Rule, the agency was unconstitutionally structured. The Associations rely on the Supreme Court's holding in *Lucia v. Securities and Exchange Commission* for the premise that allowing the Bureau to lean on ratification would deny the Associations a meaningful remedy to the constitutional wrong and would fail to "create incentives" for plaintiffs to challenge actions taken by unconstitutionally structured agencies. *See* 138 S.Ct. 2044, 2055 (2018). But the Associations already received a meaningful remedy for the harm they suffered: a validly appointed Director reviewed the record pertaining to the 2017 Rule and chose to ratify a portion thereof. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 120 (D.C. Cir. 2015) ("new hearing" does not need to be "completely new proceeding" but could instead entail "de novo review"). That the remedy the Associations received stops short of their desire is immaterial—the solution is tailored to the harm.

The Associations' next argument is that this specific ratification is improper because ratification requires that the agency had the authority to do the act ratified at the time it was done. The Associations contend: "[R]atification requires two entities—a principal who had authority to act at the time in question, and an agent who did not." Here, though, the Associations contend the Bureau is the only entity involved and it lacked authority from the start. The Bureau responds that "The Bureau is the principal, and the Director is the agent who acts on the Bureau's behalf."

Other courts have considered and rejected this argument. *See Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1191 (9th Cir. 2016); *Federal Election Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704, 707–09 (D.C. Cir. 1996). The *Gordon* Court explained:

> Both [Defendant and amicus] recognize that for a ratification to be effective, it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made. This rule of law is derived from the Second Restatement of Agency. Under the Second Restatement, if the principal (here, [the Bureau]) had authority to bring the action in question, then the subsequent August 2013 ratification of the decision to bring the case against [Defendant] is sufficient. The Third Restatement, which is less "stringent" than the Second, advises that a ratification is valid even if the principal did not have capacity to act at the time, so long as the person ratifying has the capacity to act at the time of ratification. . . . Because the [Bureau] had the authority to bring the action at the time [Defendant] was charged, [the Bureau Director's] August 2013 ratification, done after he was properly appointed as Director, resolves any Appointments Clause deficiencies.

813 F.3d at 1191–92 (internal citations and quotations omitted); *see also Intercollegiate Broad. Sys.*, 796 F.3d at 121 ("[O]nce a new Board has been properly appointed (or reconstituted), the Appointments Clause does not bar it from reaching the same conclusion as its predecessor."); *Legi-Tech*, 75 F.3d at 707, 709 (newly constituted Federal Election Commission need not "start at the beginning" and "redo the statutorily required procedures in their entirety").

Based on this analysis, it appears that the Ninth Circuit would uphold the ratification in this case under either the Second or Third Restatement of Agency. *Gordon* identifies the Bureau as the principal—and presumably the Director as its agent. *Gordon*, 813 F.3d at 1191. But *Gordon* also recognized that ratification is valid so long as the person ratifying has capacity to act at the time of ratification. *Id.* at 1192. The court finds this reasoning persuasive.

Finally, the Associations challenge the Ratification as arbitrary and capricious. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its own judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Id.* (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing that explanation, the court should "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citing *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974)).

The Associations posit that the Bureau engaged in an "unexplained about-face" on the issue of the time needed to implement the Payment Provisions. In 2017, the Bureau gave companies like those the Associations represent 21 months to come into compliance with the provisions of the 2017 Rule. The Bureau reasoned that "the interest of enacting protections for consumers as soon as possible" had to be balanced against "giving [lenders] enough time for an orderly implementation period" and concluded 21 months was the time required for lenders to adjust practices to come into compliance. 2017 Rule Official Interpretations, 82 Fed. Reg. at 54, 814. The Associations now urge that if 21 months was the time *required* for lenders to come into compliance, the Bureau's offer of a 30-day compliance period is, on its face, arbitrary and capricious. *See National Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 762 (3rd Cir. 1982) (effective date is "an essential part of any rule: without an effective date, the agency statement could have no future effect and could not serve to implement, interpret, or prescribe law or policy").

In promulgating the 2017 Rule, the Bureau reasoned that 21 months was the necessary time for lenders to adjust their practices according to the Rule. Lenders have had considerably *more* than 21 months. The Bureau's offer of a short additional compliance period after the lapse of the

original 21-month compliance period cannot accurately be described as an "unexplained about-face."

In arguing that the Ratification is arbitrary and capricious, the Associations next point to the requirement that the Bureau consider "the potential benefits and costs to consumers and [lenders]," which the Associations contend the ratification fails to do properly. *See* Consumer Fin. Prot. Act ("CFPA") §§ 1022(b)(2), 12 U.S.C. § 5512(b)(2). The cost-benefit analysis conducted by the Bureau considered the Underwriting Provisions of the 2017 Rule in conjunction with the Payment Provisions—in other words, the analysis considered aspects of the 2017 Rule that have since been revoked *alongside* aspects that were ratified. The Associations contend that the Bureau's failure to conduct a new cost-benefit analysis inherently renders the ratification arbitrary and capricious. But the Bureau responds that the consideration of the crossover impact of the Underwriting Provisions on the Payment Provisions was limited to a couple of sentences on which the 2017 Rule's cost-and-benefit analysis did not rely.[3] The court agrees with the Bureau that this discussion is far from the "essential premise" of the cost-benefit analysis the Associations contend it constitutes.

### 3. Payment Provisions exceed Bureau's statutory authority and are arbitrary and capricious

The Associations' third argument is that the Payment Provisions violated the CFPA and the APA when enacted by declaring a practice unfair and abusive in a manner that exceeded the Bureau's authority and was arbitrary and capricious.

---

[3] The language in question is: "[T]he Bureau expects that unsuccessful payment withdrawal attempts will be less frequent under the rule. This is because . . . the [Underwriting] provisions . . . will reduce the frequency with which borrowers receive loans that they do not have the ability to repay. This should in turn lessen the impacts of instances where a lender is required to notify consumers that the lender is no longer permitted to attempt to withdraw payments from a borrower's account." 2017 Rule Official Interpretations, 82 Fed. Reg. at 54,846.

*"Unfair."* First, the Associations challenge the Bureau's finding that a third withdrawal attempt after two failed withdrawals is unfair. To declare a practice "unfair," the Bureau must find that the practice "has a reasonable basis to conclude that [1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c). The Bureau found that all three of these elements were met by new withdrawal attempts from consumer's bank accounts after two attempts have failed unless the consumer gives renewed approval. 2017 Rule Official Interpretations, 82 Fed. Reg. at 54720.

The Associations first challenge is that, in determining the withdrawal attempts were unfair, the Bureau did not carefully weigh the costs and benefits to consumers and to competition. The Associations then suggest that the benefits of payday and other covered loans to consumers are substantial and are discounted only because of the Bureau's paternalism. But this argument fails for two reasons: first, the court is not seeking in this review to determine if the court *agrees* with the Bureau or would have made the same decision, so reweighing the costs and benefits is inappropriate. Second, the practice in question is not offering loans, but making successive withdrawal attempts, and the Associations have presented no evidence why those attempts help consumers.

The Associations also challenge the Bureau's finding that consumers can reasonably avoid the injury in question. For instance, the Associations allege consumers could (a) refuse to authorize automatic withdrawals; (b) put sufficient funds in their bank accounts; (c) renew loans or negotiate repayment options; or (d) avoid taking out a loan in the first place. Again, these arguments are unpersuasive. The Bureau, in drafting the 2017 Rule, considered whether consumers could take out loans without authorizing automatic withdrawals but found that such loans are generally

unavailable. 2017 Rule Official Interpretations, 82 Fed. Reg. at 54737. The Bureau also considered whether consumers could reasonably avoid successive withdrawal attempts by contacting the lender but found that withdrawals often happen multiple times in a day—too fast for such a solution. *Id.* Similarly, the argument that overdraft fees are "reasonably avoidable" because consumers could simply put sufficient funds in their accounts or avoid taking out loans at all is unpersuasive. By that logic, no practice by a lender could *ever* be "unfair," because the consumer could have simply paid the loan back on time or avoided it altogether.

The Associations' final challenge against the Bureau's conclusion that the successive withdrawals are unfair is that the Bureau charges lenders with being the cause of the injury even though the customers' banks cause the failed-payment fees. But, as the Bureau contends, the fact that "a company's conduct was not *the most* proximate cause of an injury generally does not immunize liability from foreseeable harms." *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (in context of unfairness, "the contribution[s] of independent causal agents . . . do not magically erase the role" of others in causing harm).

*"Abusive."* The Associations challenge the Bureau's finding that the successive withdrawals are "abusive." The CFPA deems a practice abusive after a finding that it:

> takes unreasonable advantage of (a) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; [or] (b) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service.

12 U.S.C. § 5531(d)(2)(A)–(B).

The Bureau found, when promulgating the 2017 Rule, that successive withdrawal attempts are abusive because they take advantage of consumers' lack of understanding of the risk that a

lender would attempt to charge the consumer's account again and again if withdrawal attempts failed. 2017 Rule Official Interpretations, 82 Fed. Reg. at 54,741.

The Associations complain that the Bureau has since rejected the interpretations of "lack of understanding" that led it to designate the withdrawal attempts in question as abusive. More specifically, the Associations claim it is the Bureau's belief that a consumer having a general understanding of the risk of the fees associated with failed withdrawal attempts is enough to preclude a finding that a practice takes advantage of a consumer's lack of understanding. *See* 2017 Rule Official Interpretations, 82 Fed. Reg. at 54,740. The Associations contend that because the Bureau has rejected the approach it used to find the withdrawal attempts abusive, that finding is arbitrary and capricious.

The Associations' arguments fail once again. The Bureau responds, and the court agrees, that no substantive consideration about this process has changed. Regarding the Associations' lack-of-understanding argument, the only relevant change to the Bureau's standard concerns the now-revoked Underwriting Provisions. *See* 2017 Rule Official Interpretations, 82 Fed. Reg. at 54597–98.

***Failure to differentiate financial products.*** The Associations contend that the Bureau failed to establish a "rational connection between the facts found and the choice made" when crafting the 2017 Rule because the Bureau failed to heed important differences in the varieties of financial products covered. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. For instance, the Associations contend the Bureau failed to consider the difference between withdrawal attempts from debit or prepaid cards and those from automated clearing houses and checking accounts.

But the Bureau considered these differences. The 2017 Rule found that the harm it sought to prevent would only be prevented if the lenders "do not charge NSF, overdraft, return payment

fees, or similar fees, and do not close accounts because of failed payment attempts." 2017 Rule Official Interpretations, 82 Fed. Reg. at 54,746. Finding that "all payment methods" could expose consumers to some of these fees, the 2017 Rule declined to exempt any payment types from the Payment Provisions. *Id.* That is sufficient to establish the "rational connection between the facts found and the choice made" necessary to avoid the determination the Rule was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

  ***Final "Arbitrary and Capricious" Arguments.*** Lastly, the Associations contend the 2017 Rule is arbitrary and capricious because the Bureau unfairly targeted high-interest loans in violation of Congress's prohibition on establishing a usury limit and that the 2017 Rule is primarily based on public policy considerations. These arguments fail as well. Specifying which loans qualify for restrictions does not establish a limit on annual percentage rate, and the 2017 Rule is supported by reasoning beyond public policy, much of which has been discussed herein.

### 4. Payment Provisions rest on defective cost-benefit analysis

  The Associations' fourth argument is that the Payment Provisions rest on a flawed cost-benefit analysis. The CFPA requires the Bureau to consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products." 12 U.S.C. § 5512(b)(2). The Associations contend the 2017 Rule's cost-benefit analysis has two "serious flaw[s]" that "render the rule unreasonable." *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). The Associations point to two factors they believe the Bureau did not consider in its cost-benefit analysis: (1) the increased likelihood a loan would enter into collections sooner than it otherwise would have; and (2) the additional accrued interest customers will incur as a result of the notice requirements in the Payment Provisions.

The Bureau responds that it is only required to consider "important aspect[s] of the problem" before it. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It is "not required to consider every single possible cost." *STG LLC v. United States*, 147 Fed. Cl. 790, 809 (2020). The court agrees. The rational-basis test of APA review asks "whether the [] agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). That a review of the agency's cost-benefit analysis with the benefit of hindsight can produce costs not considered or not thoroughly considered by the agency does not automatically render a rule unreasonable.

### 5. Bureau's denial of Association member's rulemaking petition was arbitrary and capricious

A member of Plaintiff Community Financial Services Association, Advance Financial, submitted a rulemaking petition asking the Bureau to "amend" the 2017 Rule "to exclude debit card payments" from the reach of the Payment Provisions. The Associations contend the Bureau's decision to decline this request amounted to a clear error in judgment and the 2017 Rule should therefore be set aside as arbitrary and capricious. *See Safe Extensions, Inc. v. Federal Aviation Admin.*, 509 F.3d 593, 604 (D.C. Cir. 2007). The reason, similar to arguments made by the Associations above, is that debit card transactions are not usually subject to the same insufficient-funds fees. Again, the Bureau considered those transactions and chose not to make an exception for them. That the Associations disagree is insufficient to establish the "rational connection between the facts found and the choice made" necessary to avoid the determination the Rule was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 6. Bureau's structure continues to violate Separation-of-Powers principles

Finally, the Associations assert the Bureau's structure continues to violate Separation of Powers principles that the Supreme Court had no opportunity to consider in *Seila Law*. The Associations contend the Bureau's Director can establish its budget, up to a set percentage of the Federal Reserve's operating expenses, and that this budget is exempt from review by the congressional Appropriations Committees. According to the Associations, this violates the constitutional proscription against taking money from the Treasury except "in Consequences of Appropriations made by Law." U.S. Const., art. I § 9, cl. 7.

The Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citing *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). Therefore, if a statute authorizes an agency to receive funds up to a certain cap, as the CFPA authorizes the Bureau to do, there is no Appropriations Clause issue. *See* 12 U.S.C. § 5497(a).

The Associations also contend that the Bureau violates the Constitution because Congress merely "announce[d] vague aspirations and then assign[ed] others the responsibility of adopting legislation to reach its goals." *See Gundy v. United States*, 139 S.Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting). Here, the Associations assert Congress has done just that by assigning the Bureau the responsibility to prevent unfair and abusive practices in this industry. The court disagrees and does not find a remaining constitutional issue. *See Gundy*, 139 S.Ct. at 2123 (holding Congress may delegate power to agencies as long as it provides an "intelligible principle" for those agencies to follow).

### 7. Summary

Because the Associations have not shown they are entitled to judgment as a matter of law, the court will deny their Motion for Summary Judgment.

#### b. The Bureau's motion for summary judgment

The Bureau offers six reasons it is entitled to summary judgment on each of the Associations' causes of action. The court considers each of these arguments in turn.

#### 1. The Associations' constitutional challenge provides no basis to set aside the Payment Provisions because a validly appointed director ratified them.

The Bureau first argues it is entitled to summary judgment on the issue of whether the Payment Provisions are void *ab initio*. The Supreme Court's holding in *Collins* suggests the Bureau is correct. *See Collins*, 2021 WL 2557067, at *19 n. 24 (*Seila Law*'s "holding on standing does not mean that actions taken by [an improperly appointed] officer are void *ab initio* and must be undone."). The court therefore concludes that the Payment Provisions are not void *ab initio*.

Therefore, the court considers whether the Bureau's ratification of the Payment Provisions was proper. Federal courts have held consistently that ratification by a properly appointed official remedies the constitutional problem with actions initially approved by an improperly appointed official. *See, e.g., Gordon*, 819 F.3d at 1190–91 (9th Cir. 2016) (properly appointed official's ratification cured constitutional problem caused by actions initially overseen by official appointed in violation of Article II); *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 372 (D.C. Cir. 2017) (same); *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 602 (3d Cir. 2016) (same). The court therefore concludes that ratification can be a proper mechanism of addressing the sort of constitutional problem at issue here.

Additionally, the court finds that the Bureau's ratification of the Payment Provisions was a solution tailored to the constitutional injury sustained by the Associations. *See United States v.*

*Morrison*, 449 U.S. 361, 364 (1981) (noting "general rule that remedies should be tailored to the injury suffered from the constitutional violation"). A few weeks after the Supreme Court's holding in *Seila Law*, the Bureau's constitutionally appointed director ratified the Payment Provisions. *See* Ratification, 85 Fed. Reg. 41905-02. In doing so, the Director noted she "is familiar with the payment provisions and has also conducted a further evaluation of them for purposes of th[e] ratification. Based on the Director's evaluation of the payment provisions, it is the Director's considered judgment that they should be ratified." *Id.* This assurance is sufficient to establish "*de novo* review." *See Intercollegiate Broad. Sys.*, 796 F.3d at 120 ("new hearing" does not need to be "completely new proceeding" but could instead entail "*de novo* review"). Finally, as previously discussed, the Associations' arguments against the propriety, legality, and sufficiency of the Ratification all fail. The court concludes that the Ratification was valid and cured the constitutional injury caused by the 2017 Rule's approval by an improperly appointed official.

### 2. Payment Provisions are consistent with the Bureau's statutory authority and not arbitrary and capricious

The Bureau argues that, as a matter of law, the Payment Provisions do not exceed the Bureau's statutory authority and are not arbitrary and capricious.

The Bureau argues that it reasonably determined that the practice addressed by the Payment Provisions—repeated attempts to withdraw money from consumers' accounts after such attempts have failed twice—is "unfair." The Bureau arrived at this conclusion because it determined that such a practice caused substantial injury to consumers by subjecting them to substantial and repeated fees, was not reasonably avoidable by those consumers, and did not include some countervailing benefit to outweigh that substantial injury. The Associations' challenges to the Bureau's determination that the Payment Provisions were "unfair" fail.

The Bureau next asserts that it reasonably determined that the proscribed withdrawals were "abusive" because they take unreasonable advantage of (a) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service and (b) the inability of the consumer to protect the interests of the consumer in selecting or using" the product or service. The Associations' challenges to the Bureau's determination that the Payment Provisions were "abusive" fail.

The Bureau contends that it reasonably declined to exempt certain payment methods from the Payment Provisions and that this denial was not arbitrary and capricious. More specifically, the Bureau contends it set forth a "rational connection between the facts found and the choice made" when it chose to not exempt debit-card and prepaid-card payments from the restrictions of the Payment Provisions, even though these do not usually result in insufficient-funds fees. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (discussing "rational connection" standard to overcome arbitrary and capricious claims). The Bureau established the rational connection between the facts found and the choice made when it chose to include debit- and prepaid-card payments in the Payment Provisions.

Lastly, the Bureau contends it did not establish a usury limit or improperly rely on public policy. The Bureau is limited from "establish[ing] a usury limit applicable to an extension of credit offered or made . . . to a consumer" and from allowing public policy to "serve as a primary basis" for the determination that an act or practice is unfair. 12 U.S.C. §§ 5517(o), 5531(c)(2). As discussed above, the Associations fail in their attempt to show that the Payment Provisions run afoul of either of these statutory restrictions.

The court therefore concludes as a matter of law that the Payment Provisions are consistent with the Bureau's statutory authority and are not arbitrary and capricious.

### 3. Bureau reasonably considered Payment Provisions' costs and benefits

The Bureau contends it is entitled to summary judgment on the issue of whether it thoroughly considered the costs and benefits of the Payment Provisions in accordance with the CFPA. *See* 12 U.S.C. § 5512(b)(2)(A). The Associations claim that the Bureau fell short of this requirement in two ways: first by failing to consider that the Underwriting Provisions' absence would affect and enhance certain aspects of the Payment Provisions and, second, by failing to consider certain costs the Payment Provisions would impose on customers.

Both arguments fail. The Bureau noted the Underwriting Provisions could lessen certain impacts of the Payment Provisions, but also discussed and considered the impact the Payment Provisions would have independent of the Underwriting Provisions. Further, The Bureau is only required to consider "important aspect[s] of the problem" before it. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It is "not required to consider every single possible cost." *STG LLC*, 147 Fed. Cl. at 809. The Associations have failed to show that either of the issues the Bureau supposedly overlooked—the likelihood a loan would enter collections sooner or that customers might incur additional accrued interest because of the Payment Provisions—are so important as to render the entire cost-benefit analysis defective. The Bureau is entitled to summary judgment on this issue.

### 4. Bureau appropriately denied Advance Financial's rulemaking petition

The Bureau contends that, as a matter of law, it was not unreasonable to deny a Petition for Rulemaking submitted by Advance Financial. The petition asked the Bureau to create a new rule to exempt debit- and prepaid-card payments from the restrictions of the Payment Provisions.

Just as it was not arbitrary and capricious for the Bureau to initially refuse to exempt those payment methods from the Payment Provisions, it was not arbitrary and capricious to decline to do so via a new rule. Further, the Supreme Court has held that an agency's refusal to promulgate

a rule is subject only to "extremely limited and highly deferential" review. *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007). On this issue, too, the Bureau is entitled to summary judgment.

### 5. No remaining constitutional problem with the Bureau's structure

The Bureau contends it is entitled to summary judgment on the issue of whether its current structure and function violates the Constitution's Separation of Powers Doctrine and Appropriations Clause. The Associations contend that two constitutional problems remain. First, the Associations contend the Bureau violates the Appropriations clause's mandate that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. The Bureau's structure allows its director to set a budget for the Bureau up to a certain cap. *See* 12 U.S.C. § 5497(a)(1)–(2). The Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Richmond*, 496 U.S. at 424. Where, as here, a statute authorizes an agency to receive funds up to a certain cap, there is no Appropriations Clause issue.

Second, the Associations contend the Bureau violates the Separation of Powers Doctrine because Congress improperly vests its powers to develop regulations in the Bureau without "an intelligible principle to guide [the Bureau's] use of discretion." *See Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting). Instead, the Associations argue that by assigning the Bureau the responsibility to prevent unfair and abusive practices in an industry, Congress has merely "announce[d] vague aspirations and then assign[ed] others the responsibility of adopting legislation to reach its goals." *See id*. The court disagrees and concludes that the Bureau is vested with an "intelligible principle," so no Separation of Powers problem remains.

**6.  Bureau observed all required procedures in promulgating Payment Provisions**

Finally, the Bureau contends it is entitled to summary judgment on Count Eight of the Associations' amended complaint, which alleges that the Bureau "violated . . . procedural requirements" in promulgating the Payment Provisions.

Count Eight includes four barebones arguments: while under its previous Director, the Bureau (a) made repeated false statements, (b) allowed groups opposed to payday lending to drive the rulemaking leading to the 2017 Rule, (c) failed to comply with unnamed provisions of the Regulatory Flexibility Act, and (d) failed to give interested parties an opportunity to participate in rulemaking by creating the 2017 Rule against the wishes of many of these parties. These allegations are baseless. For instance, the Associations charge the Bureau with failing to publish a regulatory flexibility analysis. The Bureau *did* publish such an analysis. *See* 82 Fed. Reg. at 54853–70 (final regulatory flexibility analysis); 81 Fed. Reg. at 48150–66 (initial regulatory flexibility analysis). Similarly, the Associations claim the Bureau approached the rulemaking process with the preconceived intention to create the 2017 Rule and did not approach it with an open mind. But besides the Associations' failure to provide any details, the Supreme Court has rejected the "open-mindedness" requirement for the APA. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020).

The Bureau is also entitled to summary judgment on Count Eight of the Associations' Amended Complaint.

**7.  Summary**

The court concludes that the Bureau is entitled to summary judgment on each of the Associations' claims.

### c. Compliance Date

The Associations ask that, in the event the court upholds the Payment Provisions, the court restart (or, in the alternative, resume) the compliance period, so it may have sufficient time to prepare its operations for compliance with the Payment Provisions. Because the original compliance date of August 19, 2019, has passed, the Associations ask the court to stay the compliance date because it would be unfair to penalize parties that reasonably relied on the court's stay. As the Associations put it, "[b]ecause the stay was requested with 445 days left until the implementation deadline, and it was entered with 286 days remaining, any decision upholding the Payment Provisions should leave 445 days—or alternatively, 286 days—for companies to comply with those provisions." According to the Associations, the court should establish a compliance date of at least 286 days, so they receive the full intended benefit of the court's stay—the "preserv[ation] of the status quo." *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 19 (D.D.C. 2012). Further, the Associations believe the Bureau's request of a 30-day compliance period would be arbitrary and capricious in that it would suddenly reduce what was once a 21-month compliance period to one month. Finally, the Associations posit that a longer compliance period gives them time to appeal the court's decision.

In response to the Associations' arguments, the Bureau notes that the decision to stay the compliance period is discretionary and equitable. *See Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982) (discussing stays pending appeal); *Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016) (applying standards for stay pending appeal to request for stay of agency action under § 705 of the APA); *accord, e.g.*, *Bauer v. DeVos*, 325 F. Supp. 3d 74, 106 (D.D.C. 2018) (explaining that "the authority granted" under § 705 to stay rules "is equitable" (alteration omitted)). The Bureau suggests that the Associations are not entitled to an additional delay, especially because the APA

23

requires only 30 days' notice before a rule may take effect. *See* 5 U.S.C. § 553(d). Further, the Bureau contends it warned the Associations that it would seek to promptly lift the stay, so the Associations' decision to forego preparations to bring operations into compliance with the rule was a gamble. Lastly, the Bureau responds that the 2017 Rule's original 21-month compliance period contemplated the now-revoked Underwriting Provisions, without which the compliance date would have been much shorter. The Bureau asks that the court lift the stay on the compliance date within 30 days after the court enters judgment.

The court is persuaded by the Associations' arguments that they should receive the full benefit of the temporary stay and that a more substantial compliance date allows time for appeal. The court will extend the compliance-date stay for 286 days after final judgment.

## IV.    CONCLUSION

Having determined the foregoing, the court renders the following orders:

**IT IS ORDERED** that the Associations' Motion for Summary Judgment (Dkt. No. 80) is **DENIED**.

**IT IS FURTHER ORDERED** that the Bureau's Cross-Motion for Summary Judgment (Dkt. No. 82) is **GRANTED**, and the Associations shall **TAKE NOTHING** by their claims against the Bureau.

**IT IS FINALLY ORDERED** that the August 19, 2019 compliance date of the 2017 Rule is **STAYED** until 286 days after the date of this order, at which time the stay will expire.

SIGNED this *31st* day of August, 2021.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE